Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF MAINE
 3
 4                      Civil Action
                   Docket No.: 1:24-CV-00072-LEW
 5
    JJM, LLC,
 6          Plaintiff
 7              vs.
 8   THE ABANDONED AND SUBMERGED
     VESSEL, DELHI, her engines,
 9   boilers, tackle,
     appurtenances, cargo, and
10   her other equipment, etc.,
11   in rem,
                  Defendant
12
13   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
14                   DEPOSITION OF
15                   RICHARD SIMON
16                  August 29, 2025
17                    8:58 a.m.
18        RHODE ISLAND OFFICE OF ATTORNEY GENERAL
                  150 South Main Street
19              Providence, Rhode Island 02903
20
21
22
23
24
25        Patricia A. Magnone, CSR, RPR, Notary Public
```

Page 2

```
 1                 APPEARANCES OF COUNSEL
 2
 3   On behalf of the Plaintiff, JJM, LLC:
 4        TWAIN BRADEN, ESQ.
          ARCHIPELAGO LAW, LLP
 5        One Dana Street, 4th Floor
          Portland, Maine 04101
 6        207.558.0102
          Tbraden@archipelagona.com
 7
 8
     On behalf of the Claimant, THE STATE OF MAINE, including
 9   THE MAINE STATE MUSEUM:
10        TIMOTHY STEIGELMAN, AAG
          LAUREN E. PARKER, AAG
11        STATE OF MAINE OFFICE OF THE ATTORNEY
          GENERAL
12        6 State House Station
          Augusta, Maine 04333
13        207.626.8509
          Timothy.steigelman@maine.gov
14        Lauren.parker@maine.gov
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                     I N D E X
 2   WITNESS: Richard Simon                      PAGE
 3   Examination by Mr. Steigelman.................  6
 4
 5                  E X H I B I T S
 6   NO.    DESCRIPTION: Defendant's             PAGE
 7   1    Notice of Deposition...................... 6
 8   2    Plaintiff's Disclosure of Expert
          Witnesses: Shoreline Diving...............11
 9
     3    Mount Desert Island Shipwreck
10        Investigation report dated 11/11/24........16
11   4    Mount Desert Island Shipwreck
          Investigation and Identification dated
12        5/23/25...................................19
13   5    State of Maine's Rule 34 Second Request
          for Production of Documents by JJM, LLC....31
14
15   6    Printout from Shoreline Diving website.....46
16   7    Affidavit of Gregory Johnston regarding
          Service of Process of Abandoned and
17        Submerged Vessel..........................55
18   8    Exhibit A to Affidavit of Service of
          Gregory Johnston, JJM, LLC................55
19   9    Three underwater photos dated 9/13/24 and
          9/14/24...................................80
20
     10   Affidavit of Justin Seavey................98
21
22   11   United States Department of the Interior,
          National Park Service, National Register
23        of Historic Places, Determination of
          Eligibility Comment Sheet................113
24   12   Annex 4 - Shipwreck Excavation Case
          Studies..................................125
25
     (original exhibits attached to original transcript)
```

Page 4

```
 1        DEPOSITION OF RICHARD SIMON
 2              August 29, 2025
 3
 4              RICHARD SIMON,
 5   Having been first duly sworn, testified as follows:
 6        THE REPORTER:  Would you state your name
 7   and spell your last name for the record.
 8        THE WITNESS:  Richard Simon, S-I-M-O-N.
 9        MR. STEIGELMAN:  Good morning.  I'm Tim
10   Steigelman, Assistant Attorney General.  I will be
11   taking the deposition today.  With me here is my
12   colleague Lauren Parker, AAG.  And just for the record,
13   this is Attorney Twain Braden, plaintiff's counsel for
14   JJM, LLC.
15        Twain, before we get rolling on the deposition,
16   we have a couple of discovery items we want to go over
17   with you if that's okay?
18        MR. BRADEN:  Sure.
19        MS. PARKER:  Thanks, Tim.  So when we did
20   JJM's 30(b)(6) deposition, which was on August 20, 2025,
21   it became clear that JJM likely has additional documents
22   that are responsive to the State of Maine's request for
23   documents dated January 31, 2025, which was asking that
24   JJM produce all documents related to the Delhi.  These
25   records, as I understand it from JJM, include financial
```



RICHARD SIMON                                           August 29, 2025
JJM vs ADV

Page 5

1  records, research records, sonar data, and possibly
2  agreements with Justin Seavey and Joe Coffey.  JJM said
3  that they would provide those documents to us by Monday,
4  August 25, 2025.  And so we just want to let you know
5  that we still are waiting for those documents.
6         MR. BRADEN:  So if they're responsive to
7  your initial discovery request, and they acknowledged --
8  as you know, I wasn't there.
9         MS. PARKER:  Correct.
10        MR. BRADEN:  They acknowledged on the
11  record that there were additional documents that were
12  responsive to your original requests, and that they
13  would provide them by Monday, and you still haven't
14  gotten them?
15        MS. PARKER:  Yes.
16        MR. BRADEN:  Okay.  That's the state of
17  affairs.  And do I need to know anything more than you
18  just told me about that in order to see if I can smoke
19  them out?
20        MS. PARKER:  I don't think so.  We bring
21  this up just because, since we didn't have the documents
22  at the time, we had to leave the deposition open.
23        MR. BRADEN:  Their depositions, the --
24        MS. PARKER:  The 30(b)(6) deposition for
25  JJM.  Yes.

Page 6

1         MR. BRADEN:  Okay.  And did they share
2  that role, Mike and Greg, the 30(b)(6) role, or did one
3  of them stand in as the company rep?
4         MS. PARKER:  Greg was the primary 30(b)(6)
5  designee.  There were a couple of topics, so Mike
6  supplemented at the end as the 30(b)(6) designee, but
7  that was very limited.
8         MR. BRADEN:  All right.  That's helpful.
9  Thanks.  No promises, because I don't know anything
10  about it until now so, but I will see what I can do.
11        MS. PARKER:  Thank you.
12        MR. STEIGELMAN:  Appreciate it.
13        EXHIBIT 1 (Defendant's Exhibit marked for
14  ID)
15        EXAMINATION BY MR. STEIGELMAN
16     Q.  The first exhibit, I have a notice of
17  deposition which I've marked as Exhibit 1.  Mr. Simon,
18  have you seen this before?
19     A.  I have.
20     Q.  Okay.  And you agree that's why we are here
21  today, for your deposition?
22     A.  Yes.
23     Q.  Wonderful.  Have you ever had your deposition
24  taken before?
25     A.  Yes.

Page 7

1      Q.  How many times?
2      A.  Once before.
3      Q.  For what?
4      A.  Lawsuit I was involved in.
5      Q.  What was the lawsuit about?
6      A.  A prop on a ship that fell off.
7      Q.  A prop, so meaning a propeller?
8      A.  Propeller.
9      Q.  What caused the prop to fall off?
10     A.  We do not know.  It ended up settling out of
11  court.
12     Q.  You were deposed.  Did that go to trial, or
13  just --
14     A.  No.
15     Q.  But no other depositions?
16     A.  None.
17     Q.  So you're familiar with how this works
18  generally?
19     A.  Generally.
20        MR. STEIGELMAN:  All right.  I will be
21  asking questions, and I hope you will be answering them.
22  And you're doing a good job so far listening to
23  questions and waiting for the question to end.  Am I
24  making sense so far?
25        THE WITNESS:  Yes.

Page 8

1         MR. STEIGELMAN:  And you're familiar with
2  how objections work at depositions?
3         THE WITNESS:  Yes.
4         MR. STEIGELMAN:  So we need a clear
5  question and answer.  So if there is a nod of the head,
6  I will prompt you to please verbalize your answer so
7  that Pat here can get it on the record, okay?
8         THE WITNESS:  Yes, sir.
9         MR. STEIGELMAN:  Great.  Thank you.  The
10  other thing, and I'm going to try really hard to do
11  this, as well, is if we start talking over each other,
12  it makes it hard for Pat, which you might do at a coffee
13  shop or at a bar, but at this table, it's really hard
14  for Pat to sort of break that up, if that makes sense.
15        THE WITNESS:  Yes.
16     Q.  Okay.  How did you prepare for your deposition
17  today, please?
18     A.  I reread our report and the State's expert
19  report.
20     Q.  Did you meet with anyone or talk with anyone?
21     A.  I had a conversation with Twain.
22     Q.  When was that conversation?
23     A.  I'm not exactly sure.  Sometime this week.
24     Q.  Was it in person, or by phone, or Zoom, or
25  what?



RICHARD SIMON                                                          August 29, 2025
JJM vs ADV

Page 9

1    A. Zoom.
2    Q. How long was that conversation?
3    A. 45 minutes.
4    Q. What did you talk about?
5    A. How to answer questions, basically, answer them
6  fully, clearly, yes or no. Talked about our deposition.
7    Q. What else did Attorney Braden instruct you to
8  how you might answer?
9    A. That's it. Just clearly, concisely.
10   Q. Accurately, I hope?
11   A. Accurately.
12   Q. Great. Okay. And so you're familiar with
13 Attorney Braden; right?
14   A. Yes.
15   Q. And you're also familiar with Attorney Ben
16 Ford?
17   A. Yes.
18   Q. And how about Attorney Grayson Szczepaniak?
19   A. Yes.
20   Q. Jointly, they are the three lawyers for JJM in
21 this matter; right?
22   A. I'm not a hundred percent sure on that.
23   Q. So other than your discussion earlier this week
24 with Attorney Braden, how many other times have you
25 spoken with Plaintiff's lawyers?

Page 10

1    A. I couldn't accurately answer that. More than
2  once, we have gone back and forth.
3    Q. Okay, that's helpful. More than once. Do you
4  think it was more than 20 times?
5    A. Again, I couldn't accurately tell you an exact
6  number.
7    Q. Other than the one this past week prepping for
8  deposition, when is the next most recent time you spoke
9  with one of JJM's lawyers, please?
10   A. Probably setting up our Zoom meeting.
11   Q. Do you have a clear recollection of the last
12 time JJM's lawyers gave you advice or discussed the case
13 with you?
14   A. I do not.
15   Q. Are you clearheaded and sober this morning?
16   A. Yes.
17   Q. Are you currently taking any mind-altering
18 medications?
19   A. No.
20   Q. Is there any reason you cannot give accurate
21 testimony today?
22   A. No.
23   Q. Okay. Your role in this matter is as an expert
24 witness; right?
25   A. Correct.

Page 11

1    Q. Do you agree that, in that role, you are to
2  provide an honest opinion?
3    A. Yes.
4    Q. And you would agree with me that you should
5  give your honest, unbiased opinion, even if that honest
6  opinion might not help JJM in this lawsuit; right?
7    A. Yes.
8    Q. And the reason for that is that, if you were a
9  biased expert, if you did not give your honest opinion,
10 that wouldn't be helpful to the court in determining the
11 truth; correct?
12   A. Correct.
13       MR. STEIGELMAN: All right. I'm going to
14 hand you a document that I'm going to mark as Exhibit 2.
15       EXHIBIT 2 (Defendant's Exhibit marked for
16 ID)
17   Q. Have you ever seen this document before? I'm
18 sorry. Take a moment to review it first, and let me
19 know when we can talk about it. Sorry.
20       (Witness perusing document)
21   A. Yes, I have seen this before.
22   Q. Okay. And this is the plaintiff's expert
23 disclosure; is that correct?
24   A. Correct.
25   Q. And you would agree with me that you are one of

Page 12

1  the two designated experts in this designation; correct?
2    A. Yes.
3    Q. Okay. I'm going to step through this document
4  here, Exhibit 2, the expert designation, okay?
5    A. Yes.
6    Q. At the bottom of the first page, sort of the
7  bottom left corner there, see where it says, under the
8  rule citation with all those parentheses, it says
9  "Statement of all opinions"; do you see that?
10   A. Yes.
11   Q. Let's just go through each of these one at a
12 time here. So do you see Opinion Number 1?
13   A. Yes.
14   Q. I'm going to read it out loud and just have you
15 follow along, okay? What I see is, Number 1, "The
16 expert report provided by the State of Maine is mistaken
17 in its conclusions regarding the historical significance
18 of the submerged wreck." Did I read that correctly?
19   A. Correct.
20   Q. Is that statement your accurate opinion?
21   A. Yes.
22   Q. Okay. Let's go to Number 2, please. Again,
23 bottom of page 1, Exhibit 2, it says, "The expert report
24 filed by the State of Maine is mistaken in its
25 conclusions regarding the status of the wreck as



RICHARD SIMON                                                    August 29, 2025
JJM vs ADV

Page 13

1  embedded, both in fact and as that term is or may
2  otherwise be defined under the law," end of quote.  Did
3  I read that correctly?
4      A.  Yes.
5      Q.  Is that statement, Opinion Number 2, your
6  accurate expert opinion?
7      A.  Yes.
8      Q.  So flip the page, now top of page 2 of
9  Exhibit 2, your expert designation, do you see Opinion
10  Number 3 at the top of the page?
11      A.  Yes.
12      Q.  I'm going to read Opinion 3.  "Mr. Simon and
13  Captain Takakjian may, after further research and
14  inspection of the vessel, disagree with the State's
15  opinion as to the identity of the wreck," end of quote.
16  Did I read that correctly for Opinion 3?
17      A.  Yes.
18      Q.  As we sit here today, is that Opinion 3 still
19  an accurate statement of your expert opinion?
20      A.  I would say that we would agree that the wreck
21  is the Delhi, if that is the question you're asking.
22      Q.  You're a couple steps ahead of me, but I think
23  I understand where you're going.  So flip one page, you
24  will see this expert opinion, this expert designation is
25  dated February 27th of this year; right?

Page 14

1      A.  Correct.
2      Q.  And so since February, you have now come to
3  believe it is the Delhi; correct?
4      A.  Correct.
5      Q.  So would you agree with me, then, that this
6  Opinion 3 is no longer an accurate opinion?
7      A.  Correct.
8      Q.  Thank you.  Let's go to Number 4.  And again,
9  Exhibit 2, Opinion Number 4, top of page 2.  Quote, The
10  wreck is not historically significant and not likely
11  eligible for listing on the National Register of
12  Historic Places or, in the alternative, that the
13  possible designation on the register, taken alone, is
14  not sufficient basis for excluding or denying
15  Plaintiff's claims against the wreck, period, end of
16  quote.  Did I read that correctly?
17      A.  Yes.
18      Q.  And sitting here today, is that still an
19  accurate statement of your expert opinion?
20      A.  Yes.
21      Q.  Let's go to the next one here, Opinion Number
22  5.  Quote, After a dive on the site and further
23  research, Mr. Simon and Captain Takakjian may express an
24  opinion that the wreck is not embedded, both in fact and
25  as that term is or may otherwise be defined under the

Page 15

1  law, end of quote.  Did I read that correctly?
2      A.  You did.
3      Q.  And as you sit here today, is that Opinion
4  Number 5 an accurate statement of your expert opinion?
5      A.  Yes.
6      Q.  And let's go to Number 6, please, the last of
7  the listed opinions, just above the middle of page 2.
8  Quote, The potential for damage to the integrity of the
9  wreck site, cargo, and artifacts should the court unseal
10  the name of the wreck, period, end of quote.  Did I read
11  that correctly?
12      A.  Correct.
13      Q.  And as you sit here today, is that Opinion
14  Number 6 still an accurate expert opinion you hold?
15      A.  Yes.
16      Q.  Do you have any other expert opinions relevant
17  to this lawsuit, other than those five or six we just
18  went through?
19      A.  No.
20      Q.  Okay.  Let's go down to the next section here.
21  And again, see on the left, it has the rule citation,
22  all the parentheses, and then facts or data considered
23  by the witness; do you see that?
24      A.  Yes.
25      Q.  And I'm going to go through each of these five

Page 16

1  categories here.  Actually, we're not going to go
2  through each of them.  Let me just ask, the Number 1 is
3  the State's expert report; right?
4      A.  Yes.
5      Q.  I'm going to hand this out now, just because
6  we're going to be talking about it quite a bit today.
7  It's a copy.  I'm marking as Exhibit 3 a document here.
8          EXHIBIT 3 (Defendant's Exhibit marked for
9  ID)
10      Q.  Have you ever seen this document before?
11      A.  Yes.
12      Q.  Is this the expert report that you referred to
13  as your first source listed on your facts or data in
14  this designation?
15      A.  Yes.
16      Q.  Thank you.  So you have reviewed the State's
17  report, Exhibit 3, before?
18      A.  Correct.
19      Q.  Did you review the references that the State's
20  expert refers to in this report?
21      A.  Are you referring to the ROV footage?
22      Q.  We can start with that.  That's fine.
23      A.  What specifically are you referring to?
24      Q.  Fair enough.  Did you review any of the ROV
25  video that's referenced in the State's expert report?



Page 17

1     A.  Yes.
2     Q.  Did you review all of the ROV video referenced
3  in the State's expert report?
4     A.  I would believe so.  Everything that was
5  provided to me.
6     Q.  And approximately how many hours of video do
7  you think that was?
8     A.  I couldn't accurately answer that off the top
9  of my head.
10     Q.  How long did it take you; like a day, three
11  days, a week?
12     A.  Probably a full two days going through
13  everything.
14     Q.  Other than the ROV video, did you review any of
15  the other references in the State's expert report?
16     A.  Without reading and looking and refreshing my
17  memory, I couldn't accurately answer that.
18     Q.  Do you have a memory of looking at any listed
19  references and then going and pulling that reference to
20  compare it with the report?
21     A.  Yes.
22     Q.  Okay.  How many times do you think you did
23  that?
24     A.  Again, I couldn't exactly tell you.  As I was
25  reading, if they referenced something, I pulled up the

Page 18

1  referenced material.
2     Q.  Every time?
3     A.  Not every time, but if it was something I
4  didn't know or understand what they were saying.
