**Page 1**

```
                UNITED STATES DISTRICT COURT
                    DISTRICT OF MAINE

                        Civil Action
                    Docket No: 1:24-cv-00072-LEW

JJM, LLC,
        Plaintiff
        vs.
THE ABANDONED AND SUBMERGED
VESSEL, DELHI, her engines,
boilers, tackle,
appurtenances, cargo, and
her other equipment, etc.,
in rem,
        Defendant

--------------------------------------

                        DEPOSITION OF

                      ERIC JOHN TAKAKJIAN

                       August 29, 2025

                         12:45 p.m.

        STATE OF RHODE ISLAND OFFICE OF ATTORNEY GENERAL
                     150 South Main Street
                   Providence, Rhode Island 02903




            Patricia A. Magnone, CSR, RPR, Notary Public
```

**Page 2**

```
              APPEARANCES OF COUNSEL

On behalf of the Plaintiff, JJM, LLC:
    TWAIN BRADEN, ESQ.
    ARCHIPELAGO LAW, LLP
    One Dana Street, 4th Floor
    Portland, Maine 04101
    207.558.0102
    Tbraden@archipelagona.com


On behalf of the Claimant, THE STATE OF MAINE, including
THE MAINE STATE MUSEUM:
    TIMOTHY STEIGELMAN, AAG
    LAUREN E. PARKER, AAG
    STATE OF MAINE OFFICE OF THE ATTORNEY
    GENERAL
    6 State House Station
    Augusta, Maine 04333
    207.626.8509
    Timothy.steigelman@maine.gov
    Lauren.parker@maine.gov
```

**Page 3**

```
                    I N D E X
WITNESS: Eric John Takakjian                    PAGE

Examination by Mr. Steigelman................. 4


                    E X H I B I T S
NO.    DESCRIPTION: Defendant's               PAGE
 1     Amended Notice to take Deposition......... 5
 2     Plaintiff's Disclosure of Expert
       Witnesses: Shoreline Diving............... 9
 3     Mount Desert Island Shipwreck
       Investigation and Identification, dated
       5/23/25..................................18
 4     Excerpt from book, Dangerous Shallows......49
 5     Excerpt from book, Dangerous Shallows......52
 6     NJ.com article titled N.J. shipwreck
       hunters find sunken passenger liner lost
       in 1856..................................56
 7     United States' Notice of Dismissal of
       Defendants Takakjian and the Research
       Vessel Quest.............................59
 8     Undercurrent.org article titled
       Massachusetts Wreck Plunderer Returns
       Artifacts................................67
 9     Notes handwritten by Witness.............69
10     Notes handwritten by Witness.............69
11     Photocopy of book cover, Dangerous
       Shallows, along with title page,
       publishing information, and inscription....71

       (Original exhibits attached to original transcript)
```

**Page 4**

DEPOSITION OF ERIC JOHN TAKAKJIAN
August 29, 2025

ERIC JOHN TAKAKJIAN,
Having been first duly sworn, testified as follows:
        THE REPORTER: Would you state your name and spell your last name for the record.
        THE WITNESS: Eric John Takakjian, T-A-K-A-K-J-I-A-N.
        MR. STEIGELMAN: Good afternoon, Captain.
        THE WITNESS: Good afternoon.
        MR. STEIGELMAN: "Takakjian." Did I get that right?
        THE WITNESS: Yes. The second K is silent.
        MR. STEIGELMAN: I'm probably going to stick with "Captain," just for my own sanity if that's okay with you.
        THE WITNESS: Sure, or Eric. That works.
        EXAMINATION BY MR. STEIGELMAN
    Q. Thanks for coming in today. The first document we're going to talk about, just to get the ball rolling here, is the deposition notice. I'm going to mark it as Exhibit 1. And you're going to realize pretty quickly we'll spend a lot of time talking about documents.



Page 5

1    EXHIBIT 1 (Defendant's Exhibit marked for
2  ID)
3    Q.  Have you ever seen this document before,
4  Exhibit 1?
5    A.  Yes.
6    Q.  Do you understand you're here today as a result
7  of that deposition notice?
8    A.  Yes.
9    Q.  Have you ever had your deposition taken before?
10    A.  No.
11    Q.  Have you ever been involved in a lawsuit
12  before?
13    A.  No.
14    Q.  So you have never been to trial, never
15  testified under oath before?
16    A.  No.
17    Q.  First time?
18    A.  Yes.
19    Q.  Have you and Twain Braden talked, or any of
20  JJM's lawyers, have you and any of them talked before
21  today about what to expect today?
22    A.  Yes.
23    Q.  To the best of your recollection, what did you
24  talk about?
25    A.  We talked about what to expect.

Page 6

1    Q.  And what did they tell you?
2    A.  That you would ask me questions about this
3  case.
4    Q.  Did they give any suggestions or ideas for how
5  to testify or what to testify about?
6    A.  No.
7        MR. STEIGELMAN:  Okay.  We'll spend some
8  time talking about documents.  Attorney Braden might
9  object to my questions.  I imagine he will at some
10  point, but he probably won't try to cause too much
11  damage.  If there's an objection pending, one of us will
12  tell you whether to talk or not.
13        Usually it will be, "Go ahead and answer."  On
14  occasion, I might decide my question was so terrible, I
15  will try again, and I'll just tell you, "Let me try
16  again."  Okay?
17        THE WITNESS:  Yes.
18        MR. STEIGELMAN:  You're doing a great job
19  so far of listening for the question, and I appreciate
20  that.  I'm going to do my best to listen to your answer
21  and let you finish the full answer.  And I would ask you
22  to please wait until the full question is out before you
23  answer so we don't talk over each other, okay?
24        THE WITNESS:  Understood.
25    Q.  Thanks.  How long ago was your discussion with

Page 7

1  Attorney Braden in preparation for today?
2    A.  It was on Monday.
3    Q.  Before Monday, had you spoken with Attorney
4  Braden or Attorney Ford or Attorney Szczepaniak for the
5  plaintiffs?
6    A.  No.
7    Q.  So you had not talked to any plaintiff's
8  lawyers before Monday at all?
9    A.  Well, yes, we have.  I mean, I have known Twain
10  for quite some time.
11    Q.  How do you know him?
12    A.  I was, we first met on an expert witness case a
13  number of years ago where I provided a report on a
14  maritime case.
15    Q.  And what case was that?
16    A.  It was -- I don't actually recall.  It was a
17  case where the front of a barge was pulled off by a
18  tugboat, but I can't remember the exact name.
19    Q.  Do you remember where it occurred?
20    A.  It was off the coast of Virginia.
21    Q.  Do you remember which court it was in?
22    A.  No.
23    Q.  No recollection if it was somewhere in the
24  Northeast, or if it was --
25    A.  It was somewhere in the Northeast, Northeast

Page 8

1  U.S., but exactly whose courthouse, I have no idea.
2  Never got that far.  I provided a professional report.
3    Q.  Okay.  And based on your testimony just a
4  moment ago, you never had to testify as the expert in
5  that case?
6    A.  No.  It was settled out of court.
7    Q.  So other than that, sir, the tugboat case, have
8  you ever served as an expert witness in any other case?
9    A.  No.
10        MR. BRADEN:  Can I interrupt for a quick
11  second?
12        MR. STEIGELMAN:  Sure.
13        (OFF THE RECORD)
14    Q.  Are you clear-headed and sober this afternoon?
15    A.  Yes.
16    Q.  Are you currently taking any mind-altering
17  medications?
18    A.  No.
19    Q.  Is there any reason you cannot give accurate
20  testimony today?
21    A.  No.
22    Q.  Now, you have been an expert before, you just
23  told us?
24    A.  Yes.
25    Q.  So you understand, as an expert witness, your



Page 9

1  role is to provide your honest opinion in the case;
2  right?
3     A.  Correct.
4     Q.  And you agree that you should give that honest,
5  unbiased opinion, even if that opinion might not help
6  your side; right?
7     A.  Understood.  Yes.
8     Q.  And that's because, if you were a biased
9  expert, if you shaded your opinion or you didn't give an
10  honest opinion, that would not be helpful to the court
11  in determining the truth; right?
12     A.  Correct.
13     Q.  I'm going to mark as Exhibit 2 a document here.
14  And just take a moment to look it over, please.
15           EXHIBIT 2 (Defendant's Exhibit marked for
16  ID)
17           (Witness perusing document)
18     A.  Okay.
19     Q.  Have you had a chance to review Exhibit 2?
20     A.  Yes.
21     Q.  Have you seen this document before today?
22     A.  This one?  No.
23     Q.  We're going to go through that document in a
24  little bit of detail here.  You see at the bottom of the
25  first page, sir, the bottom left, underneath the rule

Page 10

1  cite, it says "Statement of all opinions"?
2     A.  Yes.
3     Q.  And then it goes 1 and 2 at the bottom of
4  page 1, and then 3 through 6 at the top of page 2;
5  right?
6     A.  Yes.
7     Q.  Let's go through these one at a time.  I'm
8  going to read them and just ask you about them.  So
9  Opinion Number 1, quote, The expert report provided by
10  the State of Maine is mistaken in its conclusions
11  regarding the historical significance of the submerged
12  wreck, end of quote.  Did I read that correctly?
13     A.  Yes, you did.
14     Q.  As you sit here today, is that your expert
15  opinion?
16     A.  Yes.
17     Q.  Next, Number 2, I'm going to read, and please
18  follow along, quote, The expert report filed by the
19  State of Maine is mistaken in its conclusions regarding
20  the status of the wreck as embedded, both in fact and as
21  that term is or may otherwise be defined under the law,
22  end of quote.  Did I read that correctly?
23     A.  Yes.
24     Q.  And as you sit here today, is that your expert
25  opinion?