5     Q.  Okay.  And going back to Exhibit 2, the expert
6  designation, we already talked about the State's expert
7  report, Number 1.  And then I see 2 through 5 that are
8  listed down here as other facts or data; is that right?
9     A.  Correct.
10     Q.  And sitting here today, are there any other
11  facts or data upon which you relied in this matter,
12  other than what's listed here?
13     A.  No.
14     Q.  Thank you.  Let's go to the next section here,
15  Exhibit 2, towards the bottom of page 2, "Exhibits used
16  to summarize or support conclusions"; do you see that?
17     A.  Yes.
18     Q.  And there's only a single Number 1, a single
19  enumerated paragraph; right?
20     A.  Correct.
21     Q.  And I'm just going to paraphrase it.  This
22  refers to a report that it says Shoreline Diving will
23  produce; right?
24     A.  Correct.
25     Q.  And you completed that report; right?

Page 19

1     A.  Correct.
2          EXHIBIT 4 (Defendant's Exhibit marked for
3  ID)
4     Q.  And I just marked Exhibit 4, a document called
5  Mount Desert Island Shipwreck Investigation and
6  Identification.  Do you see that?
7     A.  Yes.
8     Q.  In the top left corner -- well, let me ask you,
9  what is that image in the top left corner of the first
10  page?
11     A.  My company logo.
12     Q.  And what is the name of that company?
13     A.  Shoreline Diving.
14     Q.  This report, the Shoreline Diving report,
15  there's an image on the front page; right?
16     A.  Correct.
17     Q.  And then the date of May 23, 2025?
18     A.  Correct.
19     Q.  So this May 23, 2025, report, is that the
20  report that you reference -- sorry -- that is referenced
21  in Exhibit 2, the expert designation, as the report that
22  Shoreline Diving will complete?
23     A.  Yes.
24     Q.  Same report?
25     A.  Same report.

Page 20

1     Q.  Okay.  Let's go to the next section here.  The
2  last major section, not the footnote in Exhibit 2, page
3  2, but the section above that, "Witness Qualifications";
4  do you see that?
5     A.  Correct.
6     Q.  And this Number 1 talks about both you and
7  Captain Takakjian's experience as commercial and
8  technical wreck divers; correct?
9     A.  Correct.
10     Q.  And then on the next page, top of page 3 of
11  Exhibit 2, it talks about both you and Captain
12  Takakjian's experience with historic wrecks off New
13  England; right?
14     A.  Correct.
15     Q.  And then more discussion about working with
16  museums, marine archaeologists on certain wrecks, Number
17  3; right?
18     A.  Correct.
19     Q.  And then Number 4 says, the experts -- sorry,
20  this is not a direct quote, but that you will supplement
21  with additional publications; right?
22     A.  Correct.
23     Q.  Let me ask, going back to the bottom of page 2,
24  Exhibit 2, the witness qualifications, the end of that
25  first Paragraph 1, where it talks about special training



RICHARD SIMON                                                    August 29, 2025
JJM vs ADV

Page 21

1  and experience on historic preservation; do you see
2  that?
3     A. Correct.
4     Q. Tell me about your training and experience on
5  historic preservation, please.
6     A. So I will say that's more of Eric's expertise.
7  I have worked on a lot of historic shipwreck discoveries
8  for both the State and on our own in projects.
9     Q. And so let me start with you. What has your
10  role been in those historic shipwreck matters?
11    A. So it really depends on the circumstances. We
12  have gone out and looked for research and found them on
13  our own and then reported them. We give a lot of
14  presentations. We have also, I have surveyed shipwrecks
15  with Key Biscayne National Park. So it's a very wide
16  range of activities.
17    Q. And so when you have searched for shipwrecks
18  and reported them, what did that entail?
19    A. Again, you start with research. You know, we
20  know about a wreck, so you start in the archives looking
21  up where the wreck could be. Then it's either side-scan
22  data or another form to identify where it's located.
23  And then identifying the shipwreck, and then writing a
24  paper and putting it out, what we found.
25    Q. And what was your work in Key Biscayne about?

Page 22

1     A. We were surveying shipwrecks for the National
2  Park Service, just what was there. Nothing crazy. That
3  was a couple years ago.
4     Q. Okay. And so the last two words of this
5  Paragraph 1, historic preservation, is that work that
6  you did, or is that more what the captain was working
7  on?
8     A. That's more of what Eric works on.
9     Q. Okay. Let's go to the next page here, back to
10  page 3 of Exhibit 2. And, again, this is the expert
11  qualifications; right?
12    A. Yes.
13    Q. Do you see Paragraph 2, and how it mentions the
14  Britannic and the Titanic?
15    A. Yes.
16    Q. How much of this wreck exploration was yours,
17  and how much of it was Captain Takakjian's?
18    A. Captain Eric, to my knowledge, has not been to
19  Britannic. That was an expedition I was on.
20    Q. So is the discovery of the Britannic's ship
21  bell, that was your work; correct?
22    A. Mainly Joe Mazraani and my work. Another diver
23  and I were working on that together.
24    Q. What was your role in that expedition, please?
25    A. The expedition, we were there with Drain the

Page 23

1  Oceans, a TV production, to document the shipwreck. And
2  one of our goals was to see -- there was always a story
3  of whether the bell was there or not, if it was taken by
4  Cousteau. And we identified and found the bell. And
5  since then, it's been recovered.
6     Q. By whom?
7     A. The owner of the shipwreck, Simon Mills.
8     Q. Okay. Let's go to the next one, Number 3 here,
9  talking about you and Captain Takakjian working with
10  historians, museums, and marine archeologists. How much
11  of that sort of work have you done, please?
12    A. So I have, the most recent one would be I found
13  submarine Defender in Long Island Sound. And I have
14  worked with the state archaeologist after we found that,
15  trying to figure out what to do with it. That's
16  probably the most recent one that comes to mind.
17    Q. Who was the state archaeologist you worked
18  with?
19    A. It's a woman from UConn. I would have to look
20  up her name.
21    Q. UConn, meaning the University of Connecticut?
22    A. Yes. That's where she's out of.
23    Q. So there was a state archeologist that was
24  doing the archaeological work?
25    A. We were providing her with the data from the

Page 24

1  wreck after we found it. And we were kind of trying to
2  figure out what to do with it now.
3     Q. And how did that resolve, what happened?
4     A. It hasn't. We're still in the process.
5  Nothing moves fast.
6     Q. Do you know what the possible outcomes might
7  be?
8     A. No. We're trying to figure out what might be
9  the best course for this.
10    Q. What is the wreck?
11    A. The submarine Defender.
12    Q. Do you know who the owner is?
13    A. Of the wreck? Right now I would say it's
14  abandoned.
15    Q. Is that your opinion of abandonment, or is
16  there some determination somewhere that it's
17  abandonment?
18    A. It's been lost, and I'm the only one who found
19  it, and I am the only one who knows where it is. So,
20  since 1942.
21    Q. Okay. Is there any other archeological work
22  that you have done, other than the Defender or the TV
23  show work on the Britannic, anything else come to mind?
24    A. Friends of mine hold arrests on numerous
25  shipwrecks that we work, salvage, recover artifacts to



RICHARD SIMON
JJM vs ADV

August 29, 2025

Page 25

1  preserve, to put in shows and private museums and
2  museums in New Jersey.
3     Q.  About how many wrecks do you think that is
4  total?
5     A.  I'm thinking of two in particular right now
6  that were in the last year we have been working on.
7     Q.  Which wrecks?
8     A.  The Carolina, and then the Andrea Doria.
9     Q.  What is your role?  Let's do the Carolina, so
10  is that a long E?
11     A.  It's spelled Carolina, but it's from Puerto
12  Rico, so it's pronounced "Carolina."  But it's spelled
13  Carolina.
14     Q.  So the Carolina, I thought I heard you say that
15  your friends have these arrests?
16     A.  Correct.  Their company, if you will.
17     Q.  So what is your role in your friend's company's
18  arrest of Carolina, please?
19     A.  So as divers researching, trying to figure out
20  where objects would be, what they are.  Identification.
21     Q.  And who is the archaeologist that you're
22  working with for the Carolina?
23     A.  There is no archeologist.
24     Q.  How about the Andrea Doria, what is your role
25  with the friend's company's arrest of the Andrea Doria,

Page 26

1  please?
2     A.  Again, it's the same.  As divers recovering and
3  researching the wreck.
4     Q.  And there's no archaeologist involved in the
5  Andrea Doria; is that correct?
6     A.  Correct.
7     Q.  And then we're looking at Number 4 here on the
8  top of page 3, Exhibit 2, it says the witnesses, meaning
9  the experts, including you, will supplement with a list
10  of publications?
11     A.  Correct.
12     Q.  When I look at Exhibit 4, please, your expert
13  report, if you can flip to page 4, please?
14     A.  Yes.
15     Q.  That's your bio at the top of page 4; right?
16     A.  Yes.
17     Q.  And I see your reference at the end of it, too,
18  to Defender, which we already talked about; right?
19     A.  Correct.
20     Q.  And the Andrea Doria.  And we haven't talked
21  about Lusitania yet.  Before we get to the Lusitania,
22  let me ask, I don't see any publications listed here in
23  your expert designation -- sorry -- in your report?
24     A.  Correct.
25     Q.  Earlier this morning, you mentioned that you

Page 27

1  would occasionally write up reports after dives?
2     A.  Yes.  So most of what we put out is for, like,
3  magazines and end consumer, not scientific reports.  So
4  we do, like, presentations, things like that.
5     Q.  And what kinds of magazines?
6     A.  We have had stuff in Wreck Diver magazine, some
7  local newspaper reports.
8     Q.  Let me just ask, it's more or less random, ever
9  been published in Scientific American?
10     A.  No.
11     Q.  Ever been published in National Geographic?
12     A.  No.
13     Q.  Any other popular periodicals come to mind that
14  you have been published in?
15     A.  No.  I mean, Hartford Courant, newspapers.
16  Just to clarify, we've been on Nat Geo TV, if that
17  counts, but not in the magazine.
18     Q.  Nat Geo TV, was that Drain the Oceans, or was
19  that a different project?
20     A.  Drain the Oceans.
21     Q.  How many times on that show?
22     A.  Just on the Britannic special.
23     Q.  Okay.  So would you agree with me, for purposes
24  of your, we're going to talk about two documents here at
25  the same time, right, your expert designation says, will

Page 28

1  supplement with publications; right?
2     A.  Yes.
3     Q.  And then your report doesn't have any
4  publications listed; right?
5     A.  Under me.  Correct.
6     Q.  And I see there are some for Captain Takakjian,
7  but right now I'm talking about you, okay?
8     A.  Correct.
9     Q.  So tell me about your work on the Lusitania,
10  please.
11     A.  We were there in 2019 on a project to further
12  document the wreck with the same group of divers that we
13  were on Britannic with.
14     Q.  And how long did the expedition last?
15     A.  I don't remember.  We were there for two weeks.
16  I think we did eight dives to the site.
17     Q.  Were you working with an archaeologist as part
18  of that expedition?
19     A.  No.  We were working with the receiver of the
20  wreck, which is a UK thing.
21     Q.  Is that part of the British government?
22     A.  Yes.  Under permit.
23     Q.  Let's go on to the next section here of the
24  expert designation, I'm back in Exhibit 2 on page 3.
25  There should be, you will see the signature box at the



RICHARD SIMON                                          August 29, 2025
JJM vs ADV

Page 29

1  bottom of it?
2      A. Yes.
3      Q. The second-to-last section, do you see the
4  second-to-last section there, list of cases?
5      A. Correct.
6      Q. And here it says, list of cases in the last 4
7  years, it says "none"; correct?
8      A. Correct.
9      Q. Didn't you tell me about some deposition you
10  recently had?
11      A. That was because I was, my company was being
12  sued over a prop that fell off on a ship.
13      Q. So in that case, you were testifying as a
14  party, not as an expert; correct?
15      A. Correct.
16      Q. And were you designated in any sort of expert
17  capacity in that case?
18      A. No.
19      Q. What was the name of the case, please?
20      A. Couldn't tell you. It was Shoreline Diving
21  versus -- I couldn't even tell you off the top of my
22  head. It was a couple years ago.
23      Q. What is your best estimate of how long ago it
24  was?
25      A. Five years ago. And it was in the State of

Page 30

1  Connecticut.
2      Q. Connecticut state court?
3      A. I do not know that to be fact.
4      Q. So in Connecticut, but it could be state or
5  federal court?
6      A. Could be state or federal.
7      Q. Okay. Let's go to the next section, again,
8  Exhibit 2, your expert designation. I keep saying
9  "your." It's the Plaintiff's expert designation, but
10  you're in it. So I know it's not yours personally. So
11  I'm sorry if it's confusing.
12      A. Correct.
13      Q. You see where it says "statement of
14  compensation"?
15      A. Correct.
16      Q. And then it talks about an estimate of a
17  charge, about $7,850; right?
18      A. Correct.
19      Q. And then an hourly rate to be determined for
20  additional research time; do you see that?
21      A. Correct.
22      Q. To the best of your knowledge, was your hourly
23  rate disclosed in your report?
24      A. I do not know, to be honest.
25      Q. I don't think it was. I'm sorry, I missed it.

Page 31

1  What was your testimony, it is or it isn't?
2      A. I do not know off the top of my head. I don't
3  believe it is.
4          MR. STEIGELMAN: Actually, let's go to the
5  next document here.
6          EXHIBIT 5 (Defendant's Exhibit marked for
7  ID)
8      Q. Please take a look at Exhibit 5 and let me know
9  when you're ready to talk about it.
10          (Witness perusing document)
11      Q. Have you had a chance to look at Exhibit 5?
12      A. Yes.
13      Q. The State of Maine's Rule 34 second request for
14  production of documents; right?
15      A. Correct.
16      Q. Have you ever seen this document before?
17      A. I don't believe so.
18      Q. If you can flip to the second page, do you see
19  the "Document Requests" header right in the middle of
20  the page?
21      A. Correct.
22      Q. And it says, "The entire expert file from each
23  and every of Plaintiff's experts"; right?
24      A. Correct.
25      Q. Have you turned over your expert file to JJM's

Page 32

1  lawyers in this matter?
2      A. Everything that we have, yes.
3      Q. When did you do that, please?
4      A. Twain and I talked, and he asked if there was
5  anything that he didn't have that we needed to send
6  over. And there was nothing else that we needed to send
7  over.
8      Q. And when did you have that conversation,
9  please?
10      A. I couldn't recall the -- a couple weeks ago.
11          MR. STEIGELMAN: Okay. Twain, we still
12  haven't seen any response to this, we haven't seen any
13  documents. We're going to have to keep the deposition
14  open because I don't have any expert file to examine the
15  experts on.
16          MR. BRADEN: So when I got Lauren's
17  e-mail, I asked Rick Simon if there was anything further
18  responsive to it, and he said, "Whatever I have given to
19  you has already been turned over." And I turned it
20  over, so if there was nothing responsive, if you want me
21  to send you an e-mail in response to that, I'm happy to
22  do it.
23      Everything he got, he gave to me. Everything I
24  got, I gave to you. What else would you like?
25          MR. STEIGELMAN: I think the rules require



RICHARD SIMON                                                    August 29, 2025
JJM vs ADV

Page 33

1  a written response to discovery, which we still haven't
2  gotten since July 21st when the request went out.
3          MR. BRADEN:  Sure.  I will do that.
4          MR. STEIGELMAN:  So I will look forward to
5  a written discovery response.
6          MR. BRADEN:  Sure.
7     Q.  Mr. Simon, have you or your company received
8  any money for your work in this case?
9     A.  I believe, off the top of my head, the only
10  thing we have received, and it mentions, which was the
11  cost for the report and diving, which is listed, the
12  amount of 7,850.
13     Q.  Did you invoice JJM or JJM's lawyers for that
14  work?
15     A.  I believe we invoiced JJM directly.
16          MR. STEIGELMAN:  Well, Twain, I think I
17  should be getting an invoice in discovery.
18          MR. BRADEN:  You got it.  I will put a
19  star on that and make sure you get their invoice.
20     Q.  Mr. Simon, how did you normally communicate
21  with Attorney Braden, or any of JJM's lawyers?
22     A.  Most of the time, phone call, because I'm not
23  very good at returning e-mails.  I'm easy to get on the
24  phone, I'm not very good at e-mailing back.
25     Q.  You said returning e-mails.  Does that mean you

Page 34

1  would, from time to time, receive e-mails from JJM's
2  lawyers?
3     A.  I mean, Twain would e-mail me, like, this
4  stuff, or when I sent him over the report, that stuff
5  was done via e-mail.  But, like, scheduling stuff was
6  mostly done over the phone.
7     Q.  And how many e-mails, just your best estimate,
8  do you think you received from Twain or any of JJM's
9  lawyers over the course of this case?
10     A.  I couldn't even tell you.  A few.
11     Q.  More than one?
12     A.  More than one.  Correct.
13     Q.  Probably not more than 25?
14     A.  Again, I can't give you an accurate number.
15     Q.  Okay.  And have you collected the $7,850 that
16  was estimated?
17     A.  Yes.
18     Q.  What is your hourly rate in this case?
19     A.  Couldn't even tell you off the top of my head.
20  I would have to look that up.  I couldn't answer that
21  question off the top of my head.
22     Q.  I'm going to read you the last sentence of the
23  statement of compensation from the expert designation,
24  okay?
25     A.  Yes.

Page 35

1     Q.  "It," referring to Shoreline Diving, "It will
2  also charge an hourly rate to be determined for any
3  additional research time and testimony as may be
4  required."  Did I read that correctly?
5     A.  Yes.
6     Q.  Have you determined what your hourly rate is
7  going to be?
8     A.  I'm sure I have.  We have different hourly
9  rates.  I own a company for diving, so we have different
10  hourly rates for different things.  So I couldn't tell
11  you what it is off the top of my head.
12     Q.  So as you're sitting here today, how much do
13  you expect to charge JJM's lawyers for your work today?