Page 11

1     A.  Yes, it is.
2     Q.  Okay.  Let's look at top of page 2, Opinion
3  Number 3.  And I will read.  Please follow along.
4  Quote, Mr. Simon and Captain Takakjian may, after
5  further research and inspection of the vessel, disagree
6  with the State's opinion as to the identity of the
7  wreck, end of quote.  Did I read that correctly?
8     A.  Yes, you did.
9     Q.  As you sit here today, is that still your
10  expert opinion in this case?
11     A.  Yes.
12     Q.  Next, Number 4, I'm going to read and ask you
13  to follow along, please.  Quote, The wreck is not
14  historically significant and not likely eligible for
15  listing on the National Register of Historic Places or,
16  in the alternative, that the possible designation on the
17  register, taken alone, is not sufficient basis for
18  excluding or denying Plaintiff's claims against the
19  wreck, end of quote.  Did I read that correctly?
20     A.  Yes.
21     Q.  As you sit here today, is that your expert
22  opinion in this matter?
23     A.  Yes, it is.
24     Q.  Next, Number 5, I'm going to read it.  Please
25  follow along.  Quote, After a dive on the site and

Page 12

1  further research, Mr. Simon and Captain Takakjian may
2  express an opinion that the wreck is not embedded, both
3  in fact and as that term is or may otherwise be defined
4  under the law, end of quote.  Did I read that correctly?
5     A.  Yes.
6     Q.  As you sit here today, is that Opinion Number 5
7  your expert opinion in this case?
8     A.  Yes.
9     Q.  And last, Number 6, I'm going to read, please
10  follow along.  Quote, The potential for damage to the
11  integrity of the wreck site, cargo, and artifacts should
12  the court unseal the name of the wreck, end of quote.
13  Did I read that correctly?
14     A.  Yes, you did.
15     Q.  As you sit here today, is that Opinion Number 6
16  your expert opinion in this case?
17     A.  Yes.
18     Q.  Okay.  Do you have any other expert opinions
19  relevant to this lawsuit?
20     A.  Not relevant to those questions.
21     Q.  So my question is, do you have any other expert
22  opinions relevant to this lawsuit, other than those six
23  we just went over?
24     A.  No.
25     Q.  Okay, thank you.  The next section you will see



Page 13
1  on the left, there is a rule citation.  Underneath, it
2  says, "Facts or data considered by the witness"; do you
3  see that?  Middle of the page on the left?
4      A.  Yes.
5      Q.  The facts and data part?
6      A.  Yes.
7      Q.  And on the right, there are five, sort of,
8  areas of information; do you see that?
9      A.  Yes.
10     Q.  The first one, Number 1, refers to the State's
11  initial expert report; right?
12     A.  Yes.
13     Q.  And have you seen that document?
14     A.  I have.
15     Q.  Have you read it?
16     A.  I have.
17     Q.  Did you review any of the ROV video reference
18  from that report?
19     A.  I read the report.  And the ROV images that are
20  in the report were the ones that I reviewed.
21     Q.  So you didn't watch the ROV, hours and hours of
22  ROV video feed from the ROV underwater; correct?
23     A.  No.
24     Q.  Okay.  As you sit here today, are there any
25  other facts or data, other than the five listed in this

Page 14
1  section of Exhibit 2, upon which you relied in drawing
2  your conclusions?
3      A.  I would have to say that, in addition to what
4  you have listed here, facts and data considered by
5  myself in rendering my opinion on the report that we
6  presented would include the references listed in the
7  report that we provided.
8          MR. STEIGELMAN:  Okay.
9          MS. PARKER:  When you say "we provided,"
10  do you mean the Shoreline Diving report?
11     A.  Yes.
12         MR. BRADEN:  And, Tim, so I don't have to
13  object and make a mess, Number 5 says "by Shoreline
14  Diving."  I'm going to assume that you're including him
15  within the Shoreline Diving ambit.
16         MR. STEIGELMAN:  Let's ask about that.
17  That is a thought.  Thank you for flying it.  It's a
18  fair question.
19         MR. BRADEN:  Okay.
20     Q.  Captain, are you an employee of Shoreline
21  Diving?
22     A.  No.
23     Q.  Are you an owner of Shoreline Diving?
24     A.  No.
25     Q.  What is your relation to Shoreline Diving,

Page 15
1  please?
2      A.  It would be a subcontractor.
3      Q.  Okay.  What is the nature of your contract with
4  Shoreline Diving?
5      A.  I was essentially hired to provide historical
6  context on this project, and also diving services.
7      Q.  Were you hired by Shoreline Diving, or were you
8  hired by Plaintiff JJM, LLC?
9      A.  I was hired by Shoreline Diving.
10     Q.  So do you have a -- so there is a contract in
11  existence somewhere with --
12     A.  No.  It's just a verbal agreement.
13     Q.  Okay.  No e-mails, no text messages about that
14  verbal agreement anywhere?
15     A.  No.
16     Q.  Has any payment been made on this oral
17  subcontract agreement?
18     A.  I was paid for diving services when we dove on
19  the shipwreck.
20     Q.  Who paid you?
21     A.  Shoreline Diving.
22     Q.  How much did they pay you?
23     A.  A thousand dollars.
24     Q.  Was that a thousand dollars for a day's work,
25  or a thousand dollars for your opinions in this

Page 16
1  designation; what does that thousand dollars represent?
2      A.  A thousand dollars represents a day's diving
3  work.
4      Q.  Is that thousand dollars for a day's diving the
5  only payment you have ever received related to this
6  case?
7      A.  Yes, it is.
8      Q.  Do you expect to receive any other payments
9  related to this case?
10     A.  I expect to receive payment for appearing
11  today.
12     Q.  What is your hourly rate?
13     A.  It's $75 an hour, and $650 a day for providing
14  deposition or testimony.
15     Q.  And if you can please flip ahead to page 3, the
16  last, sort of, section there?  Well, first, at the
17  bottom, you see this is provided by Ben Ford, Esquire,
18  on the signature line, toward the bottom right; do you
19  see that?
20     A.  Yes.
21     Q.  And do you know who Ben Ford is?
22     A.  He is a partner with Twain.
23     Q.  Right.  So this came from Plaintiff's counsel;
24  right?
25     A.  Okay.



Page 17
1  Q. So the last section there, do you see, on the
2  left side, it says "statement of compensation"?
3  A. Yes.
4  Q. Where will I look in statement of compensation
5  to find your daily rate, your hourly rate, or any of
6  your subcontracting information for you as a
7  subcontractor, please?
8  A. You would have to ask Shoreline Diving.
9  Q. Okay. Would you agree with me that there's
10  nothing in this statement of compensation about the
11  subcontract arrangement?
12  A. I would agree.
13  Q. And would you agree with me there's nothing in
14  the statement of compensation about your hourly rate?
15  A. I would agree.
16  Q. And would you agree with me there's nothing in
17  the statement of compensation about your daily rate?
18  A. I would agree.
19  Q. So before we came into this room, there was no
20  way for anyone other than Shoreline to know, Shoreline
21  and you, there's no way for anyone else to know what you
22  were going to charge; isn't that correct?
23  A. That would be correct.
24  Q. Okay. Let's go back to page 2. We left off
25  after getting to the five areas of facts and data and

Page 18
1  you mentioned the references; I appreciate that. The
2  next, the penultimate section on the left side, after
3  the rule cite you will see, "Exhibits used to summarize
4  or support conclusions"; do you see that?
5  A. Yes.
6  Q. And I'll just give you a moment to review that
7  paragraph. I don't need to read it out loud. Just let
8  me know when you're ready to talk about it.
9  A. Okay.
10  Q. And that refers to the report that Shoreline
11  Diving was projected to produce; correct?
12  A. Correct.
13  Q. And this designation was from February of this
14  year; right?
15  A. That's what the date on the last page is.
16  Q. To your knowledge, did Shoreline Diving provide
17  that report?
18  A. Yes.
19  Q. I'm going to mark as Exhibit 3 a document.
20  Just flip through it briefly. You don't have to read it
21  all right now. Let me know when you're ready to talk
22  about it, please.
23       EXHIBIT 3 (Defendant's Exhibit marked for
24  ID)
25       (Witness perusing document)

Page 19
1  Q. I take it you have had a chance to look through
2  this Exhibit 3, not read every page, but you have at
3  least thumbed through it?
4  A. Yes.
5  Q. Before today, have you ever seen this document,
6  Exhibit 3, before?
7  A. Yes.
8  Q. Have you read it front to back, cover to cover
9  before?
10  A. Yes.
11  Q. And this is Mr. Simon's expert report in this
12  case; is that right?
13  A. Correct.
14  Q. If you can please flip to page 26, the
15  second-to-last page, I think. I see that you're on
16  page 26. It says, "Report written by Richard Simon";
17  correct?
18  A. Correct.
19  Q. And what I take to be his signature sort of
20  squiggled there on the bottom right; do you see that?
21  A. I do.
22  Q. And it has you and two other people listed as
23  reviewers; right?
24  A. It does.
25  Q. Is that accurate; were you a reviewer of this