14     A.  Probably $75 an hour, plus expenses, would be
15  my guess is what we're charging.
16     Q.  And have you communicated that with JJM's
17  lawyers?
18     A.  I believe so, but again, I couldn't tell you
19  off the top of my head.
20     Q.  And to your best recollection, do you remember
21  if that was in writing, or was it a phone call?
22     A.  Again, I couldn't answer that off the top of my
23  head.
24     Q.  And so just to be clear, the first time the
25  State's aware of what your hourly rate is is when we're

Page 36

1  sitting here in the deposition room with you; correct?
2     A.  I can't answer that question.
3     Q.  Okay.  How else might we have known, other than
4  if it was listed here in the designation?
5     A.  I'm not a lawyer, I can't answer that question.
6          MR. BRADEN:  So, Tim, just so you know --
7  we can have this on the record or not -- I asked him to
8  send me an invoice for travel here, attendance here.  I
9  didn't know about the hourly rate that I will send to
10  you for you guys to cover for his rate.  So we had that
11  conversation on the steps.
12          MR. STEIGELMAN:  Expenses are part of the
13  deposition.  I'm not worried about the payment part.
14  That's part of the game.  What I'm concerned about is
15  the lack of documents, and I can't cross him on
16  documents I don't have, so I'm going to have to keep the
17  deposition open.
18          MR. BRADEN:  You can put whatever you like
19  on the record.
20     Q.  Okay.  How did you receive payment from JJM or
21  its attorneys, please?
22     A.  I believe it was a check.
23     Q.  So there should be a copy of that check
24  somewhere in the universe; right?
25     A.  Yes.  If it was a check, I could probably pull



RICHARD SIMON                                                August 29, 2025
JJM vs ADV

Page 37

1    a bank record for it.
2         MR. STEIGELMAN:  Okay.  Sounds like
3    another record.
4         MR. BRADEN:  I wrote it down.
5    Q.   What is your educational background, please,
6    Mr. Simon?
7    A.   Can you ask the question more specifically?  As
8    far as diving goes?  What education?
9    Q.   Sure.  Did you graduate high school?
10   A.   Yes.
11   Q.   Where?
12   A.   E.O. Smith High School.
13   Q.   Where is that?
14   A.   Storrs, Connecticut.
15   Q.   And did you graduate college?
16   A.   No.
17   Q.   Did you attend any college?
18   A.   Yes.
19   Q.   Where?
20   A.   I first went to Manchester Community College in
21   Manchester, Connecticut, and then Eastern State
22   University, or Eastern Connecticut State University,
23   ECSU, which is in Windham [sic], Connecticut.
24   Q.   While you were enrolled in college, what, if
25   anything, was your focus or major?

Page 38

1    A.   My original focus before I, I looked at going
2    to East Carolina for underwater archaeology, and then I
3    changed, decided to stay local because I started a
4    business and went to Manchester Community College while
5    working, and then to Eastern with business and
6    communication.
7    Q.   Okay.  Do you hold any professional or academic
8    certifications?
9    A.   Professional, yes.
10   Q.   What are they, please?
11   A.   I probably won't list them all, but can I list
12   the major ones in diving and not all of them?
13   Q.   What do you believe are the most pertinent ones
14   that you remember?
15   A.   So I'm a dive instructor.  I'm a United States
16   licensed captain.  I can teach diving on shipwrecks and
17   numerous other forms of diving.  I'm a commercial diver.
18   I'm just going through in my mind.  I mean, little
19   things that probably don't matter, but like UT readings
20   for ultrasonic thickness.
21        Lots of little diving certifications like that
22   for what we do for a living.
23   Q.   Do you have any academic background with
24   archaeology?
25   A.   I do not have a college degree.  I have a lot

Page 39

1    of, I have done lots of reading and educating myself on
2    the topic.
3    Q.   You said you are a licensed captain.  What
4    kind?
5    A.   I am a 50-ton -- not -- Twain, sorry, I'm bad
6    with this.  Not a near coastal, what is the other one?
7         MR. BRADEN:  I can't answer.
8    Q.   Is it open ocean?
9    A.   It's to like 200 miles, whatever that...
10   Q.   Okay.  In your understanding, what do you
11   believe your captain licensure allows you to do?
12   A.   Again, I'm, an inspected vessel up to 50-gross
13   tons.
14   Q.   And you said, up to 200 nautical miles?
15   A.   I believe that's what it is, but I'm not --
16   it's not all oceans.  It's near coastal.  I believe
17   that's what the designation is.
18   Q.   Thank you.  Okay.  And your professional
19   background, how many years -- let me back up.  Are you a
20   technical and wreck diver, is that an accurate
21   explanation?
22   A.   Yes.
23   Q.   And how many years have you been doing that,
24   please?
25   A.   I probably got my first certification in 2005

Page 40

1    for technical diving.
2    Q.   And what does technical diving mean?
3    A.   So in recreational, you have recreational scuba
4    diving, then you have kind of the stuff past 130 feet.
5    So that's what they consider technical diving, is
6    anything below 130 feet of water.
7    Q.   Why does that require a different level of
8    certification, please?
9    A.   Because you need more training to go deeper.
10   The physics change, the danger changes, the risk changes
11   once you pass 130 feet of water.
12   Q.   Let's turn back to Exhibit 4, please, the
13   Shoreline Diving report.  I think we established this is
14   your expert report in this case?
15   A.   Correct.
16   Q.   And to your knowledge, this is JJM's only
17   expert report in this case; right?
18   A.   I cannot answer that.  I don't know if they
19   hired anyone else besides me.
20   Q.   Okay.  Well, let's go back to Exhibit 2, the
21   plaintiff's disclosure of expert witnesses.  Two-thirds
22   of the way down, three-quarters of the way down, first
23   page, there's you and Captain Takakjian; right?
24   A.   Correct.
25   Q.   So this is your report?



RICHARD SIMON                                                     August 29, 2025
JJM vs ADV

Page 41

1    A. Correct.
2    Q. Sorry. Exhibit 4 is your report; right?
3    A. Correct.
4    Q. Does Captain Takakjian have a report?
5    A. No.
6    Q. Are there any other reports of which you are
7  aware?
8    A. No.
9    Q. So this Exhibit 4, the Shoreline Dive report
10 dated May 23, 2025, did you write this report?
11   A. I did.
12   Q. Flip to page 26, please. The bottom of
13 page 26, is that your signature?
14   A. Yes.
15   Q. I see three other names at the bottom of 26, as
16 reviewed by; do you see that?
17   A. Correct.
18   Q. It has Captain Takakjian?
19   A. Yes.
20   Q. And Robert Foster and Mark Munro; right?
21   A. Yes.
22   Q. Who is Robert Foster?
23   A. Robert Foster is one of the other divers who
24 was on the wreck that day.
25   Q. And who is Mark Munro, please?

Page 42

1    A. He is the side-scan sonar operator.
2    Q. And it says reviewed by those three people?
3    A. Correct.
4    Q. What did that review consist of, please?
5    A. Just fact-checking, going over, making sure
6  that everything was true and factual. Mark provided the
7  side-scan imagery, so making sure that that was
8  portrayed properly. And then the information that
9  Robert -- Bob, as we call him -- collected was true and
10 accurate.
11   Q. Did you get any feedback from your three
12 reviewers?
13   A. It mainly was grammatical and spelling.
14   Q. What form did that feedback take, please?
15   A. It was, "Rick, you have a spelling error here,"
16 you know. That kind of...
17   Q. Was this done in person or by phone call or
18 over e-mail?
19   A. Most of the time, it was done by phone call,
20 with me fixing the report as we were talking about it.
21   Q. As you sit here today, do you recall whether
22 any of your reviewers provided you written feedback on
23 your draft report?
24   A. I do not believe so.
25   Q. Let's flip back to page 4 of the same

Page 43

1  Exhibit 4, your report. Actually, scratch that. Okay.
2  Let's talk about Shoreline Diving. What is your
3  position with Shoreline Diving?
4    A. Vice president.
5    Q. I'm going to take a wild guess and assume there
6  is a president?
7    A. There is.
8    Q. And who is the beneficial owner of the company?
9  Let me try a different way. Is it owned in, is it a
10 corporation with shares?
11   A. Corporation with shares. Stock certificates.
12   Q. Who are the shareholders, please?
13   A. Myself and the president.
14   Q. And that's it?
15   A. That's it.
16   Q. So you are the vice president and co-owner?
17   A. Correct.
18   Q. In your role either as shareholder or as vice
19 president, do you manage the day-to-day activities of
20 Shoreline Diving?
21   A. Yes, I do.
22   Q. How would you describe the business of
23 Shoreline Diving, please?
24   A. Are you asking what we do on a daily basis?
25   Q. Yes.

Page 44

1    A. It's varied. So we are an inland commercial
2  diving company. So one day we can be doing water
3  towers, the next we can be picking up a sunk vessel that
4  sank, to an inspection. It's varied on what we do.
5    Q. So a sunk vessel, that would be like, typically
6  like a boating casualty, something like that?
7    A. When you say "casualty," are you saying a boat
8  that sank or a fatality?
9    Q. How about a boat that sank, property damage,
10 boat goes underwater, they call you to go get it?
11   A. Correct.
12   Q. What kinds of customers will typically hire
13 Shoreline Diving?
14   A. Vast. So we do a lot with the State of
15 Connecticut, the naval research lab. Shoreline
16 volunteered to the State of Maine earlier in the year to
17 do a body recovery. So it's very vast in what we do.
18   Q. If a vessel floods or capsizes, your company
19 can come and help salvage the vessel?
20   A. Correct.
21   Q. Or if a boat goes up on the rocks, your company
22 can probably help --
23   A. Facilitate getting it off. Correct.
24   Q. What kind of equipment does Shoreline Diving
25 normally use for vessel salvage?



RICHARD SIMON                                                            August 29, 2025
JJM vs ADV

Page 45

1    A.  Depends.  Everything from cranes and barges to
2   lift bags.  It really depends on what the salvage is.
3   And I'm using the term "salvage," but most of the time,
4   it's contract wreck removal.  Salvage implies we're
5   saving value.  Most of the time -- we have only done a
6   couple of true salvages.  It's wreck removals.
7    Q.  And so framed as wreck removals, would you
8   typically have a deck barge or some other kind of
9   working platform?
10    A.  Yes.  Deck barge.  It really depends.  If we
11   can lift bag it, we'll lift bag it.  Cranes are very
12   expensive.
13    Q.  Yes.  You also perform dam inspections?
14    A.  Correct.
15    Q.  Utility work?
16    A.  What do you mean by utility work?  Pipelines,
17   cables, that kind of utility?
18    Q.  Yes.  Is that the kind of work you do?
19    A.  Yes.
20    Q.  And so pipelines, cables, you mean those are
21   all submarine cables, underwater stuff you can --
22    A.  Underwater, or sometimes it's, every once in a
23   while, we do confined space work, just because we have
24   the equipment to go under, where some people don't.
25    Q.  Okay.  I'm going to mark as Exhibit 6 a

Page 46

1   document.  Just take a look through it, please, and let
2   me know when you're ready to talk about it.
3           EXHIBIT 6 (Defendant's Exhibit marked for
4   ID)
5           (Witness perusing document)
6    Q.  This document marked Exhibit 6, do you
7   recognize it?
8    A.  Yes.
9    Q.  What is it, please?
10    A.  It looks to be a printout from my website.
11    Q.  And the top right corner of Exhibit 6, just for
12   reference, do you see the website address ends with the
13   word "salvage" by itself there?
14    A.  Correct.
15    Q.  So this salvage exhibit, if we go to the second
16   page here, these are various kinds of salvage or wreck
17   removal; is that sort of used interchangeably here?
18    A.  Yes.
19    Q.  So the top left photo there, the
20   "Shoreline-Diving-Connecticut-boat-salvage"; do you see
21   that, the top left photo?
22    A.  Yes.
23    Q.  If you can tell from the photo, or if you
24   remember, what's going on there?
25    A.  Looks to be a sunk sailboat that we're raising.

Page 47

1    Q.  And how are you raising it?
2    A.  That one would be lift bags.
3    Q.  And then the next photo, over to the right, it
4   looks like another sailboat?
5    A.  You said to the right.  You mean to the left?
6    Q.  Top right photo.
7    A.  Oh, sorry.  I apologize, then.  I was looking
8   at that photo.  So the first photo is actually a
9   commercial fishing vessel that sank.
10    Q.  Okay.  Top left is a commercial fishing vessel.
11   Thank you.  So let's start with the top left, commercial
12   fishing vessel, what is the equipment on that one?
13    A.  Craning barge.
14    Q.  And then top right, is that the, the nighttime
15   photo, is that a lift bag you used for that?
16    A.  I don't know if that was a lift bag or we
17   pumped it out, to be honest with you.  I couldn't tell
18   you off the photo.
19    Q.  And how about the middle on the right side, it
20   looks like you have a half capsize, the boat is on its
21   side; do you see that?
22    A.  Yes.  That was a craning barge.
23    Q.  Okay.  And then how about middle left, what is,
24   it looks like a pump-out operation?
25    A.  That was lift bags on the pump-out.

Page 48

1    Q.  And bottom left, what's going on there?
2    A.  That was an abandoned vessel in a marina for
3   years.  Craning barge operation.
4    Q.  Crane barge.  Okay.
5    A.  And the one on the rocks, the next one, was a
6   craning barge.
7    Q.  Crane barge, bottom right.  Okay.  And then
8   next page, let's look at the top left, the nighttime
9   photo?
10    A.  Yes.
11    Q.  What's going on there?
12    A.  Craning barge salvage on a boat that burned and
13   sank.
14    Q.  And then what's going on on the top right?
15    A.  That's the same vessel as we were picking it up
16   and righting it to pump the fuel out.
17    Q.  The same vessel as the left photo there?
18    A.  Yes.  Believe it or not, that is the bow of
19   that vessel.
20    Q.  So you worked through the night to get that
21   out?
22    A.  Yes.
23    Q.  What is the vertical, are those chains coming
24   down?
25    A.  Those, I don't know if -- those are probably a



Page 49

1  set of chain spreaders to the blue straps you're seeing.
2     Q.  So then out of the frame of this photo, there's
3  got to be a crane up --
4     A.  There's a crane.  Correct.
5     Q.  So, back up.  We are at the end of Exhibit 6,
6  the last page, the top right photo; right?
7     A.  Yes.
8     Q.  So the chains, they're probably a spreader bar
9  we can't see very well; right?
10     A.  Correct.
11     Q.  And there is a crane outside the frame of the
12  photo; right?
13     A.  Correct.
14     Q.  So to what is the crane attached, as far as you
15  can tell, or to the best of your recollection?
16     A.  It's to the propellers on that one.
17     Q.  To the propellers of the boat?
18     A.  Correct.
19     Q.  What about the other side of the crane?
20     A.  To a crane block.
21     Q.  To a crane block...
22     A.  Up in the air.
23     Q.  And then where does the crane block go?
24     A.  Straight up, two straps coming down to each
25  propeller.

Page 50

1     Q.  How about the back side of the crane; to what
2  is the crane attached?
3     A.  It's sitting on deck of a barge, if that is the
4  question.
5     Q.  This is another deck barge operation?
6     A.  Deck barge.
7     Q.  Thank you.  Does Shoreline Dive from time to
8  time do sewer diving?
9     A.  Yes.
10     Q.  What does that usually entail?
11     A.  Depends on what the problem is.
12     Q.  So in summary, Shoreline Diving is a commercial
13  dive outfit; right?
14     A.  Correct.
15     Q.  And not an archeological company; is that
16  correct?
17     A.  Correct.
18     Q.  Let's talk about your history between you and
19  Captain Takakjian, please.  Is Captain Takakjian part of
20  Shoreline Diving?
21     A.  No.
22     Q.  How long have you known him?
23     A.  Over 20 years.
24     Q.  And in what capacity have you come to work with
25  him?

Page 51

1     A.  Eric is a marine surveyor and a diver.
2     Q.  And have you worked on projects together?
3     A.  Can you define projects?
4     Q.  Have you ever worked with Captain Takakjian
5  before today?
6     A.  Yes.
7     Q.  On what, please?
8     A.  He surveyed my vessel when I bought it.  In
9  2005, he owned a research vessel, the R/V Quest, that I
10  had dove off of several times.
11     Q.  What were you diving on in 2005?
12     A.  A shipwreck.  I couldn't tell you which one.
13     Q.  Where was it, to the best of your recollection?
14     A.  I couldn't tell you.  Somewhere off of
15  Massachusetts, the best guess.
16     Q.  Best guess, or your best recollection?
17     A.  Yes.  Somewhere off of Massachusetts.
18     Q.  But you're not guessing; that is your best
19  recollection?
20     A.  That is my best recollection.
21     Q.  Thank you.  Over the years, how often have you
22  worked, or dove, or otherwise worked with Captain
23  Takakjian in any capacity?
24     A.  Numerous.  We have worked on projects offshore,
25  scanning on Georges Bank to identify several shipwrecks.

Page 52

1  I have consulted with him on some of my own shipwreck
2  projects.
3     Q.  How did you get involved in this case, please?
4     A.  Through, I believe it was through Eric, who
5  worked with Twain.  But somehow it was through that
6  connection.
7     Q.  So do you think Eric reached out to you first?
8     A.  I couldn't recall if Twain reached out through
9  Eric, or Eric reached out through Twain.  I couldn't
10  recall.  It was a long time ago now.
11     Q.  And to the best of your recollection, was it an
12  e-mail or phone call or something else?
13     A.  I believe it was a phone call.
14     Q.  How many times did you go to the shipwreck site
15  at issue in this case?
16     A.  We spent one day out there.
17     Q.  And without guessing, do you recall the date of
18  that dive?
19     A.  I do not.
20     Q.  Let's look at your report, please, Exhibit 4.
21  If you can go to page 5, do you see the header, top of
22  page 5; yes?
23     A.  Yes.
24     Q.  And I see the date May 4, 2025; do you see
25  that?