Page 20
1  report before it was finalized?
2  A. Yes.
3  Q. What did your review consist of, please?
4  A. My review consisted of reading through the
5  whole document and providing historical information and
6  technical, maritime technical support.
7  Q. And did you provide feedback to Mr. Simon?
8  A. Yes.
9  Q. What form did that feedback take, please?
10  A. I reviewed the report and made highlights and
11  additions and corrections, fine-tuning the historical
12  context and that information.
13  Q. So you sat down with a copy of the report. And
14  did you have a pen or a highlighter, or one, or both?
15  A. I did it on a computer.
16  Q. Okay. And you marked up highlights on the
17  computer copy?
18  A. I suppose I did. Yes. Or added things in.
19  Q. What kinds of things did you add in?
20  A. I added in references. The List of Merchant
21  Vessels of the United States, I added that in. Exact
22  details from MVUS. John Leavitt's Wake of the Coasters,
23  I added that in. On page 19, regarding the overall
24  condition of the wreck site.
25      The three of us, as you all know, made the dive,



Page 21
1  made two dives on the site, and we all shared our
2  observations and findings.  So impacts, the passage of
3  time -- there's an observation.  "Impacts from
4  commercial fishing gear; impacts from storm affected
5  debris and refuse transiting ▮▮▮▮▮▮▮▮ bottom with tidal
6  flow.
7       "This includes remains of docks and piers, trees
8  and branches and de-facto refuse of all kinds, including
9  plastics discarded by the local population; and
10  environmental conditions, including the effects of
11  marine boring organisms and decomposition of organic
12  material, namely wood, cloth, and natural fiber rope,
13  due to prolonged submersion in saltwater."
14      Those are observations that all of us made, and
15  all of us contributed into the report.  I made mention
16  of physical disarticulation of the wreck site by impacts
17  from debris flowing through ▮▮▮▮▮▮▮▮.  The modern
18  timbers.  I was able to identify the difference between
19  modern timbers, likely from old docks, and ships'
20  timbers.
21      On page 21, the first and second paragraph below
22  what's underlined, I largely wrote that.  And on
23  page 22, the top paragraph, I largely wrote that.
24    Q.  The top full paragraph?
25    A.  Yes.

Page 22
1    Q.  Thank you.
2    A.  That starts, "In our opinion," and ends in
3  "history."  On page 25, the fourth paragraph, that
4  starts with, "The State claims that rope left on the
5  wreck is from 1893 when the wreck sank," I contributed
6  to that.
7      And the last paragraph regarding the deadeyes,
8  "The State uses the fact that the deadeyes are intact to
9  show preservation," I largely contributed to that.  On
10  page 26, the first full paragraph that starts with, "The
11  State's report does a poor job of stating the facts of
12  the wreck," I largely contributed to that.  There you
13  go.
14    Q.  Okay.  Thank you for that.
15    A.  You're welcome.
16    Q.  When you were sharing your observations and
17  findings like you talked about on page 19, how did you
18  share those observations and findings, please?
19    A.  A combination of phone calls and e-mails.
20    Q.  Do you still have access to those e-mails?
21    A.  I may.  I'm not sure.  My computer crashed a
22  month ago, and I had to replace it.  So I'm not sure
23  what I still have left.
24    Q.  With whom were those e-mails exchanged, please?
25    A.  Rick Simon.

Page 23
1    Q.  Anybody else?
2    A.  No.  Just Rick and I.
3    Q.  Did you share those e-mails with Plaintiff's
4  counsel?
5    A.  No.
6    Q.  Did they ask for them?
7    A.  No.
8    Q.  Have they asked you for your expert file?
9    A.  No.
10    Q.  They haven't even asked for it?
11    A.  I don't understand the question.
12    Q.  Okay.  Has Plaintiff's counsel asked you for
13  your files related to this matter?
14    A.  No.
15    Q.  Were there any other of these reviewers listed
16  at the bottom of page 26 -- it has you, it has Robert
17  Foster, and Mark Munro -- were either Mr. Foster or
18  Mr. Munro on that e-mail chain about any of these
19  observations or findings?
20    A.  No.
21    Q.  Do you have any understanding of whether
22  Mr. Foster or Mr. Munro shared in writing their
23  observations or findings?
24    A.  I do not.
25    Q.  The portion of this Shoreline Diving report,

Page 24
1  Exhibit 3, where you testified you largely contributed
2  or largely wrote the portions you just told us about,
3  how did you share that drafting or those draft words
4  with Mr. Simon?
5    A.  E-mail exchanges.
6    Q.  Again, by e-mail?
7    A.  Yes.
8    Q.  Do you have any idea if Mr. Simon still has
9  access to those e-mails?
10    A.  I do not.
11      MR. STEIGELMAN:  We're going to have to
12  leave the deposition open.  We're finding out about more
13  documents we have never seen.
14      MR. BRADEN:  I have been letting this run,
15  of course, without chipping in, but we take a very
16  different view, that you're not entitled to any drafts
17  of any reports.  We've litigated this issue before.
18  Maybe you guys have a different view.
19      But these experts exchanging drafts, me
20  exchanging drafts, I don't think you're entitled to any
21  of that.
22      MR. STEIGELMAN:  And a proper, timely
23  objection would assert that; right?
24      MR. BRADEN:  Well, I think it's in the
25  rules.



Page 25
1  Q. All right. Captain, you have read this report
2  before; correct?
3  A. Yes.
4  Q. Is there anything in this report with which you
5  disagree?
6  A. No.
7  Q. And you did not, yourself, complete a report in
8  this matter; correct?
9  A. No.
10  Q. I'm sorry. Did you or did you not write your
11  own report in this matter?
12  A. I did not.
13  Q. You did not. So to your knowledge, the only
14  report that exists is this Shoreline Diving report,
15  Exhibit 3; correct?
16  A. Correct.
17  Q. I should say, for JJM, for the Plaintiff's
18  side, I mean.
19  A. Correct.
20  Q. Let's go back to Exhibit 2, the expert
21  disclosure, please. At the bottom of page 2, on the
22  left-hand side under the rule citation, you see it says,
23  "Witness qualifications"?
24  A. Yes.
25  Q. And I'm just going to read this Number 1 at the

Page 26
1  bottom of page 2, okay?
2  A. Sure.
3  Q. Open quote, Mr. Simon and Captain Takakjian are
4  experienced commercial and technical wreck divers with
5  certifications for underwater commercial activity, which
6  includes special training and experience on historic
7  preservation, end of quote. Did I read that correctly?
8  A. Yes.
9  Q. And if you flip the page, top of page 3, we're
10  still on witness qualifications, you see Bullet Point 2
11  talks about diving on the Britannic; do you see that?
12  A. I do.
13  Q. Were you involved in that dive?
14  A. I was not.
15  Q. So before the discussion on Britannic, it talks
16  about both Mr. Simon and you diving on other wrecks off
17  New England and around the world; right?
18  A. Yes.
19  Q. And then Number 3 below, and I'm going to read
20  this and you can follow along, please. Quote, Mr. Simon
21  and Mr. Takakjian work with historians, museums, and
22  marine archaeologists to interpret objects recovered
23  from or left in situ at wreck sites, close quote. Did I
24  read that correctly?
25  A. Yes.

Page 27
1  Q. Which marine archeologists have you worked
2  with, please?
3  A. Victor Mastone.
4  Q. And with what organization is Mr. Mastone
5  affiliated?
6  A. He is retired now, but he was the director of
7  the State of Massachusetts Division of Underwater
8  Archeological Resources.
9  Q. And in what capacity did you work with
10  Mr. Mastone?
11  A. I have known Victor for 35 years, I guess,
12  something like that. And so I guess, originally, with
13  the White Squall wreck off of the backside of the Cape,
14  which a business partner of mine at the time was
15  involved in; Le Magnifique, which was a French 74-gun
16  man-of-war that sank in Boston Harbor.
17  Q. How long ago was the Le Magnifique?
18  A. That was the early '90s, I would have to say.
19  I don't remember the exact date.
20  Q. How about the White Squall, how long ago was
21  that?
22  A. That was in the '80s, 1980s.
23  Q. Are there any other marine archaeologists you
24  recall working with?
25  A. No.

Page 28
1  Q. Let's go down to Item Number 4 in this. Again,
2  we're still on witness qualifications on the top of
3  page 3, okay? It says, "The witnesses will supplement
4  with a list of publications"; do you see that?
5  A. I do.
6  Q. Can we look at the Shoreline expert report,
7  Exhibit 3, please. Page 4, on the top of page 4, do you
8  see Mr. Simon is listed as team leader?
9  A. Yes.
10  Q. And the next, you're listed as the diver and
11  historical expert; right?
12  A. Right.
13  Q. And it lists some of your publications, I see;
14  right?
15  A. Yes.
16  Q. So between the expert designation we talked
17  about and what's listed here in your bio in the report,
18  do you have any other qualifications relevant to your
19  expert opinions in this case?
20  A. As a historical expert, I hold a master's
21  license, which I have held since 1986.
22  Q. Master of what, please?
23  A. Master of steam and motor vessels, upon oceans.
24  Q. Is that open oceans?
25  A. Open oceans. Yes.