RICHARD SIMON                                                  August 29, 2025
JJM vs ADV

Page 53

1     A. Correct.
2     Q. Having seen this page 5 of your report, does
3  that refresh your recollection of when the dive likely
4  happened?
5     A. Yes.
6     Q. As you sit here today, do you believe the dive
7  happened on May 4, 2025?
8     A. Yes.
9     Q. Can you just, without reading from this and
10  just based on your recollection, how did the dive go;
11  describe what happened, please.
12     A. Again, that is so broad. It's such a broad
13  question.
14     Q. Okay. Let's step through the day. What time
15  did you meet at the pier?
16     A. To be exact, I'm going to have to look at the
17  report to tell you.
18     Q. If you need to refresh your recollection, go
19  ahead.
20     A. So it says we got underway at 7:30, so we
21  probably loaded at 7 a.m., which is kind of our typical
22  in the morning meeting time.
23     Q. And as you sit here today, we're about almost
24  four months after the dive; right?
25     A. Correct.

Page 54

1     Q. Do you have a conscious memory of that day or
2  not?
3     A. Yes.
4     Q. What kind of day was it?
5     A. Weather? Again, that is such a --
6     Q. Was it sunny?
7     A. It was sunny. Yes. It was a nice day.
8     Q. Do you remember what the winds were like?
9     A. Not off the top of my head, I don't, but it
10  wasn't rough.
11     Q. It wasn't enough that you cancelled?
12     A. Correct. It was not a rough day.
13     Q. Which pier did you use, if you remember,
14  please?
15     A. That I don't know. I just met at the address
16  of the boat. I couldn't...
17     Q. How long did it take you to transit from the
18  pier to the wreck site?
19     A. I don't know what he cruised at, but it wasn't
20  very long. Half hour, 45 minutes.
21     Q. Okay. Do you recall the water depth at the
22  dive?
23     A. Off the top of my head, no. It was, they said
24  it was going to be around 130, and it was, as I recall,
25  like ten feet shallower. So like 120ish.

Page 55

1     Q. Okay. I'm going to back up. Are you familiar
2  with the idea of an arrest warrant on a vessel?
3     A. Yes.
4        MR. STEIGELMAN: Okay. Next one.
5        EXHIBIT 7 (Defendant's Exhibit marked for
6  ID)
7     Q. I have handed you a document I have marked as
8  Exhibit 7. The title is "Affidavit of Gregory
9  Johnston," and it goes on. And it's Document 22-1 in
10  this lawsuit; do you see all that?
11     A. Yes.
12     Q. And I'm also marking as Exhibit 8, Document 21
13  at the top, in this lawsuit; do you see that?
14     A. Yes.
15        EXHIBIT 8 (Defendant's Exhibit marked for
16  ID)
17     Q. Let's start with Exhibit 7, at the top of the
18  page, it says 22-1; do you see that?
19     A. Yes.
20     Q. Have you ever seen this document, Exhibit 7,
21  before?
22     A. Yes.
23     Q. And what is your understanding of what this
24  Exhibit 7 is, please?
25     A. The arrest of the shipwreck, the arrest

Page 56

1  warrant.
2     Q. This is, you see the title saying "Affidavit of
3  Gregory Johnston"; do you see that?
4     A. Yes.
5     Q. And to your understanding, who is Gregory
6  Johnston, please?
7     A. One of the clients from JJM.
8     Q. And this is his affidavit; right?
9     A. Okay, correct.
10     Q. And when you flip -- I'm not asking you to take
11  my word for it. If you flip back to the second page of
12  this thing, again, Exhibit 7, do you see Mr. Johnston's
13  signature, sort of the middle of page 2 there?
14     A. Yes.
15     Q. And then going up from that, the signature
16  date; right?
17     A. Yes.
18     Q. And then a declaration that this is true and
19  correct; do you see that declaration?
20     A. Yes.
21     Q. I'm going to try again, because I think we
22  stepped on each other. Do you see the declaration that
23  this is true and correct?
24     A. Yes.
25     Q. Okay, thank you. And then accompanying this



RICHARD SIMON                                                    August 29, 2025
JJM vs ADV

Page 57

1  Exhibit Number 8, marked in red at the top, do you see
2  this is "Exhibit A to Affidavit of Service of Gregory
3  Johnston, JJM"; do you see that?
4      A.  Yes.
5      Q.  So you have testified before you're familiar
6  with vessel arrests.  In your experience, or to your
7  understanding, what is the typical procedure for a
8  vessel arrest?
9      A.  That a document needs to be sealed and put onto
10  the wreck.
11      Q.  And have you seen these two documents before
12  today?
13      A.  No, I haven't.  I thought it was something
14  different, and then I fully read it.
15      Q.  Okay.  On the day of the dive, so now we're
16  back to May of 2025, did anyone have copies of the
17  vessel arrest warrant that day?
18      A.  I did.
19      Q.  You did?
20      A.  Yes.
21      Q.  How many copies did you have?
22      A.  One was given to me.
23      Q.  Who gave it to you?
24      A.  Twain.
25      Q.  Did it come sealed, or how did you have it?

Page 58

1      A.  I put it into a sealed set of Ziploc bags, I
2  believe, is what we ended up putting it in.
3      Q.  How many Ziploc bags?
4      A.  I believe, two, but I'm not a hundred percent
5  sure.
6      Q.  What did you do with that Ziploc-bag-sealed
7  arrest warrant?
8      A.  We brought it down and put it under a
9  cobblestone on the wreck.
10      Q.  Was it just, so there is just a plastic bag
11  under one of the rocks; is that right?
12      A.  Sticking out, but yes.
13      Q.  There's not a line that it's anchored to or
14  anything like that, it's just under one of the rocks?
15      A.  Correct.
16      Q.  To your knowledge, did anyone else on the dive
17  have additional copies of the arrest warrant that day?
18      A.  No.
19      Q.  And let me ask, how big was the dive boat?
20      A.  Don't quote me.  I'm going to say it's 38 to
21  45.  I'm going to say it was a 42, but don't quote me
22  exactly.  It could be a 45.  It wasn't a 50.  It was a
23  typical Maine lobster boat.
24      Q.  Okay.  So lobster-boat type, so it was a medium
25  size, smallish deck in the back; right?

Page 59

1      A.  For us it's a big deck, but -- so I hate to
2  say --
3      Q.  It's all relative.
4      A.  Yes, it's all relative.
5      Q.  Was it of a small enough size so that if other
6  folks on the dive had had copies of the arrest warrant,
7  you likely would have seen it?
8      A.  Correct.
9      Q.  And you didn't see anyone else with an arrest
10  warrant; correct?
11      A.  Correct.
12      Q.  So you think it's likely that you were the only
13  person that had any copy of the arrest warrant, and just
14  the one?
15      A.  Correct.  I don't know if there was other
16  copies onboard, but I was given one copy, if that
17  answers your question.
18      Q.  Okay.  But you didn't see any other copies?
19      A.  I did not see any other copies.
20      Q.  Did anyone ask you, "Hey, what's that thing in
21  the plastic bag?"
22      A.  I think everyone knew that I had the arrest
23  warrant, and part of our plan was for me to go and put
24  it on the wreck.  So everyone knew that I had had it.
25      Q.  Okay.  So then everybody talked about, "Hey,

Page 60

1  this is part of the dive, I'm going to do this"?
2      A.  Yes.
3      Q.  And was anyone else planning to, as part of the
4  dive plan, to put another copy on the wreck?
5      A.  No.
6      Q.  By the way, while we're looking at it,
7  Exhibit 8, the photos in Document 21, do you see that?
8      A.  I thought you said Document 21.
9      Q.  Yes.  So Exhibit 8, we're looking at the same
10  document?
11      A.  Yes.
12      Q.  Okay.  You see this brick on the first page;
13  right?
14      A.  Yes.
15      Q.  And then it looks like some sort of some blue
16  something or other tied through the brick; do you see
17  that?
18      A.  Yes.
19      Q.  What would you call that, that's tied to the
20  brick?
21      A.  A rope, a string.
22      Q.  A line?
23      A.  A line.
24      Q.  Small stuff, maybe?
25      A.  Yes.  You could identify it as small stuff.



RICHARD SIMON                                                      August 29, 2025
JJM vs ADV

Page 61

1    Q.  And the Exhibit 7, Mr. Johnston's affidavit,
2  talks about how, previously, in 2024, the arrest warrant
3  was dropped over the side of the boat; right?
4    A.  Correct.
5    Q.  When you were down at the wreck site on May 4th
6  of 2025, did you see the prior arrest warrant down
7  there?
8    A.  I did not.
9    Q.  Did any of the other divers who went down say
10  they saw it?
11    A.  No.
12    Q.  Did you ask, or did anybody ask, "Did you see
13  the other one," or did it not come up in conversation?
14    A.  Did not come up in conversation.
15    Q.  What were the bottom conditions at the wreck
16  site, please?
17    A.  Are you asking, bottom composition?  Again,
18  that's a loaded -- water temperature, all of it?
19    Q.  Bottom conditions; was it sand, was it mud, was
20  it rocky bottom?
21    A.  It is what we like to call kind of mayonnaise.
22  It's light and fluffy goo.
23    Q.  And I assume it's not actually an egg-and-oil
24  mixture down there, so what, in your experience,
25  constitutes that mayonnaise?

Page 62

1    A.  I would say it's loose sediment.  It's kind of
2  suspended in the water.
3    Q.  When you were down at the wreck site, were you
4  swimming neutrally -- were you swimming, or were you
5  neutrally buoyant, or were you able to stand?
6    A.  So in diving, you would never stand and walk on
7  the bottom.  So we try and be neutrally buoyant up off
8  the bottom, unless you're physically in the bottom
9  looking for something.  But you try and stay off of the
10  bottom so you can see and you don't stir up visibility.
11    Q.  Okay.  To your recollection, what was the ocean
12  floor comprised of?
13    A.  That's a little bit of a loaded -- right at the
14  wreck site, you're saying?
15    Q.  Yes.
16    A.  Off the wreck, or on the wreck site?
17    Q.  Let's start with off the wreck.
18    A.  So it's a very oozy, gelatinous bottom with a
19  lot of debris, manmade debris or natural, being sticks
20  and other debris.
21    Q.  You would agree with me that there is more
22  ocean bottom than there is debris down there?
23    A.  Yes.
24    Q.  What is the ocean bottom comprised of, please?
25    A.  Again, it's an oozy sediment, loose bottom.

Page 63

1    Q.  Would you describe it as a sandy bottom, a mud
2  bottom, a rocky bottom?
3    A.  I would describe it as a loose mud bottom.
4    Q.  And how about on the wreck site; the same, a
5  loose mud bottom?
6    A.  The same.
7    Q.  Approximately how long were you in the water
8  for this dive?
9    A.  For dive one, I would have to look at it
10  exactly, but roughly half an hour or so.
11    Q.  Is that 30 minutes bottom time, or 30 minutes
12  in the water total?
13    A.  I would have to go back and look exactly what
14  we ended up doing for an exact bottom time.
15    Q.  Do you recall how much of the time was spent on
16  the bottom compared to descending or ascending, please?
17    A.  Yes.  So, again, it's a relatively shallow
18  dive.  So we descend rather quickly.  So most of the
19  time here would have been bottom time.
20    Q.  Did you take any video during any of your dives
21  that day?
22    A.  Yes.
23    Q.  And how much video footage is there?
24    A.  Again, off the top of my head, I couldn't tell
25  you exactly.  Everything we had we gave over to Twain,

Page 64

1  but I couldn't tell you the exact amount off the top of
2  my head.
3    Q.  In your recollection, did you record most of
4  the dive, or half, or less than half?
5    A.  I would probably say less than half, because
6  once we started working and looking at things, the
7  visibility went poor, to be very poor.
8    Q.  Did you take any measurements at the wreck
9  site?
10    A.  We did.
11    Q.  And with what did you take the measurements?
12    A.  Fiberglass tape.
13    Q.  Did you map out the wreck site while you were
14  down there?
15    A.  We took some measurements while we were down
16  there, and then we, from that, we wrote those down.  We
17  didn't physically draw the wreck while we were down
18  there because of bottom-time limitations.
19    Q.  So you wrote down the measurements?
20    A.  Yes.
21    Q.  What did you do with that writing of the
22  measurements?
23    A.  It was probably on, like, an erasable dive
24  slate, is what it was on.  And then from there, we put
25  it down in writing.  I couldn't tell you where it went



RICHARD SIMON
JJM vs ADV

August 29, 2025

Page 65

1  exactly off the top of my head.
2      Q.  But your recollection is, from an erasable dive
3  slate, it went into writing somewhere?
4      A.  Correct.
5      Q.  Was that on the boat?
6      A.  Yes.
7      Q.  And do you know what happened to that writing
8  on the boat?
9      A.  I do not, off the top of my head.  If it went
10  into my notebook or, I couldn't tell you.
11      Q.  So if you preserved that record of the
12  measurements, it would be in your file; is that correct?
13      A.  Again, I can't answer that a hundred percent.
14  I could go back.  I carry a notebook most of the time
15  with me, or if we did it on video.  But most of the
16  time, it went onto a slate.  So I can't tell you if I
17  still have it or not.
18      Q.  I'm not asking if you have it or not, I'm
19  asking a hypothetical.  If you preserved that record
20  when it was transcribed into writing, if you preserved
21  it at the time, it would be in your expert file now;
22  correct?
23      A.  Correct.
24      Q.  Did you bring up to the surface anything from
25  the wreck of the Delhi?

Page 66

1      A.  No.
2      Q.  To your knowledge, did anyone bring anything up
3  to the surface from the Delhi the day of that dive?
4      A.  No.  No one brought anything up except
5  pictures.
6      Q.  Okay.  In your opinion, was the dive boat of
7  such a size that, had someone brought up artifacts, you
8  would have seen it?
9      A.  Yes.
10      Q.  And as you sit here today, your testimony is
11  that didn't happen?
12      A.  Correct.
13          MR. BRADEN:  Ready for a break?
14          MR. STEIGELMAN:  Yes.
15      (Brief recess taken, 10:12 a.m. to 10:20 a.m.)
16  BY MR. STEIGELMAN:
17      Q.  Okay.  Let's turn to the State's expert report,
18  please, marked as Exhibit 3.  Do you see the date on the
19  bottom right of the first page, 11 November 2024?
20      A.  Yes.
21      Q.  Have you seen this document before?
22      A.  Yes.
23      Q.  You have read the whole thing; right?
24      A.  Correct.
25      Q.  And there are portions in this report that --

Page 67

1  I'll variously call it Mr. McBrian's report or the
2  State's report, okay?  Do you understand that to be the
3  same thing?
4      A.  Yes.
5      Q.  There are portions of Mr. McBrian's report with
6  which you disagree; right?
7      A.  Correct.
8      Q.  And you have identified those disagreements in
9  your report, Exhibit 4; right?
10      A.  Correct.
11      Q.  Now, let's start with the areas of agreement,
12  okay?  You agree that the vessel Shoreline Diving dove
13  on is the Delhi; right?
14      A.  Yes.
15      Q.  And the pavers at the wreck site were the
16  Delhi's cargo at the time of the sinking?
17      A.  Yes.
18      Q.  And the Delhi's sternpost is obviously present
19  on the wreck; right?
20      A.  Correct.
21      Q.  And the sternpost sticks up from the bottom;
22  right?
23      A.  Correct.
24      Q.  And so the part that's sticking up is exposed
25  to the water; right?

Page 68

1      A.  Correct.
2      Q.  And you agree that the Delhi's body of the hull
3  below the waterline is still in place; right?
4      A.  No.
5      Q.  You don't?  Okay.  Let's go to your report,
6  Exhibit 4, please, page 19.  Are you on page 19?
7      A.  Correct.
8      Q.  I'm looking at the bottom of page 19, three
9  lines up on the far right, the last two words of the
10  third line, "Beside her."  Do you see that?
11      A.  Say that again, what line?
12      Q.  Three lines up on the far right, last two
13  words, "Beside her"?
14          THE WITNESS:  Three lines up from the
15  bottom?
16          MR. STEIGELMAN:  Yes.
17      A.  Yes.
18      Q.  I'm going to read that sentence, "Beside her,"
19  okay?  Quote, Beside her sternpost, the underwater body
20  of the hull below the waterline, deadeyes, china and
21  cobblestones, there is not much left of this schooner,
22  period, close quote.  Did I read that correctly?
23      A.  What I'm saying, and I might not have said it
24  properly is, besides what's left of her sternpost.  I'm
25  not saying that the whole thing remains.  I'm saying



RICHARD SIMON                                                    August 29, 2025
JJM vs ADV

Page 69

1  that parts of it remain, but not that it's exactly
2  intact underwater.
3      Q.  So the question was, did I read that correctly?
4      A.  You did read it correctly.
5      Q.  Thank you.  So you would agree that your
6  sentence that I just read describes how the underwater
7  body of the hull below the waterline remains on the
8  wreck, doesn't it?
9          MR. BRADEN:  Objection.
10         MR. STEIGELMAN:  You can answer.
11     A.  That's how you're interpreting what I'm saying.
12  That's not what I'm trying to say.
13     Q.  What did you mean by that one offset phrase
14  starting with, "the underwater body," that's offset with
15  commas, please?
16     A.  It should say, "besides what's left of her
17  sternpost."  I'm not saying that it's all there.  What
18  I'm trying to say is, besides what's left of her there.
19     Q.  Besides what's left of the sternpost?
20     A.  Of the sternpost.
21     Q.  And besides what's left of the underwater body?
22     A.  Correct.
23     Q.  And besides what's left of the deadeyes;
24  correct?
25     A.  Correct.  Because I think we could both agree

Page 70

1  that the whole sternpost, you know, the rudder is gone.
2  There's only a little bit of the sternpost remaining.
3  The whole sternpost is not there.
4      Q.  Was it your intent in that sentence to modify
5  the entire sentence by, "other than what has degraded
6  over time"?