Page 29
1  Q. Is there a tonnage or horsepower limitation?
2  A. There's 3,000 tons international tonnage, and
3  1600 tons domestic tonnage. First class pilot of
4  vessels, any gross tons. And a three-ring binder full
5  of STCW certificates.
6  Q. Anything else?
7  A. I have been a student of maritime history my
8  entire life. And I'm also a marine surveyor. I have a
9  certification through Navtech as a marine surveyor. And
10 I'm also a member of SAMS, the Society of Accredited
11 Marine Surveyors, as a surveyor associate.
12      I'm a member of the American Boat and Yacht
13 Council, and I'm certified through them as a master
14 marine technician.
15 Q. Do you think that your -- what's listed is in
16 three parts. First, your captain's licenses and related
17 seagoing licenses, do you think those are relevant to
18 your qualifications in this case?
19 A. I do.
20 Q. Were you aware they were not included in your
21 expert designation or in the report?
22      MR. BRADEN: Let me just pause for a
23 second. Are you saying you don't have his CV or
24 anything? Not now physically, but I mean, was it never
25 supplied to you?

Page 30
1      MS. PARKER: I believe that's correct.
2      MR. STEIGELMAN: I think what we have --
3  and this is the whole point -- is the expert designation
4  and the bio. So hearing about his captain's licenses,
5  well, that's maybe not a surprise. But a lot of other
6  stuff, first we're hearing is in the room today or just
7  earlier this morning.
8      MR. BRADEN: All right.
9  Q. Captain, do you believe your seagoing
10 licenses -- I'm just going to call them that just to
11 refer to them all. Do you believe your seagoing
12 licenses are relevant to your expert opinions in this
13 case?
14 A. Yes.
15 Q. In what way?
16 A. It represents a long period of training and
17 testing to achieve the licenses that I hold as set forth
18 by the U.S. Coast Guard and the International Maritime
19 Organization. So they don't just hand those out. You
20 have to have certain qualifications in order to attain
21 those. It's lengthy.
22      And I have been a professional mariner since July
23 of 1978, so going on close to 50 years of going to sea
24 as a professional mariner, living and working on ships
25 and oceangoing tugboats. I have an extensive knowledge

Page 31
1  of ships, how they operate, what they do, what they
2  carry for cargo, where they go, how they're constructed.
3  I worked in boatyards and shipyards in my time off. So
4  there's very little that I haven't seen or done when it
5  comes to operating a vessel of any kind, or for that
6  matter, building or repairing one.
7  Q. Tell me more about your experience building and
8  repairing vessels, please.
9  A. Well, let's see. In 1970, I purchased my first
10 boat. I was ten years old. And at the time, I was
11 working at a boatyard in Piermont, New York, on the
12 Hudson River just north of New York City. And I worked
13 in those boatyards from 1970 to 1978 when I graduated
14 from high school.
15     Between '70 and '78, I owned four boats. The
16 first one was a wooden pram that I bought as a hull.
17 And I took -- I was in, I think, junior high school. I
18 took a book out of the library on how to build a wooden
19 boat. And the librarian gave me a hard time because I
20 wasn't returning the book on time.
21     So I built the rest of the boat from the hull:
22 Centerboard trunk, centerboard, rudder, mast, boom. My
23 father had a sail sewn up for me at a sailmaker on City
24 Island. I rigged it myself and then sailed it. I
25 sailed that boat for a couple of years. Sold it. I

Page 32
1  bought a decrepit fiberglass boat that I repaired and
2  put in service as a sailboat. And then I bought a
3  Thompson wooden boat, power boat. That was outboard
4  powered, it had a hole in the bottom. I replaced the
5  planks. I think I was 15 years old.
6      I replaced two planks on the starboard side back
7  aft. And I used it with an outboard engine for the
8  first year, but the gasoline was so expensive with that
9  that I decided to make it an inboard. So I took the
10 outboard off, and I planked the transom up.
11     And I bought a four-cylinder Universal Atomic 4
12 engine with a V drive, and I converted the boat from an
13 outboard to an inboard with a V drive. I cut a hole in
14 the keel, deadwoods, engine foundations, all of that.
15 Put an inboard rudder in it, then used it as that.
16     And that was the last boat I had, that and an
17 aluminum skiff, before I went in the Coast Guard. I
18 went in the Coast Guard in 1978. And I sold all the
19 boats I had right before I went in the Coast Guard. And
20 then I did four and a half years active duty.
21     My last two years of active duty, I was stationed
22 in Provincetown on Cape Cod. And the station in
23 Provincetown is right next to Tave's Boatyard. So I
24 worked at Tave's Boatyard in my time off. And we did
25 repair work on wooden fishing trawlers. So we did



Page 33

1  planks, stanchions, replacement frames.  I did a lot of
2  large timber, wooden fishing vessel repair work.  After
3  I got out of the Coast Guard, I worked on an
4  oceanographic ship for eight months.  When I came back
5  from that, I went back to work at Tave's until I got
6  another ship.
7       And on that time back, this was late summer of
8  1983, we basically completely rebuilt a boat called the
9  Little Natalia.  We built a whole new boat.  Basically
10 lifted the pilot house up and built a 65-foot wooden
11 trawler underneath it, set it back down.
12      She originally had a large Hathaway winch that
13 was aft, it was Eastern-rigged.  And we put split
14 winches forward.  But all new centerline timber, all new
15 sawn futtock frames, all new planking, all new ceiling.
16 Ceiling is the planking that goes on the inside of the
17 hull.
18      All new deck beams, new deck, laid deck, caulked
19 it, new stanchions.  We kept, the boat had a steel mast,
20 we kept that and then reinstalled the machinery.
21 Deadwood sternpost, all of that.  You know, that's some
22 of my hands-on experience.
23    Q.  Did that hands-on experience help you to become
24 a qualified marine surveyor?
25    A.  It absolutely did.

Page 34

1    Q.  Looking at Exhibits 2 and 3, the Plaintiff's
2  expert designation, Exhibit 2, and Plaintiff's expert
3  report, Exhibit 3, do you see anywhere where your
4  experience as a boat builder or as a surveyor is
5  disclosed?
6    A.  It's not.
7    Q.  Thank you.  Let's go back to the -- I'm not
8  sure I asked this.  And if I already asked it, I
9  apologize.  How did Shoreline pay you for your work as a
10 subcon?
11   A.  With a check.
12   Q.  Is a copy of that check available to you if you
13 were to ask for it?
14   A.  Probably through my bank statements, yes, I
15 would think so.
16        MR. STEIGELMAN:  Another reason to keep
17 the depo open, Twain.
18        MR. BRADEN:  I flagged it for something he
19 brought.  If you want to reopen the deposition and ask
20 him about this check and have the State of Maine pay for
21 that, you're welcome to do so.
22   Q.  What do you do for your income, please?
23   A.  I'm a merchant mariner.
24   Q.  And do you make your money diving, do you make
25 your money going to sea, commanding vessels; what is the

Page 35

1  majority of your income these days?
2    A.  Commanding vessels.
3    Q.  What kinds of vessels?
4    A.  I'm presently serving as captain on what they
5  call an AT/B, articulated tug/barge unit.  The name of
6  the vessel is the Chincoteague.  It's owned by Vane
7  Brothers from Baltimore, Maryland, and we're West Coast
8  based.  We're in the petroleum transportation.
9    Q.  What is your schedule like, a couple months on,
10 a couple months off?
11   A.  Three weeks on, three weeks off.
12   Q.  Do you have any background, training, or
13 education in archaeology?
14   A.  No.  Nothing formal.
15   Q.  Have you ever met with the principals of JJM,
16 Mr. Johnston or Mr. Musetti?
17   A.  Yes.
18   Q.  How many times?
19   A.  Once.
20   Q.  When was that, please?
21   A.  That was on the day that we dove on the
22 shipwreck.
23   Q.  Did they tell you anything about the lawsuit?
24   A.  No.
25   Q.  So the one dive on the shipwreck, it was just a

Page 36

1  single day; right?
2    A.  One day.  Yes.  Two dives in one day.
3    Q.  And if I told you it was May 4, 2025, does that
4  sound right?
5    A.  Sounds about right.
6    Q.  Who all was there that day?
7    A.  It was myself, Rick Simon, Bob Foster, Mark
8  Munro, Twain, the boat operator, then the two guys from
9  JJM.
10   Q.  What was the approximate depth of the Delhi?
11   A.  It was a little less than 120.  It was like --
12 I can't remember.  118, something like that.  115.  It
13 varied a little bit because we made a dive in the
14 morning and then another dive a little bit later on.  So
15 tidal differences, you know.
16   Q.  Approximately how long were you in the water
17 combined, if you remember?
18   A.  It was like two 20-minute dives, roughly.  Or
19 25 on the first dive, I think, in that neighborhood.
20 And then the second dive, I believe, was about
21 20 minutes.
22   Q.  So maybe 40 minutes total?
23   A.  Yes.
24   Q.  Did you take video of the dive?
25   A.  I did not.