7          MR. BRADEN:  Objection.
8      A.  So what I meant to say is, besides what's left
9  there of that.  I'm not trying to say that everything is
10  there.
11     Q.  Okay.  How about of the china, is there any
12  degradation to the china over time?
13     A.  Yes.  We saw broken china on the wreck.
14     Q.  Is there any degradation to the cobblestones
15  over time?
16     A.  No.  It's a hard stone.  They have been dragged
17  off and moved around, but as far as worrying about a
18  cobblestone being damaged, a cobblestone is a much more
19  rugged...
20     Q.  Okay.  Let's turn to Exhibit 3, the State's
21  expert report, please.  Page 22, please.
22         MR. BRADEN:  What exhibit are you on?
23     A.  Exhibit 3, this is the State's report.  Are you
24  on page 22 of the State's report?
25     A.  Yes.

Page 71

1      Q.  Do you see Figure 18 at the top of the page
2  there?
3      A.  Yes.
4      Q.  Okay.  And I want you to take a moment to read
5  the caption there to Figure 18, please.
6          (Witness perusing document)
7      Q.  Have you read the caption there of Figure 18?
8      A.  I have.
9      Q.  And if you take a moment, please, just the
10  couple lines at the top of the page above Figure 18, if
11  you could read that?  I know it's not a complete
12  paragraph, but just read what's above.  You can start at
13  "Based on this assumption."
14         (Witness perusing document)
15     Q.  Are you ready to talk about Figure 18?
16     A.  I will talk about it to the best of my
17  knowledge.
18     Q.  Do you agree that some portion of the Delhi
19  wreck is visible above the sea floor?
20     A.  Yes.
21     Q.  Do you agree that some portion of the Delhi
22  wreck is not visible above the sea floor?
23     A.  Yes.
24     Q.  The Figure 18 in the report, the cyan box, do
25  you see that?

Page 72

1      A.  Yes.
2      Q.  And the State's expert suggests the cyan box
3  outlines the visible portion in this wreck; do you see
4  that?
5      A.  I do.
6      Q.  And do you agree, or disagree, or not have an
7  opinion about that portion of Mr. McBrian's opinion?
8      A.  I don't have an opinion on that portion of his
9  report.
10     Q.  Fair enough.  Directly above, please, and still
11  on the top of page 22, the second-to-last line above the
12  box of Figure 18, do you see Mr. McBrian's conclusion
13  that the vessel is buried to a depth of up to two
14  meters; do you see that?
15     A.  Yes.
16     Q.  Do you agree or disagree with that conclusion?
17         MR. BRADEN:  I'm going to object to the
18  question.
19     A.  Yeah, it's such a -- I can't tell you exact,
20  and neither, I don't believe, can he based off the
21  information that's listed on the site, that you can make
22  that conclusion.
23     Q.  So is it that you have not drawn a conclusion
24  yourself, or you just think there is no conclusion that
25  can be drawn?



Page 73

1    A.  I think that I'm not an expert, and I would
2    leave that to Eric to answer that question.  That is his
3    area of expertise.
4        Q.  What is his area of expertise, please?
5        A.  Ship construction/design is his expertise.  He
6    is an ABS certified marine surveyor.  But again, I can't
7    tell you exactly what his, I believe that would be more
8    his area of expertise.
9        Q.  Let's go to your Shoreline Diving report,
10   Exhibit 4, page 4, please.
11       A.  Okay.
12       Q.  If I understood your testimony correctly, you
13   just told us that Captain Takakjian is an expert on ship
14   design and an ABS certified surveyor; did I hear that
15   correctly?
16       A.  Correct.
17       Q.  Can you show me where in this report of yours
18   it tells us that?
19       A.  I guess it doesn't list that.
20       Q.  And let's look at Exhibit 2, please, the
21   plaintiff's disclosure of expert witnesses; do you have
22   that in front of you?
23       A.  Is that Exhibit 2?
24       Q.  Yes.  Thank you.  If you can please flip to the
25   bottom of the second page, and then the top of the third

Page 74

1    page and just take a moment to review it.
2        (Witness perusing document)
3        A.  Yes.
4        Q.  Have you had a chance to review it?
5        A.  Yes.
6        Q.  Is there anywhere in this expert designation
7    where Captain Takakjian is designated an expert in ship
8    design or as an ABS surveyor?
9        A.  No.
10       Q.  Thank you.  I'm going to refer to, I'm going to
11   have to quote it, but just what I'm referring to, again,
12   is page 22 of Mr. McBrian's report, okay?
13       A.  Yes.
14       Q.  Do you agree with Mr. McBrian's conclusion that
15   the vessel's body typically below the waterline is
16   likely still in place in the sea floor?
17       A.  I do not.
18       Q.  And upon what do you base that disagreement?
19       A.  Putting my hands under the mud and feeling that
20   there's scattered timbers and there's not a lot left.
21       Q.  How many scattered timbers did you feel under
22   the mud?
23       A.  Very few.
24       Q.  What did you feel when you put your hands into
25   the mud?

Page 75

1    A.  There's just a lot of debris, some new, some
2    old.  There's loose timbers on the wreck site.  There's
3    not -- the way he draws this is that there is a full
4    ship underneath the mud, and that's just not what's
5    there.  There's some scattered timbers.
6        Q.  You said there was some debris under the mud,
7    some new, some old?
8        A.  Yes.
9        Q.  How could you tell based on what you felt?
10       A.  We pulled garbage, legitimately feeling around
11   on the bottom, we pulled up modern garbage.  Beer
12   bottles, some cans.
13       Q.  How much of your arm and forearm and hand do
14   you think you got into the sea floor when you were down
15   there?
16       A.  I would say, whatever this measurement is
17   (indicating).
18       Q.  So from your shoulder to your hand?
19       A.  Correct.
20       Q.  Couple of feet?
21       A.  Again, I'm not trying to be flippant.  Whatever
22   this measurement is is as far as we could go.
23       Q.  Unfortunately, "this measurement" doesn't show
24   up well on the record.
25       A.  If we want to get a tape measure, I can tell

Page 76

1    you exactly.  But I'm not gonna say -- it's probably
2    more than two feet to me.  I would say no more than
3    three feet of...
4        Q.  Fair enough.  So no more than three feet.  Is
5    your recollection that you were able to bury your arm
6    all the way up to your shoulder socket, or did it not go
7    quite that deep into the --
8        A.  If I wanted to, I could probably bury myself in
9    the bottom, it was that loose of a bottom.
10       Q.  That wasn't the question.  Do you recall
11   whether you were able to bury your arm into the sea
12   floor up to your shoulder socket?
13       A.  Easily, yes.
14       Q.  You did, or you could have?
15       A.  We did.  We dug around the outside to feel, to
16   see what we could feel that was there.
17       Q.  So how was your body oriented when you were
18   doing that?
19       A.  Laying flat like this in the water
20   (indicating).
21       Q.  So flat in the water.  So you were not
22   perpendicular, with your shoulder joint pointed down;
23   correct?
24       A.  Again, I was like, if my body is like this
25   (indicating), my arm would have been stretched down,



RICHARD SIMON                                                    August 29, 2025
JJM vs ADV

Page 77

1  with my body laying along the bottom.
2      Q.  Did you physically lay down on the seabed
3  yourself?
4      A.  Yes.
5      Q.  Did you make any efforts to dig around and get
6  below the surface of the sea floor to see how far down
7  the wreck might go?
8      A.  I'll say we probed with our arms, we didn't
9  dig, trying not to disturb the site.  It was more
10  pushing, what can you feel, pull out, not a dig of the
11  site.
12     Q.  Did you have a sounding rod or any other --
13     A.  I did not bring a sounding rod.
14         MR. BRADEN:  Again, Rick, let him finish
15  his question.
16         THE WITNESS:  Okay.
17     Q.  So other than a sounding rod, which you just
18  testified you didn't have, did you have any other
19  equipment that you used or could have used to see if
20  there was any more wreck below the surface of the mud?
21     A.  Could you ask the question again?
22     Q.  Was there any other equipment you brought with
23  you that you could have used to test to see whether
24  there was any other wreck below the surface of the mud?
25     A.  No.

Page 78

1      Q.  Okay.  Do you agree that some of the vessel's
2  framing and outer hull planking remain intact above the
3  sea floor?
4          THE WITNESS:  Can you ask the question
5  again?
6          MR. STEIGELMAN:  Do you agree that some of
7  the vessel's framing or outer hull planking remain
8  intact above the sea floor?
9      A.  No, I don't agree with that.
10     Q.  Do you agree that where visible framing and
11  outer hull planking come together, you can see clear
12  perpendicular angles?
13         THE WITNESS:  Can you ask that question
14  again?
15         MR. STEIGELMAN:  Do you agree that where
16  visible framing and outer hull planking come together,
17  you can see clear perpendicular angles?
18     A.  It's kind of a hard question to answer.  Are
19  you saying, do I see perpendicular angles in places, but
20  it's not -- yes, there's a few spots where you see
21  perpendicular angles where things come together.  But I
22  would not classify that as intact.
23     Q.  To your knowledge, are those perpendicular
24  angles that you can see potentially the vessel's framing
25  and outer hull planking?

Page 79

1      A.  I can't tell you what it is in the condition
2  that it's in.
3      Q.  Okay.  Turn to the State's report, page 6,
4  please.  And you can look at the photo in the bottom
5  half and read the caption for Figure 5, please.  Please
6  read the Figure 5 caption to yourself so we can talk
7  about it.  Thank you.
8          (Witness perusing document)
9      Q.  Are you ready to talk about this Figure 5?
10     A.  Yes.
11     Q.  You see, don't you, that Mr. McBrian describes
12  Figure 5 as a view of frame and outer hull planking;
13  right?
14     A.  Correct.
15     Q.  And would you agree with me that's pretty
16  clearly a couple of perpendiculars there; right?
17     A.  Correct.
18     Q.  Do you agree with Mr. McBrian's conclusion that
19  this is framing and outer hull planking; or do you not
20  agree, or do you not have a basis to agree or disagree?
21     A.  I do not have a basis to agree or disagree.
22     Q.  Okay.  Is it possible, then, that some of the
23  vessel's framing and outer hull planking do remain
24  intact above the sea floor?
25     A.  Again, I'm not an expert on this area.  I can't

Page 80

1  answer that question.
2      Q.  Let me try it this way:  You don't have a basis
3  to dispute Mr. McBrian's opinion; right?
4      A.  Correct.
5          MR. STEIGELMAN:  I will mark this as
6  Exhibit 9, please.
7          EXHIBIT 9 (Defendant's Exhibit marked for
8  ID)
9      Q.  So I have marked as Exhibit 9 three photos.
10  Just take a moment to look through them, and let me know
11  when you're ready to talk about them, please.
12     A.  I'm ready to talk about them.
13     Q.  Let's go back to front.  So go to the last page
14  first.  This is more of those perpendicular joints in
15  the wreck; right?
16         MR. BRADEN:  Objection.
17         MR. STEIGELMAN:  You can answer.
18     A.  Again, I'm not an expert, I can't tell you
19  where this is from the information provided on the
20  wreck.
21     Q.  Okay.  Let's go to one before, so the middle
22  photo there, does this look familiar?
23     A.  Yes.
24     Q.  And in what way is it familiar to you, please?
25     A.  I see in the background a piece of silt



RICHARD SIMON
JJM vs ADV

August 29, 2025

Page 81

1  fencing, modern debris laying in the background.  I see
2  a piece of wood eaten by wood borers or another marine
3  organism sitting there.
4      Q.  And how about the piece of wood prominently in
5  the foreground, does that look familiar to you?
6      A.  Do I recognize that exact piece of wood, is
7  that what you're asking?
8      Q.  Does it look familiar?
9      A.  Again, what I remember the most out of this
10  photo is the silt fence in the background.
11      Q.  Have you seen this photo before?
12      A.  Yes.
13      Q.  And when did you see it?
14      A.  It's a snippet from the ROV footage.
15      Q.  And let's flip to the first page of Exhibit 9
16  here; have you seen this before?
17      A.  Again, it looks to be a snippet from the ROV
18  footage.
19      Q.  Do you have any understanding of what this
20  snippet is showing?
21      A.  Again, this is not my area of expertise.
22      Q.  So that's a no?
23      A.  It's a, this is -- my answer is, this is not my
24  area of expertise.
25      Q.  So you don't have an opinion?

Page 82

1      A.  I don't have an opinion.
2      Q.  Okay.  So having looked at the photos from the
3  ROV and looked at the photos from Mr. McBrian, is it
4  still your position that the wreck consists of just a
5  few scattered timbers?
6      A.  Yes.
7      Q.  You believe the wreck to be in poor condition;
8  correct?
9      A.  Correct.
10      Q.  And you put that in your report; right?
11      A.  Correct.
12      Q.  And you would agree that Delhi is in worse
13  condition than a floating vessel that's fit for sea
14  today; right?
15      A.  Say that again?
16      Q.  You would agree that the Delhi is in worse
17  condition than a floating vessel that is fit for sea
18  right now?
19      A.  Yes.
20      Q.  And Delhi is certainly in worse shape than the
21  dive boat you took out that day, Stone Cutter?
22      A.  Correct.
23      Q.  And Delhi didn't go down yesterday?
24      A.  Correct.
25      Q.  It's been at the bottom for what, 130-plus

Page 83

1  years?
2      A.  Give or take, yes.
3      Q.  Delhi is not like the typical marine salvage
4  matter that Shoreline Diving performs; right?
5      A.  On our day-to-day operations, no.  But what I
6  personally do, it's what we do.
7      Q.  Who is the "we" in that statement?
8      A.  The individuals that I dive with, go out and
9  explore shipwrecks with.  It could be a wide range of
10  people.
11      Q.  Would you consider that part of your
12  professional background, is it recreational, is it a
13  combination of the two?
14      A.  I would say it's part of my professional
15  background.
16      Q.  Are you normally paid when you dive on
17  historical wrecks?
18      A.  Depends on how we're doing it.  Sometimes yes,
19  sometimes no.
20      Q.  You would agree with me that diving on a
21  historic wreck is not the same as pulling up a yacht
22  that sank in a storm; right?
23      A.  A hundred percent agree.
24      Q.  And diving on a historic wreck is even less
25  like a sewer dive; right?

Page 84

1      A.  Correct.
2      Q.  And when you write in your report that the
3  wreck of the Delhi is in poor condition, to what are you
4  comparing this century-old wooden shipwreck?
5      A.  To other century-old wooden shipwrecks that are
6  sunk.  If you look at a wreck in the fresh water that is
7  sunk, they're perfectly intact of the same age.
8      Q.  So your basis for comparison are only fresh
9  water wrecks?
10      A.  No.
11      Q.  Okay.  What are your other comparisons?
12      A.  Can you ask that again?
13      Q.  Yes.  What are your other comparatives, please?
14      A.  For other wrecks that are like this site?
15      Q.  Again, I'm curious about your opinion that the
16  Delhi is in poor condition.  And I asked you for what
17  your comparison was to offer the opinion of poor
18  condition.  And you said, other century-old shipwrecks
19  in fresh water.
20      And I'm trying to figure out if that is the
21  entire universe of comparisons are just fresh water
22  wooden shipwrecks.
23      A.  No, not at all.  That is not my only
24  comparison.  It is, in my opinion, in poor condition.
25  There's hardly anything left.  It's a pile of stone on



Page 85

1  the bottom covered in manmade debris.
2      Q.  It's in poor condition compared to what?
3      A.  Other shipwrecks in salt and in fresh water.
4  There's just not a lot of it left.
5      Q.  Which other wrecks do you have in mind?
6      A.  So there's a group of cobblestone wrecks off
7  Cape Cod.  There's, don't ask me their names off the top
8  of my head, because I don't know it, but other
9  cobblestone wrecks.  There's other intact schooners in
10  saltwater.
11      The Palmer and the Crary come to mind that, you
12  know, are intact schooners sitting on the bottom in salt
13  water.
14      Q.  So I heard the name Palmer.  What was the other
15  ship name?
16      A.  Crary.
17      Q.  Do you know how to spell that?
18      A.  Couldn't tell you.  I'm not even going to try.
19      Q.  And where, to the best of your recollection, is
20  Palmer?
21      A.  Again, they are off the Massachusetts coast.  I
22  couldn't tell you exactly.  But the Palmer and the Crary
23  are together.  They actually collided and sank together.
24      Q.  All right.  Let's look back at your report,
25  Exhibit 4, please, and turn to page 21.  I'm looking at

Page 86

1  the last full paragraph.  So it's actually the
2  second-to-last paragraph on the page, but the last full
3  paragraph on 21; do you see that?
4      A.  Yes.
5      Q.  I'm going to read the first sentence in that
6  paragraph and ask you to follow along, please.  Quote,
7  In the case of the Delhi, as noted above, the vessel
8  itself no longer exists, marine borers have eaten away
9  all of the organic material that was once there, period,
10  end of quote.  Did I read that correctly?
11      A.  Yes.
12      Q.  Do you believe that to be an accurate
13  statement?
14      A.  It should have said "most" of the organic
15  material.
16      Q.  Okay.  So sitting here today, you agree that
17  that sentence is inaccurate, because it should have said
18  "most," not "all," organic material?
19      A.  Correct.
20      Q.  And you would agree with me that we have
21  already looked at exhibits today that have wood in some
22  condition at the bottom; right?
23      A.  Correct.  The wood in, at least, this photo
24  does show marine borers having eaten.
25      Q.  Sure.  And you're pointing to the second photo,

Page 87

1  Exhibit 9.  If you flip to the first photo in Exhibit 9,
2  you would agree with me that's wood; right?
3      A.  Correct.
4      Q.  And the next page, the second photo in
5  Exhibit 9, I know you pointed out borers, but what's
6  left is wood; right?
7      A.  Correct.
8      Q.  And the next page, the third page, also wood;
9  correct?