Page 37
1    Q.  Do you know if anyone did?
2    A.  Yes.
3    Q.  Who?
4    A.  Rick took video.
5    Q.  And if you know, how did he take it, please?
6    A.  With a video camera and a housing.
7    Q.  Did you bring anything up to the surface from
8  the wreck of the Delhi?
9    A.  I did not.
10   Q.  To your knowledge, did anyone else bring
11  anything up from the Delhi that day?
12   A.  Not to my knowledge.
13   Q.  How big was the dive boat you used?
14   A.  It was about a 45-foot boat.
15   Q.  What kind of boat was it?
16   A.  It was a lobster boat.
17   Q.  Do you think the boat was of such a size that,
18  had you seen someone bringing up artifacts, you would
19  have seen it?
20   A.  I would have.
21   Q.  And did you see anyone with artifacts up on
22  deck when you came back up?
23   A.  No, I did not.
24   Q.  Did you or anyone, to your knowledge, take any
25  measurements down at the bottom?

Page 38
1    A.  Yes.  We ran a baseline with a wreck reel from
2  the sternpost, longitudinally down the length of the
3  wreck.  And we used that as a guide.  And then we swam
4  out to either side.  So you're essentially using that as
5  an orientation line, as a transect, a longitudinal
6  transect.
7    Q.  You said it was from the sternpost, you said?
8    A.  From the sternpost.  Correct.
9    Q.  Was that relatively flat over the wreck, or was
10  it at an angle?
11   A.  No.  It was relatively flat.  The wreck is very
12  low-lying.
13   Q.  What was the approximate length, if you recall?
14   A.  I would say, 50 feet.
15   Q.  Long?
16   A.  Yes.  45 to 50 feet.
17   Q.  And that's the visible portion of the wreck,
18  above the surface; correct?
19   A.  Correct.
20   Q.  Did anyone, to your knowledge, record the
21  measurements that were taken with the measuring tape?
22   A.  No.  We did all of our physical measuring with
23  a sonar.
24   Q.  To your knowledge, did anyone use an erasable
25  diving slate to write down measurements?

Page 39
1    A.  No.
2    Q.  To your knowledge, did anyone bring an erasable
3  diving slate from the bottom up to the surface and then
4  write those measurements down somewhere else?
5    A.  No.
6    Q.  No, you're sure it didn't happen, or, no, you
7  don't believe it did?
8    A.  I don't recall.
9    Q.  Okay.  As you sit here today, do you recall
10  whether you disagree with anything in Mr. Simon's expert
11  report?
12   A.  I do not.
13   Q.  Do you believe the wreck down there is the
14  Delhi, or do you think it's some other wreck?
15   A.  I believe that is most likely the Delhi.
16   Q.  So if we go back to Exhibit 2, please, the
17  expert designation, top of page 2, I'm going to read
18  Point Number 3.  Open quote, Mr. Simon and Captain
19  Takakjian may, after further research and inspection of
20  the vessel, disagree with the State's opinion as to the
21  identity of the wreck, period, close quote.  Did I read
22  that correctly?
23   A.  Yes, you did.
24   Q.  So do you agree the vessel is the Delhi, or do
25  you disagree and think it's something else?

Page 40
1    A.  I agree that the vessel is most likely the
2  Delhi.
3    Q.  And what led you to that conclusion?
4    A.  That conclusion was based on the cargo found on
5  the bottom, what we could discern from the type of the
6  ship that it appears to be, the location of the wreck,
7  and then newspaper reports or articles describing the
8  loss of the vessel.
9     So they coincided, they agreed with each other as
10  far as that.  And the lack of another vessel reported to
11  have been in ▓▓▓▓▓▓▓▓ sunk with a cargo of stone.  So
12  that's why I say it's, collectively, we agree that it's
13  most likely the Delhi.
14   Q.  So as you sit here today, you're not standing
15  by this Opinion Number 3, then, are you?
16   A.  Opinion Number 3 states, "Mr. Simon and Captain
17  Takakjian may, after further research and inspection of
18  the vessel, disagree with the State's opinion as to the
19  identity of the wreck."  I agree with that.
20   Q.  So you think there may be further research that
21  would change your opinion?
22   A.  Anything is possible.  I realize that's
23  difficult for you, but in the world of historical
24  maritime research, without something that has a name on
25  it, you can't say definitively.



Page 41

1  Q. So you just don't know?
2  A. This is our educated opinion, our considered
3  opinion, that it is most likely the Delhi. But I don't
4  have a bell that says Delhi on it, or a builder's plaque
5  that says Delhi on it to show you.
6  Q. Do you consider yourself a shipwreck hunter?
7  A. I guess you could say that.
8  Q. Is there any sort of, like, professional
9  certification or recognition or award about shipwreck
10 hunting?
11  A. No. It's just a general description of
12 somebody that's interested in shipwrecks and maritime
13 history.
14  Q. And how many different shipwrecks have you
15 dived on?
16  A. I have no idea.
17  Q. More than ten?
18  A. More than ten.
19  Q. More than 20?
20  A. More than 20.
21  Q. More than 50?
22  A. More than a hundred.
23  Q. Okay. Should we keep going, or is that about
24 the universe on the order of 100ish, and it gets --
25  A. You could keep going if you wanted to.

Page 42

1  Q. Okay. A lot?
2  A. A lot.
3  Q. Okay. How did you locate the wreck of the
4  Delhi?
5  A. We had a position that was given to the boat
6  operator. I didn't locate it, so -- it was a position
7  given to the boat operator, and the boat operator
8  located it.
9  Q. But you have found, like you have gone
10 searching for and found other wrecks that you didn't
11 know where they were; right?
12  A. Correct.
13  Q. And generally, how does that process work?
14  A. Well, what I always like to say is that every
15 successful shipwreck search starts in the library. And
16 generally, with a specific, if we're looking for a
17 specific ship, we try to gain as much historical
18 information as we possibly can, and then reconstruct the
19 events as they occurred.
20     And then once we have done that, we'll identify a
21 search area as to where we think the vessel might be.
22 And then we'll commence and start searching in that
23 area. And I will give a recent example. Last year a
24 group of us together found a passenger ship called the
25 Le Lyonnais, which was a French passenger ship that was

Page 43

1  lost on a voyage from New York to Le Havre, France, in
2  1856. She collided with an American barque called the
3  Adriatic and sank. And we did extensive research over
4  many years on the circumstances of that ship's demise in
5  archives in the United States and France.
6     And we looked through contemporary reports from
7  newspaper articles. There was some witness accounts
8  from survivors. There was only 18 people that survived.
9  And we came up with essentially a search area that we
10 thought the ship to be in. And it just takes a lot of
11 time. We went out and side-scanned in 2022, I guess it
12 was.
13     In 2022, we side-scanned a little over 100 square
14 miles. And then we decided to shift our area to the
15 east. And in 2023, we went out and side-scanned a
16 little over another 100 square miles, and we came up
17 with some targets that we thought were good candidates.
18     And then in 2024, we went out and we dove on one
19 candidate that looked promising. And in diving on the
20 wreck, it turned out to be something entirely different.
21 Steamship, old, but not, clearly not the Lyonnais. And
22 we could tell that from the machinery.
23     So we went and dove on the second target, and we
24 found that, it turns out that that was the Lyonnais.
25 And we were able to identify it by several means: One

Page 44

1  thing is the machinery. And that's one of the nice
2  things about steamship wrecks is, steamships, the
3  machinery, the dimensions of the machinery is recorded
4  in Lloyd's Register. So it's like a fingerprint, if you
5  will, for a steamship.
6     So we were able to measure the cylinder
7  dimensions, and they matched exactly with the cylinder
8  dimensions for the Lyonnais. We knew she was an
9  iron-hulled steamship. She had a very unique type of
10 steam engine. It was a two-cylinder horizontal engine
11 with opposed pistons, and that's what we found on the
12 bottom.
13     An older style of boiler. It's an iron-hulled
14 ship. She was also rigged for sail. And even though
15 all of the wooden upper works are gone, lignum vitae,
16 which is a very dense hardwood that is actually still
17 used today for stern tube bearings on ships because of
18 its resistance to wear and to degradation, was commonly
19 used for deadeyes.
20     And we were able to find some deadeyes on the
21 Lyonnais shipwreck, which concluded that she was also
22 rigged for sail. So we were able to identify the wreck
23 that way. And that was, when we first started
24 researching the Lyonnais was back in the '90s. So late
25 '90s, early 2000s. So 20 years.



Page 45

1  Q. Is that typical, or is that on the long end for
2  finding a shipwreck you're looking for?
3  A. I am going to say it's in the middle. We found
4  a shipwreck called the Allentown off of Gloucester that
5  we spent 30 years looking for. It was in an area
6  completely different from where she was reported to have
7  sunk. The German submarine U-550 that we found
8  Southeast of Nantucket was over 20 miles from where the
9  Navy thought they sank it.
10      And we spent 20 years looking for that, and
11  side-scanned a couple hundred square miles.
12  Q. All that experience in wreck hunting, you
13  really didn't need that in this case, right, because you
14  had a given location?
15  A. We had a given location. Yes.
16  Q. Can we look at Exhibit 3, please, the Shoreline
17  Diving report. I'd like you to turn to page 22, please.
18  Can you just take a moment to review what's described as
19  Question 2. So if you want to read the second half of
20  that page, and then look at page 23, please, and we can
21  talk about it.
22       (Witness perusing document)
23  Q. Have you had a moment to review page 22 of the
24  Shoreline Diving report?
25  A. Yes.