10      A.  Correct.
11      Q.  And you agree with me that wood is organic
12  material?
13      A.  Correct.
14      Q.  The Delhi is in ▮▮▮▮▮▮▮; correct?
15      THE WITNESS:  In ▮▮▮▮▮▮▮?
16      MR. STEIGELMAN:  Yes.
17      A.  Yes.
18      Q.  And we agree that ▮▮▮▮▮▮ is a fjard;
19  right?
20      A.  Yes.
21      Q.  And ▮▮▮▮ was carved out of granite by
22  glaciers?
23      MR. BRADEN:  Objection.
24      A.  I'm not a geologist, I can't...
25      Q.  Okay.  You describe in your report how the site

Page 88

1  of the wreck is like a bowl-shaped depression in the sea
2  floor; right?
3      A.  Correct.
4      Q.  And you describe in your report a suspended
5  sediment; right?
6      A.  Correct.
7      Q.  It's another way of saying mud; right?
8      A.  Correct.
9      Q.  When you were diving the wreck, did you see any
10  indication that, since Delhi went down, she might have
11  moved from the position where she initially settled?
12      MR. BRADEN:  Objection.
13      A.  Again, I can't answer that question.  I wasn't
14  there when she sank.
15      Q.  Well, that wasn't the question, but I can try
16  again.  You dove on the wreck of the Delhi?
17      A.  Correct.
18      Q.  And you saw what you saw down there?
19      A.  Correct.
20      Q.  Did you see any indication that the shipwreck
21  moved?
22      MR. BRADEN:  Objection.
23      A.  Again, I can't answer that question.  I can't
24  tell you if a dragger came through and ripped the whole
25  superstructure off at some point.  I just can't.



RICHARD SIMON                                                    August 29, 2025
JJM vs ADV

Page 89

1    Q.  Do you have any reason to think the Delhi moved
2    since she first settled on the ocean floor?
3    A.  Again, you know, it's in the bottom of a bowl,
4    so I can't answer that question if it moved from when it
5    first went down.
6    Q.  You agree that portions of the wreck of the
7    Delhi protruded up above the ocean floor; correct?
8    A.  Yes.
9    Q.  And you saw it with your own eyes?
10   A.  Yes.
11   Q.  And other parts of the wreck of the Delhi were
12   not visible to you; correct?
13          MR. BRADEN:  Objection.
14   A.  Correct.
15   Q.  You can't see through mud; right?
16   A.  I cannot see through mud.  Correct.
17   Q.  So if there were parts of the wreck in the mud,
18   you couldn't see the buried parts; right?
19          MR. BRADEN:  Objection.
20          MR. STEIGELMAN:  What's the basis?
21          MR. BRADEN:  So he testified at length to
22   the extent that he stuck his hands in there and may or
23   may not have seen things to the extent that he saw them.
24   So your question is pretty general as to what he may or
25   may not have seen or was capable of seeing.  So if you

Page 90

1    want to narrow it further and ask him about the things
2    he may have seen beneath the mud, sure, I won't object.
3          MR. STEIGELMAN:  You can answer.
4          MR. BRADEN:  Can you repeat the question?
5          MR. STEIGELMAN:  Can you read it back,
6    please.
7          (Pending question read)
8    A.  I cannot see things buried in mud, but I can
9    see things to the best of my ability down to three feet.
10   Q.  Do you agree that the piece of wood that is
11   likely the Delhi sternpost protrudes approximately two
12   meters out of the muddy sea floor?
13   A.  I don't believe we measured the height of it,
14   so I'm not comfortable answering that.  I just don't
15   know the exact.  It protrudes.  Whether it's three feet
16   or, what did you just say, six feet?
17   Q.  I said two meters.
18   A.  Two meters.  I couldn't tell you whether
19   it's -- it's somewhere probably between three feet and
20   two meters.  I cannot tell you.  We did not measure it.
21   Q.  Okay.  Did you see that the State's expert,
22   Mr. McBrian, had a conclusion about the size of that
23   sternpost?
24   A.  He did have a conclusion.
25   Q.  And that conclusion was the sternpost sticks up

Page 91

1    approximately two meters; right?
2    A.  Yes, that was his conclusion.
3    Q.  And he also concluded the original height was
4    probably close to four meters; right?
5    A.  Again, if you're telling me that's what he said
6    in his report, you would have to show it.  I'm not going
7    to say that that's what he said without...
8    Q.  Fair enough.  Let's look at the State's report,
9    Exhibit 3, page 25.  No, sorry.  Page 22.  And I'm going
10   to go one before that, page 21.  So this is State's
11   Exhibit 3, Mr. McBrian's report, page 21.  Do you see
12   that?
13   A.  Yes.
14   Q.  And the third paragraph down in this
15   Section 6.1, do you see, begins, "The keel and keelson"?
16   A.  Yes.
17   Q.  Can you take a moment to read that third
18   paragraph, please.  Let me know when you're ready to
19   talk about it.
20          (Witness perusing document)
21   A.  Okay.
22   Q.  You have read that third paragraph, the
23   Section 6.1 of Mr. McBrian's report?
24   A.  Yes.
25   Q.  And having reviewed it, do you see

Page 92

1    Mr. McBrian's conclusion of an approximate two-meter
2    height off the seabed?
3    A.  Yes.
4    Q.  And approximate height of the vessel of four
5    meters; do you see that?
6    A.  I see where he writes that.
7    Q.  And so do you see the next portion of his
8    conclusion?  And I'm going to read that to you, please
9    follow along.  It's the fourth line down in that
10   paragraph, open quote, I can; do you see that?
11   A.  Yes.
12   Q.  Quote, I can reasonably conclude that a portion
13   of the base of the sternpost is buried or embedded in
14   the seabed, period, end of quote.  Did I read that
15   correctly?
16   A.  Yes.
17   Q.  Do you agree or disagree with Mr. McBrian's
18   conclusion?
19          MR. BRADEN:  Objection.
20          MR. STEIGELMAN:  I mean, I suppose if he
21   can't comment on our expert's conclusion, then we can
22   just bar his testimony on this point, and that would be
23   fine.  But if you want him to have an opinion about
24   this, maybe the objection is not such a good idea.
25   But you can testify subject to objection.  Go ahead.



RICHARD SIMON                                    August 29, 2025
JJM vs ADV

Page 93

1    A. Again, this is not my area of expertise, the
2  construction of this ship. But I will say he took his
3  measurements, it looks like, off an ROV with lasers. So
4  not knowing how those lasers are set, I can't answer or
5  say that his data is correct with that assumption.
6    Q. Okay. So let me give you maybe a third option
7  here. Is it you agree, or you disagree, or you're just
8  not sure if you have an opinion on his conclusion?
9    A. I don't have an opinion on his conclusion.
10   Q. Okay. If portions of the vessel are protruding
11  from the sea floor and up into the water, logic tells us
12  that some portion of the wreck, of the ship's wood, has
13  got to be stuck in the mud; right?
14   A. Portions, yes.
15   Q. Your report -- so I don't want to confuse you.
16  Not the State's report, but your report claims that
17  marine boring organisms have consumed most, if not all,
18  of the ship's hull; correct?
19   A. Correct.
20   Q. And we have already looked at pictures of wood
21  and talked about it a little bit today; right?
22   A. Correct.
23   Q. So we can agree that marine boring organisms
24  have not gotten to all the wood above the sea floor;
25  right?

Page 94

1    A. Not all of it. Correct.
2    Q. And isn't it true that the sea floor mud will
3  have less oxygen in it than the water above?
4    A. Again, I'm not an expert on the exact bottom
5  composition of that mud there. I couldn't tell you. We
6  would have to study it to tell you exactly the oxygen
7  content.
8    Q. Are you familiar with some kind of oxygenated
9  JJM?
10   A. I'm not, but I don't know that there isn't some
11  kind, either. I can't accurately answer that.
12   Q. Isn't it true that the major risk to wood in a
13  shipwreck is water, in part because of the oxygen in the
14  water?
15   A. Can you ask that question again?
16   Q. Yes. Isn't it true that the major risk to a
17  wooden shipwreck on the bottom is the water itself
18  because of the oxygen in the water; isn't that one of
19  the risks to the wood?
20   A. One of the risks to the wood, you're saying, or
21  the only risk is what you're saying?
22   Q. One of the risks to the wood.
23   A. I don't -- can you just ask the question one
24  more time? I'm just trying to understand what exactly
25  you're trying to say.

Page 95

1    Q. Isn't it true that one of the risks to wood in
2  a wooden shipwreck is the water because of the oxygen in
3  the water?
4    A. So you're saying a subset of the water, not
5  taking currents and all that, is oxygen?
6    Q. Let me try it this way: You have already
7  testified about marine boring organisms; right?
8    A. Yes.
9    Q. Is it your understanding that marine boring
10  organisms need oxygen in the water to survive?
11   A. I have seen marine -- if the question is, have
12  I seen them below the mud, yes. I inspect piles every
13  day where they're well below the mud line.
14   Q. And isn't it true that the mud in the sea floor
15  will preserve the wood better than the wood is preserved
16  just in a water column?
17   A. Can you ask that question one more time?
18   Q. Isn't it true that the mud in the sea floor
19  will preserve the wreck better than the wood protruding
20  into the water column?
21   A. This isn't my area of expertise. I'm
22  uncomfortable answering that definitively.
23   Q. Okay. So you can't reasonably conclude, then,
24  if there's -- we know there's wood sticking out of the
25  sea floor; right?

Page 96

1    A. Correct.
2    Q. And based on your lack of expertise, you have
3  no opinion as to how much of the wreck might be down
4  below the sea floor, because you don't know if the
5  marine boring organisms are more or less voracious in
6  the mud; correct?
7    A. That's not correct. I can tell you from me
8  physically being there and feeling that there's not much
9  left of it from what we can feel below the mud.
10   Q. Up to the length of one arm?
11   A. Correct.
12   Q. And you saw Mr. McBrian's report saying the
13  height of the vessel, meaning the vessel hull, not the
14  rigging, but the height of the vessel hull was about
15  four meters; right?
16   A. In his opinion.
17   Q. In his opinion.
18   A. Yes.
19   Q. Do you believe your arm is four meters long?
20   A. My arm is not four meters long.
21   Q. So is it possible there's more of the wreck
22  down there, and it was deeper than you were able to
23  reach?
24   A. Again, I can't tell you what's beyond my reach.
25   Q. Is it possible?



RICHARD SIMON
JJM vs ADV

August 29, 2025

Page 97

1    A.  Again, I'm not going to make a conclusion on
2  something that I can't say.
3    Q.  You're not even going to hazard the
4  possibility?
5    A.  Again, I can't tell you, I'm not going to tell
6  you if something is there or not there that I can't
7  answer the question honestly.
8    Q.  Have you seen the artifacts that were brought
9  up from the shipwreck?
10    A.  I have not seen any artifacts brought up from
11  the shipwreck.
12    Q.  Are you aware that there were artifacts brought
13  up?
14    A.  I'm not aware that there were artifacts
15  brought up from the shipwreck.
16    Q.  Okay.
17    A.  I take that back.  I know there was a
18  cobblestone taken, if that's what you're calling, for
19  the original arrest, I believe.
20    Q.  Do you have any information whether or not
21  there were any pieces of wood that were brought up from
22  the wreck?
23    A.  I do not.
24    Q.  Do you think if there were a wooden artifact,
25  that it would have been helpful to review it to know the

Page 98

1  state of preservation of that wood in the water?
2    A.  Do I think it would be helpful?  No, because
3  one artifact doesn't tell a whole story.
4    Q.  Okay.  So it would not have been helpful at all
5  to you --
6    A.  I don't believe so.  No.  One piece of wood,
7  no.
8    Q.  I'm marking as Exhibit 10 another document from
9  the lawsuit.  Exhibit Sticker 10, Document 1-1, do you
10  see that?  And, I'm sorry.  Take a moment to read it.
11  It's not long.  And we'll talk when you're ready.
12        EXHIBIT 10 (Defendant's Exhibit marked for
13  ID)
14        (Witness perusing document)
15        MS. PARKER:  While he is reviewing, do you
16  think that we're about an hour out?
17        MR. BRADEN:  Why don't we go off the
18  record for a second.
19        (OFF THE RECORD)
20    Q.  Back on.  Okay, Mr. Simon, have you had a
21  chance to review Exhibit 10, the affidavit of Justin
22  Seavey?
23    A.  Yes.
24    Q.  Have you ever seen this document before today?
25    A.  No.

Page 99

1    Q.  So having reviewed this affidavit, and assuming
2  it to be true, is it now your understanding that both a
3  stone paver and a piece of wood came up from the wreck?
4    A.  Yes.  Line 16, he says he took up a piece of
5  wood.
6    Q.  Yes.  And you have not seen that piece of wood,
7  have you?
8    A.  I have not.
9    Q.  So you cannot form an opinion about whether
10  that piece of wood was attacked by marine boring
11  organisms, can you?
12    A.  I can't tell you if that piece of wood is even
13  from this shipwreck, so...
14    Q.  And the paver is just a big piece of rock;
15  right?
16    A.  Cut piece of stone.
17    Q.  Would you agree with me that sound
18  archeological practice should guide the excavation of
19  any historic wreck?
20    A.  Of any historic wreck?  Yes.
21    Q.  Do you think it's a sound archeological
22  practice to remove artifacts without recording or
23  documenting their location?
24    A.  Are you calling a single piece of wood and one
25  paver off a giant pile an artifact?  Is that what you're

Page 100

1  referring to, the paver and the piece of wood that was
2  taken?
3    Q.  So I can ask the question again.  Do you think
4  it is a sound archeological practice to remove artifacts
5  without recording or documenting the location from which
6  it was taken?
7    A.  Again, can you give that to me in context, the
8  question?
9    Q.  No.  You're an expert.  I'm looking for your
10  expert opinion, please.
11    A.  I would say that you should document artifacts
12  before removing them.  Yes.
13    Q.  Okay.  Do you think it's a sound archeological
14  practice to store artifacts in a residential garage?
15    A.  I can't answer that question.
16    Q.  Why not?
17    A.  Because my garage is different than your
18  garage.  You have asked the question so broadly that,
19  you know, if someone has conservation tanks and that in
20  their garage, that's totally different than me throwing
21  it on a shelf.
22    Q.  In your opinion, what would make a garage a
23  suitable place to store an archeological artifact?
24    A.  Different artifacts need different levels of
25  conservation, so you would have to be more specific.



RICHARD SIMON                                                    August 29, 2025
JJM vs ADV

Page 101

1    Q. Okay. How about a piece of wood that was
2  brought up from a 130-year-old shipwreck, what would be
3  appropriate conservation measures to store that in a
4  residential automotive garage?
5    A. I probably wouldn't store that in a residential
6  if it was a historic artifact.
7    Q. Do you think it's a sound archeological
8  practice to transport artifacts in a black plastic bag?
9    A. I have seen historical artifacts put in
10 Rubbermaid totes. So, again, it really depends on what
11 the artifact is. If you have to keep it wet, then that
12 might be a suitable way of transporting it.
13   Q. What artifact was that that you saw in a
14 Rubbermaid?
15   A. When they salvaged Britannic's bell, they put
16 it in a Rubbermaid tote when it first came up, to
17 transport it, filled with water. So, again...
18   Q. Your expert report addresses the risk of
19 souvenirs being taken from the wreck of the Delhi;
20 correct?
21   A. Correct.
22   Q. And souvenir hunting in shipwrecks is very
23 common; right?
24   A. Absolutely.
25   Q. How common?

Page 102

1    A. There's a lot of unethical people that will
2  take whatever isn't nailed down.
3    Q. Do any examples spring to mind?
4    A. An example, and I think I cited it in my
5  report, of someone jumping someone else's arrest and
6  taking things from an arrested shipwreck. I cited the
7  court case in my report.
8    Q. And that was the Carolina case?
9    A. The Carolina case. Yes.
10   Q. And the court decision was Atlantic Wreck
11 Salvage; is that correct?
12   A. Correct. It upheld their arrest of the wreck.
13   Q. The court upheld the arrest?
14   A. Yes.
15   Q. And prevented other divers from souvenir
16 hunting?
17   A. Correct. On that wreck.
18   Q. What, if anything, is wrong with divers taking
19 souvenirs from shipwrecks?
20   A. So can we specify, historic wrecks versus
21 nonhistoric?
22   Q. If you think that's appropriate, sure.
23   A. So I think that, on historic wrecks, things
24 need to be documented and saved for cultural
25 preservation, because if you leave them on the bottom,

Page 103

1  they're going to get destroyed by the environment.
2    Q. Have you ever taken a souvenir from a
3  shipwreck?
4    A. Yes.
5    Q. How many?
6    A. Couldn't tell you.
7    Q. More than one?
8    A. Yes.
9    Q. More than one this year?
10   A. Not from something that we didn't hold an
11 arrest on.
12   Q. So putting aside the -- so the ones that you
13 have arrested, there's a court process, the judge has
14 said, has allowed some form of ownership, and you're
15 proceeding under that court process; right?
16   A. Correct.
17   Q. So other than arrested vessels, wrecks that
18 there is no court process, have you ever taken a
19 souvenir from a nonarrested vessel?
20   A. Not in State waters. Most of everything that I
21 have is international that we're either in the process
22 of arresting or is unknown.
23   Q. And why do you believe that to be a relevant
24 distinction?
25   A. Because it's legal what we're doing. It's not

Page 104

1  governed by the Abandoned Shipwreck Act. It's in
2  international waters.
3    Q. Is there any law applicable in international
4  waters?
5    A. I couldn't tell you. I could be wrong, but...
6    Q. Okay. Earlier we talked about the wreck of the
7  Britannic; correct?
8    A. Correct.
9    Q. And I forget the name now, you said the name of
10 the owner of the Britannic?
11   A. Simon Mills.
12   Q. What is Simon Mills, is that a person?
13   A. That's a person. He owns the wreck. It's his
14 arrest on that shipwreck.