Page 46

1  Q. And I'm going to paraphrase here, but what I
2  understand this to be is some concern that unknown
3  persons, wreck divers, might strip the Delhi of its
4  artifacts and take them as souvenirs; right?
5  A. That's correct.
6  Q. And why would removing items from a shipwreck
7  like the Delhi be a problem?
8  A. I wouldn't say that it's a problem. I would
9  say that if the State was interested in retaining those
10  artifacts, that they do one of two things: Either keep
11  the location secret, or recover them.
12  Q. Your client in this matter is Plaintiff JJM;
13  right?
14  A. Correct.
15  Q. Not the State?
16  A. Correct.
17  Q. So in your opinion, is it a problem for wreck
18  divers to take souvenirs from shipwrecks?
19  A. No.
20  Q. And shipwreck souvenirs do get taken sometimes;
21  right?
22  A. Correct. Yes.
23  Q. And shipwreck souvenirs are sometimes put up
24  for sale; right?
25  A. I can't say that that isn't the case, but not

Page 47

1  frequently.
2  Q. So it does happen on occasion?
3  A. I would imagine. I don't have direct knowledge
4  of it.
5  Q. Have you heard other people talk about selling
6  artifacts?
7  A. No.
8  Q. Are you aware of any black market sales of
9  artifacts?
10  A. I am.
11  Q. Which artifacts?
12  A. The emergency steering helm from the USS
13  Arizona.
14  Q. And do you know who recovered it?
15  A. National Park Service.
16  Q. And I started asking about black market sales,
17  so is that emergency steering helm, was it sold at some
18  point?
19  A. I believe it was.
20  Q. By whom, if you recall?
21  A. A maritime antique dealer in San Diego.
22  Q. Do you have any understanding of how that
23  equipment went from the bottom of Pearl Harbor to the
24  maritime antique dealer's hands?
25  A. Not directly.

Page 48

1  Q. What have you heard?
2  A. This was a long time ago. But the National
3  Park Service has a, has or had a diving unit called the
4  Submerged Cultural Resource Unit, or something like
5  that. And they are the only people that dive on the USS
6  Arizona.
7      And the USS Arizona's emergency steering helm
8  that was in the stern of the ship, below decks, ended up
9  for sale at this maritime antique dealer in San Diego.
10  And I'm going to say that that was sometime in the '90s.
11  Q. And is that a problem that an artifact was
12  taken from a shipwreck like that?
13  A. From the USS Arizona, yes.
14  Q. And why is that a problem?
15  A. It's a war grave.
16  Q. Are you aware of black market sales of
17  artifacts off of the Titanic?
18  A. No.
19  Q. You have never heard of potential black market
20  sales from the wreck of the Titanic?
21  A. No, I have not. I know there are artifacts
22  that are on display, a traveling display. But I have
23  never heard of artifacts being sold from the Titanic.
24       MR. STEIGELMAN: I'm going to mark this as
25  Exhibit 4.



Page 49

1        EXHIBIT 4 (Defendant's Exhibit marked for
2   ID)
3       Q.  Captain, I want to follow up about the question
4   of potential black market sales of the Titanic
5   artifacts.  I'm handing you what I have marked as
6   Exhibit 4.  And take a look, if you can look at the,
7   just the name on the top of that page; do you recognize
8   that?
9       A.  Yes.
10      Q.  And what does it look like to you?
11      A.  It says "Dangerous Shallows."
12      Q.  What is the significance of that?
13      A.  That's a book that I wrote about shipwrecks.
14      Q.  All right.  It's not sequentially paginated.
15  They are in order, but it's not continuous.  If you can
16  flip to the second-to-last page of this Exhibit 4, and
17  it should be page 127?
18      A.  Okay.
19      Q.  Are you on 127?
20      A.  I am.
21      Q.  Why don't you take a moment to review the page.
22  And I will just represent to you that this is page 127
23  out of your book Dangerous Shallows.  Take a moment to
24  review page 127.
25           (Witness perusing document)

Page 50

1       A.  Okay.
2       Q.  I'm going to start at the top of the page, the
3   first paragraph, the last sentence of the first
4   paragraph -- actually, the second-to-last.  "A certain
5   segment"; do you see that sentence?
6       A.  I do.
7       Q.  I'll start reading, I will read these last two
8   sentences, and I'd ask you to please follow along.  Open
9   quote, A certain segment of serious collectors are
10  connoisseurs of tragedy.  These folks prize anything off
11  liners like the Lusitania, Mauritania, Normandie, and,
12  of course, Titanic, period, end of quote.  Did I read
13  that correctly?
14      A.  Yes.
15      Q.  Let's go down to the next paragraph.  I'm going
16  to skip over the first sentence and I'm going to go to
17  the second sentence, "Today recovered"; do you see that?
18      A.  Yes.
19      Q.  I'm going to read just that sentence by itself.
20  Quote, Today recovered items from these ships sell on
21  the black market, period, close quote.  Did I read that
22  correctly?
23      A.  Yes.
24      Q.  I'm going to go on.  Open quote, I have heard
25  rumors of two small bowls from the RMS Titanic selling

Page 51

1   for $25,000, close quote.  Did I read that correctly?
2       A.  Yes.
3       Q.  Having reviewed this passage from your book,
4   would you like to revise your earlier testimony about
5   whether you are aware of black market sales of Titanic
6   artifacts?
7       A.  Sure.
8       Q.  How would you like to revise your testimony?
9       A.  I'm aware of black market sales of artifacts
10  from the Titanic.
11      Q.  Have you ever removed an item from a shipwreck?
12      A.  Yes.
13      Q.  How many times?
14      A.  I have no idea.
15      Q.  More than once?
16      A.  More than once.
17      Q.  More than five times?
18      A.  Yes.
19      Q.  More than ten times?
20      A.  Yes.
21      Q.  More than 50 times?
22      A.  Yes.
23      Q.  More than a hundred times?
24      A.  Probably.
25      Q.  What do you do with these artifacts when you

Page 52

1   remove them from the ocean?
2       A.  They're restored and then put on display.
3       Q.  Put on display where, please?
4       A.  Usually at diving symposiums.  Occasionally at
5   museums.
6       Q.  Which kinds of museums, please?
7       A.  The Ships of the Sea museum in Savannah,
8   Georgia, and the Westport Historical Society, Westport,
9   Massachusetts.
10      Q.  Did you recover any artifacts off the wreck of
11  the Andrea Doria?
12      A.  Yes.
13      Q.  And I'm handing you Exhibit 5, another excerpt
14  from your book.
15          MR. BRADEN:  Same book?
16          MR. STEIGELMAN:  Same book.  Although, I
17  should probably ask the witness that.
18          EXHIBIT 5 (Defendant's Exhibit marked for
19  ID)
20      Q.  Captain, if you switch to the second page, that
21  will probably make this go a little faster.  This is the
22  second page of Exhibit 5, it's marked page 14 at the
23  bottom; do you see that?
24      A.  I do.
25      Q.  And at the top of the page, it says Dangerous



Page 53

1  Shallows; right?
2      A. Yes.
3      Q. And it looks like it's still your book?
4      A. It is.
5      Q. Does that photograph look familiar?
6      A. It does.
7      Q. And what does that photograph show, please?
8      A. It shows myself and my dive buddy Mike Manfredi
9  standing on the stern of the Wahoo holding two
10 shuffleboard court numbers from the Andrea Doria.
11     Q. What is a shuffleboard court number, what does
12 that mean?
13     A. Shuffleboard is a game that is played on, or
14 was played on passenger ships years ago. And I have
15 never played it, so I can't say authoritatively how
16 exactly, the rules of the game, but there's numbers on a
17 grid that are, it's about the size of this table that
18 are laid out on the deck.
19         And people with sticks with little tee ends on
20 them push little discs back and forth, like the size of
21 the coasters. I guess the idea is to slide the disc
22 onto a number, and somehow they keep score of that.
23     Q. Do you know where that shuffleboard number is
24 now?
25     A. I do.

Page 54

1      Q. Where is it?
2      A. It's in a display cabinet in my living room.
3      Q. When is the last time it went to a diving
4  symposium?
5      A. The last time, it was at the Boston Sea Rovers
6  passenger ship exhibit that we did. And I can't recall
7  the year that that was.
8      Q. To your best recollection, recently or not that
9  recently?
10     A. Recently.
11     Q. Would you agree that you have imagined and even
12 dreamed about finding shipwreck souvenirs?
13     A. Thought about it.
14     Q. Would it surprise you if you have a passage in
15 your book where it talks about imagining and dreaming
16 about finding shipwreck souvenirs?
17     A. That would not surprise me.
18     Q. Okay. Just off the top of your head, which
19 other shipwrecks do you recall bringing up souvenirs
20 from, please?
21     A. I guess, New Castle City, City of Columbus,
22 Stephano, PT Teddy, Baleen.
23     Q. Baleen, B-A-L-E-E-N?
24     A. Correct. Carolina.
25     Q. Is Carolina the same vessel that might be known

Page 55

1  as the Carolina, of Spanish pronunciation?
2      A. No.
3      Q. Different vessel?
4      A. Different vessel.
5      Q. Okay. How about the Carolina, the Spanish
6  pronunciation, do you have anything from her?
7      A. No.
8      Q. Any others jump to mind that you can remember?
9      A. Let me think about this. Seaconnet. Trojan.
10     Q. How is Seaconnet spelled, please?
11     A. S-E-A-C-O-N-N-E-T.
12     Q. And I think I stepped on you. You said Trojan?
13     A. Trojan, yes. The Suffolk. Colonel William
14 Cowin. The Yankee. There are probably others, but I
15 can't offhand recall.
16     Q. As you sit here today, do you believe you still
17 have in your possession most or all of those wreck
18 artifacts that you just talked about?
19     A. I do.
20     Q. Are they all at home somewhere?
21     A. Yes.
22     Q. Where are they?
23     A. They're either in my living room or in my
24 office.
25     Q. Have you ever sold any souvenirs off a wreck?