15   Q. And to your knowledge, does he own it by virtue
16 of bringing some sort of salvage claim in British court?
17   A. He bought the salvage rights from someone else
18 who did that. And that's a complicated wreck, but it's
19 in Greek waters. So it's a very complicated arrest.
20   Q. To your knowledge, has anyone working for
21 Shoreline Diving ever taken a souvenir from a vessel it
22 salvaged?
23   A. No.
24   Q. Why not?
25   A. Why haven't we?

RICHARD SIMON
JJM vs ADV

August 29, 2025

Page 105

1    Q. Sure. Why not?
2    A. Because it's my livelihood, and I wouldn't risk
3  my livelihood for something like that.
4    Q. And in your opinion, would it be inappropriate
5  for one of the Shoreline Diving employees to take a
6  souvenir off of a salvaged or retrieved vessel?
7    A. Yes.
8    Q. And why would it be wrong?
9    A. Because it's not our property.
10    Q. If you knew one of your Shoreline Diving
11  employees took souvenirs from a shipwreck, how would you
12  handle it?
13    A. I would probably make them put it back.
14    Q. Has that ever happened?
15    A. No.
16    Q. If you knew one of your diving buddies wrongly
17  took souvenirs from a shipwreck, how would you handle
18  it?
19    A. The group I dive with is, it's a very
20  tight-knit group. And mostly we go out and document and
21  arrest shipwrecks, so we don't have that. So right now
22  they hold, Atlantic Wreck Salvage, who I do a lot of
23  diving with, holds, and we mainly are diving stuff and
24  trying to arrest it in court. So we have some arrests
25  in process. So it's really not a big issue for us,

Page 106

1  because we're mainly diving that or war graves.
2    Q. And to your knowledge, do your dive buddies or
3  you ever take souvenirs from war graves?
4    A. Never.
5    Q. To your knowledge, has Captain Takakjian ever
6  taking souvenirs from a shipwreck?
7    A. Yes.
8    Q. He has?
9    A. Yes.
10    Q. And do you believe that was appropriate or
11  inappropriate?
12    A. I would say it was appropriate.
13    Q. Is there one particular instance that you're
14  thinking of, or are there multiple instances of which
15  you're aware?
16    A. There's an incident that I am thinking of.
17  Yes.
18    Q. Which one, please?
19    A. They recovered a bell from a lightship and
20  displayed it.
21    Q. Where was it displayed?
22    A. The first stop was at a big dive exposé in
23  Boston.
24    Q. And I'm sorry. Did you say that was
25  appropriate for him to take it?

Page 107

1    A. I believe that they had the best of intentions
2  when they took it. Yes.
3    Q. I don't think that answers the question.
4  Putting aside his subjective intentions, do you believe,
5  sitting here as an expert in this case, that that was
6  appropriate or inappropriate for him to take up the
7  bell?
8    A. I guess I haven't thought about it long. Can
9  you give me a minute just to...
10    Q. Yes, sure. Take your time.
11    A. I would say that, in the case that you were
12  talking about, it was appropriate, in my opinion,
13  because they were displaying it, they weren't keeping it
14  for themselves. They were trying to honor the sailors
15  of that ship.
16    Q. Putting aside the lightship you're telling us
17  about, are you aware of any other instances where
18  Captain Takakjian has taken souvenirs from a shipwreck?
19    A. Not to my knowledge, off the top of my head. I
20  don't know, to answer that.
21    Q. Let's talk about the pavers, please. You saw
22  pavers when you were down at the bottom of the ocean;
23  right?
24    A. Correct.
25    Q. And how many did you see?

Page 108

1    A. And I know you're probably not going to like
2  the answer. A lot.
3    Q. A dozen?
4    A. More than a dozen.
5    Q. A hundred?
6    A. More than a hundred.
7    Q. A thousand?
8    A. More than a thousand.
9    Q. Ten thousand?
10    A. I couldn't tell you.
11    Q. We already talked about the ROV video that you
12  received from the State's expert in this case?
13    A. Correct.
14    Q. And you said you spent about two days watching
15  most of the ROV video?
16    A. Correct.
17    Q. Did you look to see how many pavers were
18  visible in the ROV feed?
19    A. Are you saying, did I look and count how many?
20  Did you?
21    A. We tried to estimate roughly how many pavers
22  were there.
23    Q. And did you come to a conclusion or an
24  estimate?
25    A. Not a conclusive one. It's a big pile of



RICHARD SIMON                                                        August 29, 2025
JJM vs ADV

Page 109

1  pavers.
2      Q. And not a conclusive one. Is there a rough
3  estimate, a best estimate?
4      A. Yes, there's a best estimate. I don't know if
5  we listed it in our report, or if we just talked about
6  it, to be honest with you, off the top of my head. I
7  would have to reread.
8      Q. Mr. McBrian, in his report for the State,
9  estimates there could be over 30,000 pavers, as an
10 approximate number. Would you agree with that estimate?
11     A. I think that would be -- if he says that, can I
12 just do some quick math on my phone?
13         MR. BRADEN: Your phone should be off.
14     A. It is, but can I turn it on, is what I'm
15 asking.
16     Q. Actually, that would be helpful. If you want
17 to take a minute to do some estimation, that would be --
18     A. If you're saying 30,000, if someone has a
19 calculator...
20         MR. STEIGELMAN: We can go off the record
21 if he wants to punch some numbers in.
22     (Brief recess taken, 11:17 a.m. to 11:21 a.m.)
23 BY MR. STEIGELMAN:
24     Q. Okay. So we just took a quick break for a
25 little bit of math. And I'm not going to try to

Page 110

1  recreate where we were, but I think the math break was
2  for you to do a little bit of calculation --
3      A. To see if there was 30,000 cobblestones.
4      Q. So what rough estimate, if any, do you have
5  based on what you know and the math you just did?
6      A. So the average weight of a cobblestone is
7  18 pounds. So if you take 18 pounds divided [sic] by
8  30,000, you get 540,000 pounds of cobblestones. Again,
9  I'm not an expert on ship construction, but that seems
10 to be a very high estimate on how many cobblestones, in
11 my opinion, could be down there. I think that's on the
12 high side.
13     Q. Okay. So you think 30,000 is on the high side.
14 Do you think, order of magnitudewise, somewhere between
15 ten, twenty, thirty is likely?
16     A. I would think somewhere between ten and twenty
17 is more likely than thirty thousand.
18     Q. Okay. Let's go to the State's report, please,
19 on page 7. It's Section 3.1.2.
20     A. Okay.
21     Q. I'm going to focus on the second paragraph
22 here, and the very last line -- sorry -- the
23 second-to-last sentence. "This could mean"; do you see
24 that?
25     A. Yes.

Page 111

1      Q. I'm going to read it, and I'm just looking
2  ahead. I'm just going to read the second-to-last
3  sentence. "This could mean that based on the measured
4  size of the pavers, up to 20,000 pavers could be in this
5  area, buried underneath the seabed sediments and visible
6  pavers," period, end of quote. Did I read that
7  correctly?
8      A. You read it correctly.
9      Q. Do you agree or disagree with that conclusion,
10 or not have a basis for a disagreement or agreement?
11         THE WITNESS: Can I reread it myself,
12 please?
13         MR. STEIGELMAN: Yes.
14         (Witness perusing document)
15         THE WITNESS: Okay. Can you ask your
16 question again?
17         (Pending question read)
18         MR. BRADEN: Tim, just so I don't have to
19 object, is your question just about whether or not
20 there's 20,000 pavers --
21     A. Missing? That's --
22         MR. BRADEN: Wait. Possibly below the
23 surface, or -- that sentence before it talked about,
24 "based on the conclusion that half of the vessel is
25 below the seabed." So I don't have to object, do you

Page 112

1  want to clean up your question?
2      Q. Let me rephrase. Thank you. Let me start with
3  the conclusion in that penultimate sentence about up to
4  20,000 pavers in the area. Start with just the number,
5  okay? Do you agree that it's possible there could be up
6  to 20,000 pavers down there?
7      A. Again, and I'm just going to get technical. On
8  the whole wreck site, or 20,000 missing? Because the
9  way I read this, he is saying that 20,000 pavers are
10 missing.
11     Q. Well, let's go with your understanding. What
12 do you mean by missing; what is your understanding of
13 that paragraph?
14     A. My understanding is that he is trying to say
15 there was up to 30,000 pavers, he believes, there's
16 10,000 pavers in that pile, and that 20,000 pavers are
17 missing somewhere.
18     Q. So let's go with this missing point of view.
19 Do you agree or disagree or have no opinion about that
20 20,000 missing pavers conclusion?
21     A. I don't have enough information to make a
22 conclusion on that 20,000 pavers.
23     Q. Okay. Without anchoring to a particular
24 number, would you agree or disagree that there likely
25 are some pavers that are not visible to the eye,



RICHARD SIMON                                      August 29, 2025
JJM vs ADV

Page 113

1  underneath what you can see readily?
2    A.  Yes.
3    Q.  And would you agree with the last portion of
4  that penultimate sentence, that those nonvisible pavers
5  are buried underneath the seabed sediments and visible
6  pavers?
7    A.  Just so we're clear, what you're asking is, do
8  I agree that there is buried pavers?
9    Q.  Yes.
10    A.  Yes, there are some buried pavers.
11    Q.  Okay.  Thank you.  Let's turn to the next page,
12  please.
13    A.  That's page 8?
14        MR. STEIGELMAN:  Yes.  Thank you.
15  Actually, no.  We'll move on.  I'm going to mark as
16  Exhibit 11 -- this document marked as Exhibit 11 at the
17  top, it's United States Department of the Interior
18  National Park Service, National Register of Historic
19  Places, Determination of Eligibility Comment Sheet.
20        EXHIBIT 11 (Defendant's Exhibit marked for
21  ID)
22    Q.  Have you seen this document before?
23    A.  Yes.
24    Q.  Have you read it before today?
25    A.  Yes.

Page 114

1    Q.  Let's go to the last page of Exhibit 11,
2  please.
3    A.  Page 5?
4    Q.  Page 5.  Thank you.  Do you see the signature
5  block on page 5?
6    A.  Yes.
7    Q.  And it's the squiggle, I'm assuming, is a
8  signature, and the name is Michael Roller; right?
9    A.  Correct.
10    Q.  And he is apparently a Ph.D. archaeologist?
11    A.  Correct.
12    Q.  And he is employed, according to the signature
13  block, by the National Register of Historic Places and
14  the National Historic Landmarks Program; right?
15    A.  That's what it says.  Correct.
16    Q.  Okay.  Let's go back to the first page, please.
17  Actually, let me back up, because you have already read
18  this.  What is your understanding of what this document
19  decided?
20    A.  I can't answer that without rereading the exact
21  decision.  I have read the document once, so...
22    Q.  Okay.  That's all right.  Do you remember when
23  you saw it last?
24    A.  Within the last two weeks I have seen it, for
25  the first time.

Page 115

1    Q.  All right.  In the first paragraph, about a
2  little more than halfway down that first paragraph, I
3  count about eight lines up from the bottom of the first
4  paragraph, sort of more or less in the middle of the
5  paragraph, it says, "As evidence, JJM cited"; do you see
6  that?
7    A.  Yes.
8    Q.  Go ahead and review that one sentence, please.
9  "As evidence."  And I'm not going to ask you to speak
10  for the author of this document, but we can agree what
11  it says, that the document says that your expert report
12  was considered in issuing the document; right?
13    A.  Correct.
14    Q.  Okay.  Do you recall in your report you
15  criticized Mr. McBrian for not using his own side-scan
16  sonar?
17    A.  Yes.
18    Q.  And you described Mr. McBrian's ROV as a
19  low-end, almost disposable piece of amateur equipment;
20  right?
21    A.  Yes.
22    Q.  And you opined that, in your view,
23  Mr. McBrian's lack of his own side-scan sonar meant he
24  did not get an accurate layout of the wreck site;
25  correct?

Page 116

1    A.  Correct.
2    Q.  Let's turn to this document Exhibit 11's second
3  page, the first full paragraph under the heading there,
4  the last sentence of the first full paragraph.  I'm
5  going to read it.  It starts, "The McBrian report"; do
6  you see that?
7    A.  Yes.
8    Q.  I'm going to read that.  Please follow along.
9  Quote, The McBrian report documents a systematic survey
10  and evaluation by a professional archeological crew,
11  substantiating MPHC's statements regarding the shipwreck
12  site's condition and integrity, period, close quote.
13      And other than me putting the apostrophe S in the
14  wrong place, did I otherwise read it correctly?
15    A.  Yes.
16    Q.  So your report describes the Delhi as a very
17  common type of vessel; right?
18    A.  Correct.
19    Q.  And you opined the wreck site is not
20  historically important?
21    A.  Correct.
22    Q.  And the National Register disagreed with you as
23  to how common this sort of ship is; right?
24    A.  Can you tell me where that is in the report?
25    Q.  Yes.  Page 4, please.  At the top of the page,



Page 117

1  there's the first full sentence, it's three-plus lines
2  starting in the top right corner, "While these"; do you
3  see that sentence?
4    A. Yes.
5    Q. And I will just read that whole sentence. Open
6  quote, While these historic properties retain
7  significance within respective domains of interest, the
8  specific data potential of the Delhi, arrested in its
9  immediate configuration at the time of its sinking, is
10  not comparable to any other ship or shipwreck in the
11  State of Maine listed on the National Register, period,
12  close quote. Did I read that correctly?
13    A. Yes.
14    Q. Your report contends that the Delhi artifacts
15  have no monetary value; right?
16    A. Correct.
17    Q. You described them as low value and common?
18    A. Correct.
19    Q. The National Register determined your statement
20  about monetary value was irrelevant to the archeological
21  potential of the Delhi; correct?
22    A. Can you tell me where that is in the report?
23    Q. Yes. About four or five, or maybe six lines
24  up, the first full paragraph, it's one word in from the
25  left, "JJM's contention"; do you see that?

Page 118

1    A. Yes.
2    Q. I'm going to read it, please follow along.
3  "JJM's contention that the common artifacts associated
4  with the ship's crew found at the site maintain no
5  monetary value is irrelevant to a consideration of the
6  site's eligibility," period. I'm not going to close
7  quote, I'm going to go on, so stay with me here.
8      Going on, "In context, their significance is the
9  value they contribute to the research potential of this
10  archeological site," period, end of quote. Other than
11  my extemporizing to keep the quote together, did I
12  otherwise read that correctly?
13    A. Yes.
14    Q. Would you agree with me the National Register
15  mostly disagreed with your opinions in your report?
16    A. I can't agree nor disagree. There were some
17  points of contention, yes.
18    Q. Would you agree that the National Register
19  mostly agreed with Mr. McBrian's report?
20    A. Again, I think they agreed with certain parts
21  of it.
22    Q. Now, Mr. Roller at the National Register, and
23  Mr. McBrian, the State expert, they're both
24  archaeologists; right?
25    A. Correct.

Page 119

1    Q. And you are not an archaeologist?
2    A. Correct.
3    Q. Could it be that your lack of archeological
4  training and expertise explains why your report
5  disagrees with these two archeological writings?
6    A. No.
7    Q. Do you remember earlier today we talked about
8  your role as an unbiased expert?
9    A. Yes.
10    Q. Now that we have reviewed the National
11  Register's determination, do you want to change any of
12  your expert opinions?
13    A. No.
14      MR. STEIGELMAN: We have one more section
15  to get through. But we just took a break, so do you
16  want to keep going?
17      MR. BRADEN: Yes, I'm good.
18    Q. Okay. Mr. Simon, as we discussed before,
19  Shoreline Diving is a commercial dive company?
20    A. Correct.
21    Q. And because it's a commercial operation,
22  Shoreline Diving must run efficiently on every job;
23  right?
24    A. Correct.
25    Q. So Shoreline should not intentionally slow down

Page 120

1  a job; right?
2    A. Correct.
3    Q. So it shouldn't do something in months when it
4  could be done in a week or two?
5    A. Correct.
6    Q. A customer would want it done reasonably in a
7  week to limit expenses; right?
8    A. Correct.
9    Q. And that's what any reasonably competent dive
10  company would do; right?
11    A. Can you just ask that question one more time?
12    Q. That's what any reasonably competent dive
13  company would do?
14    A. Can you ask the full...
15    Q. Yes. Any reasonably competent dive company
16  would minimize the amount of time and expense for the
17  customer?
18    A. Sometimes jobs aren't done efficiently because
19  of the way they have to do it. So our job is to get the
20  job done the way you spec the job, if you will. If an
21  engineer specs they want it done a certain way, we have
22  to do it the way they spec, even if there is a more
23  efficient way sometimes. Does that make sense?
24    Q. Do you recall in your report describing that
25  all artifacts are easily picked up by hand with no



RICHARD SIMON                                    August 29, 2025
JJM vs ADV

1  effort?
2      A.  Yes.
3      Q.  Do you remember what artifacts you were
4  referring to in the statement?
5      A.  The artifacts were the china that was sitting
6  there, and the cobblestones.
7      Q.  So did the artifacts you're referring to
8  include any of the structural portions of the wreck that
9  remain in place?
10     A.  No, they did not.
11     Q.  Do you believe portions of the wreck are firmly
12 stuck in the mud on the sea floor?
13     A.  I can't answer that, because I didn't try and
14 pull on a sternpost.  So I can't answer that question
15 fairly.
16     Q.  During your dive on the wreck of the Delhi, did
17 you make any effort to remove the sternpost?
18     A.  No.
19     Q.  During the dive on the wreck of the Delhi, did
20 you make any effort to remove any of the ship's outer
21 hull planking?
22     A.  No.
23     Q.  So you have no basis to know how difficult it
24 would be to remove the large wooden planking or timbers;
25 is that correct?

1          MR. BRADEN:  Objection.
2      A.  Can you ask the question one more time?
3      Q.  You have no basis to know how difficult it
4  would be to remove the large wooden planking or timbers;
5  correct?