Page 56

1      A. No.
2      Q. Have you ever given them away or traded them
3  away?
4      A. I have given, but I have never traded.
5      Q. And I think you mentioned the French steamship
6  Le Lyonnais?
7      A. Correct. Yes.
8          MR. STEIGELMAN: Okay. I will mark this
9  as Exhibit 6.
10         EXHIBIT 6 (Defendant's Exhibit marked for
11 ID)
12     Q. Have you had a chance to review this Exhibit 6?
13     A. Yes.
14     Q. Have you ever seen this article before today?
15     A. I'm sure I have. There was a whole load of
16 articles that came out after we found the ship.
17     Q. This is just from last year; right?
18     A. Yes.
19     Q. And if you go to the second page of this, this
20 is -- let me back up. This is reporting about your
21 finding the Le Lyonnais; correct?
22     A. Correct.
23     Q. Is this you in the center, kneeling down in the
24 photo on the second page?
25     A. It is.



Page 57

1  Q. And what are you holding?
2  A. I'm holding a porthole.
3  Q. What is it made out of?
4  A. It's made out of bronze.
5  Q. Where is that porthole now?
6  A. That porthole is in a conservation tank.
7  Q. Where is the conservation tank?
8  A. It's in my basement.
9  Q. Are there any other souvenirs from the Le
10 Lyonnais that are in your basement?
11 A. No.
12 Q. You're a designated expert in this lawsuit;
13 right?
14 A. I am.
15 Q. And you understand that the plaintiff hired you
16 in this lawsuit to claim ownership of the wreck of the
17 Delhi; right?
18 A. I am.
19 Q. In addition to this lawsuit, you're familiar
20 with other wreck divers bringing lawsuits to establish
21 their ownership rights to other shipwrecks; right?
22 A. I am.
23 Q. Let's talk a little bit about the lightship
24 Nantucket. You discovered the location of the Nantucket
25 in the late '90s?

Page 58

1  A. I did.
2  Q. And in 1999, you requested permission from the
3  Coast Guard to remove the ship's bell from the wreck of
4  the Nantucket; right?
5  A. I did.
6  Q. And later that same year, in 1999, the Coast
7  Guard denied your request to pull up the ship's bell;
8  right?
9  A. They did not.
10 Q. They did not deny your request to pull up the
11 ship's bell?
12 A. No, they did not.
13 Q. What is your recollection of what the Coast
14 Guard told you about your request to pull up the bell?
15 A. They requested that we do nothing.
16 Q. You're suggesting there's a difference between
17 them saying, "Please don't pull up the bell," and, "Do
18 nothing"?
19 A. I am.
20 Q. And what is the difference?
21 A. The difference is, "Please don't pull up the
22 bell," would be, "Please don't pull up the bell." "Do
23 nothing," is, "Do nothing."
24 Q. I see we have arrived at a tautological
25 impasse. You don't agree that the Coast Guard denied

Page 59

1  your request to pull up the bell?
2  A. I don't agree.
3  Q. Okay. I'm going to mark as Exhibit 7 this
4  document from a 2005 lawsuit. Please take a look.
5           EXHIBIT 7 (Defendant's Exhibit marked for
6  ID)
7  A. I should mention that the Justice Department
8  forbade me from speaking about this.
9           MR. BRADEN: Then you shouldn't speak
10 about it.
11          MR. STEIGELMAN: I'm sorry. Did we just
12 hear Plaintiff's counsel give legal advice to the
13 expert?
14          MR. BRADEN: You can characterize it
15 however you want. If he was told that he shouldn't
16 speak about something, maybe he shouldn't. I don't
17 know.
18 Q. Is there a written order of some kind saying
19 you're not allowed to talk about this?
20 A. There is.
21 Q. Do you have a copy of it?
22 A. I do.
23 Q. Where?
24 A. In my office.
25 Q. Can you readily get access to it?

Page 60

1  A. I can find it. Yes. It will take some time.
2  25-year-old document.
3           MR. STEIGELMAN: All right. When you
4  supplement production, can you include that, please?
5           MR. BRADEN: Yes. What are we calling it?
6  An order...
7           MR. STEIGELMAN: I have no idea. Whatever
8  he thinks it is.
9           MR. BRADEN: Okay. I will track it down.
10 I will send you what it is he provides me.
11 Q. What did the order say, to your recollection?
12 I'm just talking about the order, what did that piece of
13 paper from the DOJ, I guess, what did it say?
14 A. From the Justice Department. It said that
15 myself and all of us named in this suit were forbidden
16 from discussing the details of this whole case. I can't
17 remember the verbiage, it's 20-something years ago.
18 Q. It's a letter from the DOJ, it's not an
19 injunction from a judge?
20 A. You're the legal expert. I'm a ship driver.
21          MR. BRADEN: Since you're keeping the
22 deposition open to talk about the check he received...
23          MR. STEIGELMAN: This would be great to
24 continue talking about later. I think that's fine.
25          MR. BRADEN: We're going to have to



Page 61

1  enlarge discovery, anyway, for what's his name's
2  deposition, so...
3          MR. STEIGELMAN:  Well, you can ask.  I'm
4  not sure we'll agree.
5  BY MR. STEIGELMAN:
6     Q.  If you can turn to page 9 of 12 on the top
7  right of this Exhibit 7, please.  And on the
8  understanding that there is some order of some kind, I
9  am not going to ask about the underlying facts anymore.
10 We'll respect that, pending whatever this document is,
11 that's fine.  9 of 12, do you see that?
12    A.  Maybe these are out of order or something.
13         MS. PARKER:  Are you referring to the page
14 numbers at the top, Tim?
15    Q.  Top right.
16    A.  Oh, sorry.
17    Q.  Because I'm going to, for now, curtail my
18 examination about the facts here, I'm just going to ask,
19 is that your signature?
20    A.  That is my signature.
21    Q.  Do you remember signing this document?
22    A.  I do not.
23    Q.  Okay.
24    A.  My name is also spelled wrong.
25    Q.  The first name?

Page 62

1     A.  Correct.
2     Q.  When we continue it, we'll ask all about that
3  later.  So much for Exhibit 7.  So without talking
4  anymore about the Nantucket lightship, because we're
5  going to hold that open for when the deposition
6  continues later, I have one more ship to ask about, the
7  Oregon.  Do you remember diving on the Oregon?
8     A.  Which one?
9     Q.  The one in your book?
10    A.  I did not dive on that one.
11    Q.  You didn't?  Okay.  What do you remember about
12 the Oregon in New England waters, anyway?
13    A.  It was, she sank in a collision with a
14 battleship New Mexico in 1941.  And the wreck rests on
15 the west, or the eastern edge of Nantucket Shoals, sits
16 on a slope.
17    Q.  But you didn't dive on the Oregon?
18    A.  We did not.  No.
19    Q.  Okay.  Now, before I got sidetracked about the
20 lightship, let me -- you understand that, in shipwreck
21 cases, a wreck diver might bring a lawsuit to establish
22 ownership; correct?
23    A.  I do.
24    Q.  Do you own or have you ever owned the wreck of
25 the Le Lyonnais?

Page 63

1     A.  I do not.
2     Q.  Do you own or have you ever owned the wreck of
3  the Andrea Doria?
4     A.  I do not.
5     Q.  Do you own or have you ever owned the wreck of
6  the Baleen?
7     A.  No.
8     Q.  Do you own or have you ever owned the wreck of
9  the Stephano?
10    A.  No.
11    Q.  Do you own or have you ever owned the wreck of
12 New Castle City?
13    A.  No.
14    Q.  Do you own or have you ever owned the wreck of
15 the Colonel William Cowin?
16    A.  No.
17    Q.  Do you own or have you ever owned the wreck of
18 the Suffolk?
19    A.  No.
20    Q.  Do you own or have you ever owned the wreck of
21 the Yankee?
22    A.  No.
23    Q.  Do you own or have you ever owned the wreck of
24 the Trojan?
25    A.  No.

Page 64

1     Q.  Do you own or have you ever owned the wreck of
2  the City of Columbus?
3     A.  No.
4     Q.  Do you own or have you ever owned the wreck of
5  the PT Teddy?
6     A.  No.
7     Q.  Do you own or have you ever owned the wreck of
8  the Carolina?
9     A.  No.
10    Q.  Do you own or have you ever owned the wreck of
11 the Seaconnet?
12    A.  No.
13    Q.  Of that entire list of ships where you dove and
14 have testified you brought up artifacts, have you ever
15 brought a lawsuit to establish ownership as to any of
16 those vessels?
17    A.  No, I have not.
18    Q.  Do you believe you lawfully took objects from
19 each of those wrecks?
20    A.  I do.
21    Q.  What is the basis for that belief, please?
22    A.  The basis for that belief is that all of those
23 wrecks are either in State waters and are on the
24 Massachusetts State exempted list, or they're in
25 international waters and they are abandoned.