6          MR. BRADEN:  Same objection.
7          MR. STEIGELMAN:  What is the basis?
8          MR. BRADEN:  So you had extensive colloquy
9  about what constituted frame or timbers.  And I think he
10 testified that he couldn't say whether anything was
11 frame or timber.  So if you want to refer to the
12 specific parts that he tried to remove or not remove,
13 you can do that.
14     But it presumes that there are frame or timbers
15 there that he saw.
16     Q.  Fair enough.  Let me try to rephrase.
17 Mr. Simon, do you have any basis to know how difficult
18 it would be to remove any of the wooden portions of the
19 ship that remain in place?
20     A.  I can tell you there were loose pieces of wood
21 on the wreck that we picked up to feel a weight on to
22 determine, is this from the wreck, or is this a piece of
23 dock that floated into the wreck.  So I can answer to
24 that extent.  I can't tell you -- we didn't pull on any
25 wood or try to pull anything out of the mud like that.

1      Q.  So the loose piece of dock, was that a
2  hypothetical, or was there actually a piece of dock down
3  there?
4      A.  There were pieces of broken dock down there.
5      Q.  How could you tell it was a dock?
6      A.  It was modern, pressure-treated lumber we saw.
7      Q.  Did not look the same as, for example, the
8  sternpost?
9      A.  Correct.
10     Q.  Did not look the same as the perpendicular
11 joints that, maybe they're planking, maybe they're
12 framing, but whatever they are, they're perpendicular
13 parts of the Delhi; right?
14     A.  You can tell the difference between modern
15 pieces of wood and new pieces of wood, but there were
16 trees down there, there was lots of debris down there.
17 So I'm trying to understand where you're going.
18     Q.  Did you get any pictures of the trees?
19     A.  I think, in some of the video, there's a
20 picture of some tree branches.
21     Q.  Were there any photos in Mr. McBrian's report,
22 photos of wood that you think were not actually wood
23 that belonged to the Delhi?
24     A.  In the photos that he showed here?
25     Q.  Yes.  In the report.

1      A.  Can I just skim through it again?
2      Q.  Please.
3          (Witness perusing document)
4      A.  You want specifically pieces of wood is what
5  you're asking?
6      Q.  Yes.
7      A.  To answer the question, I did not see him show
8  any pieces of wood debris on the bottom.
9      Q.  So having just reviewed Mr. McBrian's report,
10 you would agree that all the wood he displays in those
11 photos in his report, Exhibit Number 3, are likely the
12 wreck of the Delhi?
13     A.  That I can't say.  Again, he does show one
14 picture of loose wood.  I can't tell if that's from the
15 wreck or not.
16     Q.  Which one is that, please?  No, no,
17 Mr. McBrian's report.
18     A.  Oh.  Sorry.  This is a part of his report.
19 Then in this report...
20     Q.  Exhibit 3.
21     A.  Exhibit 3.  Sorry.  It appears that, from what
22 I can see, that the wood that is visible is from the
23 ship.
24     Q.  Okay.  So let's just focus on the photos in
25 Exhibit 3, Mr. McBrian's report that you just looked



RICHARD SIMON
JJM vs ADV

August 29, 2025

Page 125

1  through.  To the best of your recollection, when you
2  dove the wreck, did you or any member of the dive team
3  attempt to remove any of that wood from the wreck?
4      A.  No one tried to remove any wood.  No.
5      Q.  Do you have any basis to know how hard it would
6  be to remove that wood?
7      A.  No.
8          MR. STEIGELMAN:  I'm going to circulate
9  what's going to be Exhibit 12.  Just let me know if you
10  have seen that before.
11         EXHIBIT 12 (Defendant's Exhibit marked for
12  ID)
13         (Witness perusing document)
14     Q.  Mr. Simon, I just handed you Exhibit 12, which
15  is called "Annex 4 - Shipwreck Excavation Case Studies."
16  Do you see that?
17     A.  Yes.
18     Q.  And I will just, you will see it in the first
19  paragraph here, but I will tell you that's Connor
20  McBrian's signature at the top.  See the capital C and
21  the capital M?
22     A.  Yes.
23     Q.  Have you ever seen this document, Annex 4,
24  before?
25     A.  I have not.

Page 126

1      Q.  Let's step through this the best we can.  We
2  will just focus on the photos, okay?
3      A.  Yes.
4      Q.  Unfortunately, this Exhibit 12 is not
5  paginated, so we will have to do the best we can with
6  section numbers and that kind of thing.  So a couple of
7  pages in, there's "0.2 Case Studies."  It's about three
8  pages in, I think, if you can flip through.
9          Do you see at the top, "0.2.1 Brown's Ferry
10  Vessel"?
11     A.  Yes.
12     Q.  Are you familiar with this vessel?
13     A.  No.
14     Q.  Okay.  Let's flip the page, please.  It's not
15  paginated, but there is a Figure 1 diagram at the top of
16  this page; do you see that?
17     A.  Yes.
18     Q.  And do you see the, sort of, plan of this wreck
19  and how Brown's Ferry vessel had all kinds of bricks
20  down at the bottom of the water?
21     A.  I see an artist's rendition, not plans.
22     Q.  Fair enough.  Would you agree there is some
23  similarity to the wreck of the Delhi and this artist's
24  illustration here of Brown's Ferry vessel?
25     A.  Some similarity in what regards?  I don't know

Page 127

1  when this vessel sank like that.  Or are you saying does
2  this look similar to the Delhi?
3      Q.  Does this look similar to the wreck of the
4  Delhi?
5      A.  Yes.
6      Q.  Let's flip the page.  Next page, there's a
7  Figure 2, another artist's sketch, and then a Figure 3
8  photograph; do you see that?
9      A.  Yes.
10     Q.  And Figure 2, the caption describes it as a
11  site plan of the Brown's Ferry vessel; do you see that?
12     A.  Yes.
13     Q.  And then Figure 3 is a photograph; right?
14     A.  Yes.
15     Q.  And do you know what equipment they're using
16  to, what appears to be pulling the vessel off the
17  bottom?
18     A.  Yes.
19     Q.  What is that equipment, please?
20     A.  They're using some sort of crane, spreader
21  bars, and strapping to lift up the whole vessel.
22     Q.  And you would agree with me that that's more
23  than just the use of hand tools; right?
24     A.  Correct.  To lift up the whole vessel.
25     Q.  Let's go to the next page.  And at the top,

Page 128

1  it's Section 0.2.2; do you see that?
2      A.  Yes.
3      Q.  And the ship's name is the Vasa, V-A-S-A; do
4  you see that?
5      A.  Yes.
6      Q.  Are you familiar with this wreck?
7      A.  I am not.
8      Q.  Let's flip the page, and Figure 4 is on the
9  next page; do you see Figure 4, the artist's rendition
10  at the top there?
11     A.  Yes.
12     Q.  And why don't you take a moment to review the
13  caption for Figure 4, please.
14         (Witness perusing document)
15     A.  I have read the caption.
16     Q.  Okay, thank you.  Would you agree with me this
17  shows, again, it's an artist's rendition, but a diver
18  tunnelling underneath the hull of the wreck of the Vasa?
19     A.  That is what it's showing.  Yes.
20     Q.  And it was a cross-section to sort of show
21  what's inside the hull, but it's described as a
22  cross-section, right, the second sentence of the caption
23  explaining that?
24     A.  Yes.
25     Q.  Okay.  Let's flip the page, please.  And this



RICHARD SIMON                                                                          August 29, 2025
JJM vs ADV

1   is Figure 5, which has what I take to be one photo and
2   two different drawings or diagrams; do you see that?
3       A.  Yes.
4       Q.  Okay.  And do you see this sort of tall, skinny
5   diagram on the left shows how Vasa was sort of lifted
6   off the bottom by these barges; do you see that?
7       A.  Correct.
8       Q.  As a salvage or wreck recovery person yourself,
9   does this look familiar to you, something that Shoreline
10  Diving would do?
11      A.  Does it look similar?  Would we do it in this
12  manner, with two barges, suspended like that?  We would
13  not do it that way.  OSHA would never allow it.  But do
14  we strap a vessel and pick it up?  Yes.
15      Q.  Okay.  And look at the top right, the sort of
16  long diagram there.  Do you see how they sort of, it
17  appears they walk the vessel up?
18      A.  Yes.
19      Q.  And then the bottom right of the photo, the
20  bottom right appears to be photos.  You have the barges,
21  and then some other vessels around it; right?
22      A.  Correct.
23      Q.  Okay.  And would you agree with me that the
24  excavation and movement of the Vasa shown in Figures 4
25  and 5 are more than just hand tools?

1       A.  Yes.
2       Q.  All right.  Let's skip forward two pages, and
3   Section 0.2.3; do you see that?
4       A.  Yes.
5       Q.  And this is the Mary Rose; right?
6       A.  Yes.
7       Q.  Are you familiar with this vessel?
8       A.  I know the name, but not in detail.
9       Q.  Okay.  Let's flip forward one page, please.
10  And we have Figures 8 and 9 at the top of this page;
11  right?
12      A.  Correct.
13      Q.  And Figure 8 is a diver operating an airlift;
14  right?
15      A.  That's what it says.  I don't know if it's an
16  airlift or a water dredge based off that photo.
17      Q.  Okay.  What is the difference?
18      A.  One uses air, expanding, coming up to pick up
19  an object.  The other uses water and a Venturi effect.
20  They both do the same thing, but a little differently.
21      Q.  And then the photo in the top right there,
22  Figure 9, looks like the vessel wreck is being craned
23  somewhere; right?
24      A.  Correct.
25      Q.  Would you agree with me that the excavation and

1   movement of Mary Rose in Figures 8 and 9 shows more than
2   just the use of hand tools?
3       A.  Yes.
4       Q.  Let's go to the next page, please,
5   Section 0.2.4.  And the name at the top there is
6   Batavia; do you see that?
7       A.  Yes.
8       Q.  If you could flip ahead one page, please,
9   you'll see Figure 11 in the middle of the page, a
10  black-and-white photo; do you see that?
11      A.  Yes.
12      Q.  And the caption claims this is a diver
13  operating an airlift?
14      A.  Yes.
15      Q.  Does it appear like that could be?
16      A.  Airlift or water dredge, again.  They're both
17  very similar, but I couldn't tell you which one it is.
18      Q.  Okay.  Do you see the second sentence of the
19  caption for Figure 11, "Note"; do you see that?
20      A.  Yes.
21      Q.  I will read it.  "Note partially buried hull
22  timbers on the right side of the photo."  Did I read
23  that correctly?
24      A.  Yes.
25      Q.  And you would agree with me that the use of

1   this, whether it's an airlift or water dredge, you would
2   agree that's more than just hand tools to excavate the
3   Batavia?
4       A.  Correct.
5       Q.  Let's flip forward two pages, please.  I'm
6   looking at Section 0.2.5; do you see that?
7       A.  Yes.
8       Q.  And the vessel's name is James Matthews; right?
9       A.  Correct.
10      Q.  Flip forward one page, please.  Figures 12 and
11  13 are photos on this page; correct?
12      A.  Correct.
13      Q.  And Figure 12, it says, "Diver excavating
14  sediment with an airlift."  And again, putting aside
15  exactly how accurate, it's something like an airlift?
16      A.  Correct.
17      Q.  And then Figure 13 below claims now this diver
18  is using a water dredge; right?
19      A.  Correct.
20      Q.  Okay.  You would agree with me that the use of
21  an airlift and water dredge to excavate the James
22  Matthews, as shown in Figures 12 and 13, shows more than
23  just the use of hand tools; correct?
24      A.  Correct.
25      Q.  Flip forward two pages, please.  I'm looking at



RICHARD SIMON
JJM vs ADV

August 29, 2025

Page 133

1  Section 0.2.6, Saint Nicholas Bay Shipwreck; do you see
2  that?
3    A. Yes.
4    Q. Flip forward one page, please. And I'm just
5  going to focus on Figure 15 down at the bottom; do you
6  see that diagram?
7    A. Yes.
8    Q. And it appears to be a side diagram at the top,
9  and then an overhead diagram at the bottom; right?
10   A. Correct.
11   Q. Can you tell, based on this, your quick look at
12  this diagram, how they're doing this excavation, this
13  Saint Nicholas Bay?
14   A. No.
15   Q. Would you agree with me it looks like they're
16  using more than just hand tools down there?
17   A. It doesn't say. I can't tell you what they're
18  using. They're using something.
19   Q. Let's flip forward, please, to the next page,
20  Red Bay, Section 0.2.7; do you see that?
21   A. Yes.
22   Q. If you flip to the next page, please, Figure --
23  well, I will focus on Figure 17 at the bottom of the
24  page. Do you see those two photos?
25   A. Are they both considered 17?

Page 134

1    Q. I think so. Let's focus on the one on the
2  left. Did you describe something like that before as a
3  spreader bar?
4    A. That would not be a spreader bar.
5    Q. What would you describe that as?
6    A. That is a single point to two. A spreader bar
7  would be two points coming down separately.
8    Q. It spreads it above the load. Okay.
9    A. Above the load so you pick up and you don't
10  have a pinch point.
11   Q. I see. And then on the right, the diver, it
12  says "airlift"; right?
13   A. Correct.
14   Q. And would you agree with me that the use of the
15  lifting equipment and an airlift as shown in Figure 17
16  involves more than just the use of hand tools to
17  excavate the Red Bay?
18   A. Correct.
19   Q. Let's flip forward two pages, please. This one
20  I imagine you will have heard of. Section 0.2.8, the
21  Hunley?
22   A. Yes.
23   Q. Of course. Let's flip forward one page,
24  please, Figure 20. Do you see that torpedo spar being
25  lifted?

Page 135

1    A. Yes.
2    Q. Let's flip forward another one to Figure 21.
3  And do you see the Hunley being raised off the surface
4  by what appears to be a crane that's out of frame of the
5  picture?
6    A. Yes.
7    Q. So looking at Figures 20 and 21, would you
8  agree with me that the Hunley was excavated with more
9  than just hand tools?
10   A. Yes.
11   Q. Let's skip ahead a couple of pages, please.
12  The second-to-last page, "Conclusion, Section 0.3." Why
13  don't you go ahead and read all of that section, 0.3.
14  Go ahead and read that part now, and tell me when you're
15  ready to talk about it.
16        (Witness perusing document)
17   A. You only want me to read Section 3, right?
18   Q. 0.3. Yes. Are you ready to talk about it?
19   A. Yes.
20   Q. I'm not going to read the whole thing to you,
21  but I will paraphrase the last paragraph of that
22  Section 0.3 conclusion, okay? Would you agree with me,
23  Mr. McBrian's conclusion is that more than hand tools
24  would be required to fully excavate the Delhi; do you
25  agree with me that's his conclusion?

Page 136

1    A. He says, next to impossible.
2    Q. Okay. So that's his conclusion, it would be
3  next to impossible to fully excavate Delhi without using
4  more than just hand tools?
5    A. Correct.
6    Q. Do you agree or disagree with that conclusion?
7    A. If you were going to pick up a wood timber,
8  then, yes. If you're going to pick up the cobblestones,
9  I could pick them up by hand.
10   Q. Just to make sure I'm clear, your distinction
11  is, if the only thing to be excavated are just the
12  pavers, you could do that by hand?
13   A. Correct.
14   Q. And if you wanted to excavate --
15   A. The whole wreck site is what he is saying, you
16  would need tools.
17   Q. More than just hand tools?
18   A. Correct.
19        MR. BRADEN: Excavating, are you talking
20  about bringing it up?
21   A. Every case he listed is bringing up the
22  whole --
23        MR. BRADEN: Hold on. I'm asking...
24        MR. STEIGELMAN: So let me ask you,
25  Mr. Simon -- actually, I'm going to take a break.



RICHARD SIMON                                                    August 29, 2025
JJM vs ADV

Page 137

1          (OFF THE RECORD)
2          MR. STEIGELMAN:  Okay.  We're done.
3  That's it.
4          MR. BRADEN:  I have no questions.
5          THE REPORTER:  Counsel, can I get your
6  orders for the transcript?
7          MR. BRADEN:  Yes, please.  Just PDF is
8  fine.  I don't need hard copies.
9          MR. STEIGELMAN:  Yes.  PDF, please.
10         (DEPOSITION SUSPENDED AT 12:01 P.M.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 138

1          C E R T I F I C A T E
2
3    I, Patricia A. Magnone, a Notary Public in and for the
     State of Rhode Island, duly commissioned and qualified
     to administer oaths, do hereby certify that the
4    foregoing deposition of RICHARD SIMON, a Witness in the
     above-entitled cause, was taken before me on behalf of
5    the Claimant, the State of Maine, at the State of Rhode
     Island Office of the Attorney General, 150 South Main
6    Street, Providence, Rhode Island, on August 29, 2025, at
     9:00 a.m.; that previous to examination of said witness,
7    who was of lawful age, he was first sworn by me and duly
     cautioned and sworn to testify to the truth, the whole
8    truth and nothing but the truth, and that he thereupon
     testified as in the foregoing manner as set out in the
9    aforesaid transcript.
10   I further certify that the foregoing deposition was
     taken down by me in machine shorthand and was later
11   transcribed by computer and that the foregoing deposition
     is a true and accurate record of the testimony of said
12   witness.
13   Pursuant to Rule 28 of the Federal Rules of Civil
     Procedure, original transcripts shall not be filed in
14   court; therefore, the original is delivered and retained
     by Defendant's attorney, Timothy Steigelman.
15
16    Reading and signing of the deposition was not requested
     by the parties involved.
17
     IN WITNESS WHEREOF, I have hereunto set my hand this
18   22nd day of September 2025.
19
20
21
22
23   PATRICIA A. MAGNONE,
     NOTARY PUBLIC, RPR, CERTIFIED COURT REPORTER
24   MY NOTARY EXPIRES:  JANUARY 10, 2029
25

Patricia A Magnone
NOTARY PUBLIC
STATE OF RHODE ISLAND