Page 65

1  Q. And putting aside the Massachusetts State
2  exempted list, because that is under Massachusetts
3  law -- okay, fine -- the international waters, who
4  determined, whichever subset of those vessels were in
5  international waters, who determined they were
6  abandoned?
7     A. I did.
8     Q. Do you believe that a wreck diver can, on their
9  own, make a determination of abandonment?
10    A. They can with research.
11    Q. I don't know the number, it's probably more
12  than a dozen. Let's just say it was around a dozen or
13  so wrecks we just talked about. Do you think any of
14  those dozen or so wrecks still has an owner out there in
15  the world somewhere?
16    A. Two of them do.
17    Q. Which ones?
18    A. The Andrea Doria and the Carolina.
19    Q. And who owns the Andrea Doria?
20    A. Steve Gatto, G-A-T-T-O.
21    Q. And who owns the Carolina?
22    A. Joe Mazraani.
23    Q. And let's talk about Steve Gatto with the
24  Andrea Doria first. How was that ownership claim
25  adjudicated, if you know?

Page 66

1     A. I do not.
2     Q. And as for Mr. Mazraani with the Carolina, how
3  was his ownership adjudicated, if you know?
4     A. I don't know.
5     Q. So for the rest of the list, again, a dozenish
6  ships that were left, so excepting out Andrea Doria and
7  Carolina, all the other ships we talked about earlier,
8  do you believe there might be an owner out there in the
9  world?
10    A. I do not.
11    Q. And the reason for that belief is because, in
12  your view, all those other wrecks were abandoned?
13    A. I do.
14    Q. And so you can lawfully take whatever you want?
15    A. Depends.
16    Q. Okay. Well, we just talked about -- sorry.
17  You just testified that you took artifacts from all
18  those ships; right?
19    A. I did.
20    Q. Is it your testimony that every one of those
21  taking of artifacts was lawful?
22    A. It is.
23    Q. Because of abandonment or because of some other
24  reason?
25    A. Because of abandonment, and because the ones

Page 67

1  that are on the State exempted list are exempted. But
2  you made a statement that was broad that didn't include
3  those wrecks.
4     Q. Would you agree that you have the reputation of
5  being a wreck plunderer?
6     A. No.
7     Q. Are you familiar with the publication
8  Undercurrent.org?
9     A. I am.
10        MR. STEIGELMAN: Mark this as Exhibit 8.
11        EXHIBIT 8 (Defendant's Exhibit marked for
12  ID)
13    Q. Have you ever seen this article before?
14    A. I have.
15    Q. And do you agree that this article is about
16  you?
17    A. I do.
18    Q. And I'm going to read the headline. It says,
19  "Massachusetts wreck plunderer returns artifacts,"
20  doesn't it?
21    A. It does.
22    Q. Would you like to change your testimony about
23  whether you have a reputation as a wreck plunderer?
24    A. I do not.
25    Q. Have you been taking notes today during the

Page 68

1  deposition?
2     A. I have.
3     Q. Is your intent to add that to the expert file
4  that you're keeping for this matter?
5     A. I wrote the date, the time, the address, your
6  name, and Lauren's name.
7     Q. Great. What about the other piece of paper
8  that's perpendicular there?
9     A. The other piece of paper I didn't write today.
10  It's just a piece of paper that I brought in with me.
11    Q. Not relevant to the lawsuit?
12    A. It is relevant to the lawsuit. It's personal
13  notes. You're welcome to see it.
14    Q. Tell me about those personal notes. It's
15  related to the lawsuit?
16    A. Yes.
17    Q. What other personal notes or other notes
18  related to the lawsuit do you have?
19    A. I have this little piece of paper here. It has
20  the names of wooden schooners on it, when they were
21  built, what their size was.
22        MR. BRADEN: Can we mark those just so
23  there's no question about what it is.
24        MR. STEIGELMAN: Yes, let's do it. Great
25  idea. Good call.



Page 69

1        EXHIBIT 9 (Defendant's Exhibit marked for
2  ID)
3        EXHIBIT 10 (Defendant's Exhibit marked for
4  ID)
5     Q.  Okay.  So we now have Exhibits 9 and 10 that
6  came out of your hand notes today; right?
7     A.  Yes.
8     Q.  Thank you for that.
9     A.  You're welcome.
10    Q.  Is it your ordinary practice to maintain notes
11 as you do your work?
12    A.  It is.
13    Q.  How many notes do you think you have relevant
14 to the lawsuit?
15    A.  I have no idea.
16    Q.  How do you normally maintain the notes,
17 electronically, handwritten, what do you do?
18    A.  I scribble stuff like that on pieces of paper.
19 And then sometimes I transcribe them onto a Word
20 document and save them.
21    Q.  Do you have a file going for this case where
22 you have notes like that saved somewhere?
23    A.  I do.
24    Q.  Where is that file, please?
25    A.  It's in Fairhaven, Massachusetts.

Page 70

1        MR. BRADEN:  I wrote it down.
2     Q.  How big is the file, in folders or boxes, just
3  approximate quantity?
4     A.  It's just a few pages.
5     Q.  Okay.
6        MR. BRADEN:  It's a few pages of notes; is
7  that what I'm writing down?
8     A.  I believe.  Yes.
9     Q.  And the e-mails?
10    A.  Yes.
11       MR. BRADEN:  E-mails of what?  These are
12 the things that you wanted, that I'm saying you're not
13 entitled to the drafts.
14       MR. STEIGELMAN:  Oh, yes, you're right.
15 We'll talk about that later.  I'm not agreeing to
16 anything, but...
17       MR. BRADEN:  No, no, you don't have to
18 agree to anything.  We just take a different view of
19 drafts --
20       MR. STEIGELMAN:  We can talk about it.
21 The expert file, the payment on the expert file.
22       MR. BRADEN:  Yes.  I put a star next to
23 everything you want copies of and that I have agreed to
24 provide.
25       MR. STEIGELMAN:  Yes.  We will mark this

Page 71

1  as Exhibit 11.
2        EXHIBIT 11 (Defendant's Exhibit marked for
3  ID)
4     Q.  Do you have Exhibit 11 in front of you,
5  Captain?
6     A.  I do.
7     Q.  Let me just ask you, what is this Exhibit 11?
8     A.  It's the cover of one of my books.
9     Q.  And this is Dangerous Shallows; right?
10    A.  Correct.
11    Q.  And we flip to the second page, that is the
12 title page; right?
13    A.  Yes, it is.
14    Q.  And then flip the page, that is the publishing
15 information and the ISBN number and all that stuff?
16    A.  Yes.
17    Q.  Flip ahead one, and it looks like the
18 inscription at the beginning of your book?
19    A.  Yes.
20    Q.  I'm going to read the inscription.  "It helps
21 to have a screw or two loose to be a shipwreck guy."
22 Did I read that correctly?
23    A.  You did.
24    Q.  Do you consider yourself a shipwreck guy?
25    A.  I am.

Page 72

1     Q.  Do you think you have a screw or two loose?
2     A.  Probably do.
3        MR. STEIGELMAN:  Let's take a break.
4        MR. BRADEN:  Let's just go on the record,
5  that Counsel had a good chuckle as he said that.
6     (Brief recess taken, 2:31 p.m. to 2:35 p.m.)
7        MR. STEIGELMAN:  That's it.  We're done.
8  We're holding it open, as discussed, but subject to all
9  that.
10       THE REPORTER:  Counsel, can I get your
11 orders for the transcript?
12       MR. STEIGELMAN:  PDF, please.
13       MR. BRADEN:  Same, please.
14    (DEPOSITION SUSPENDED AT 2:34 P.M.)



Page 73

```
 1              C E R T I F I C A T E
 2
        I, Patricia A. Magnone, a Notary Public in and for the
 3   State of Rhode Island, duly commissioned and qualified
     to administer oaths, do hereby certify that the
 4   foregoing deposition of ERIC JOHN TAKAKJIAN, a Witness
     in the above-entitled cause, was taken before me on
 5   behalf of the Claimant, the State of Maine, at the State
     of Rhode Island Office of the Attorney General, 150
 6   South Main Street, Providence, Rhode Island, on August
     29, 2025, at 1:00 p.m.; that previous to examination of
 7   said witness, who was of lawful age, he was first sworn
     by me and duly cautioned and sworn to testify to the
 8   truth, the whole truth and nothing but the truth, and
     that he thereupon testified as in the foregoing manner
 9   as set out in the aforesaid transcript.
10      I further certify that the foregoing deposition was
     taken down by me in machine shorthand and was later
11   transcribed by computer and that the foregoing deposition
     is a true and accurate record of the testimony of said
12   witness.
13   Pursuant to Rule 28 of the Federal Rules of Civil
     Procedure, original transcripts shall not be filed in
14   court; therefore, the original is delivered and retained
     by Defendant's attorney, Timothy Steigelman.
15
16    Reading and signing of the transcript was not requested
     by the parties involved.
17
     IN WITNESS WHEREOF, I have hereunto set my hand this
18   24th day of September 2025.
19
20
21
22   _____
23   PATRICIA A. MAGNONE,
     NOTARY PUBLIC, RPR, CERTIFIED COURT REPORTER
24   MY NOTARY EXPIRES:  JANUARY 10, 2029
25
```

