UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JJM, LLC,<br><br>    Plaintiff<br><br>v.<br><br>*THE ABANDONED AND SUBMERGED VESSEL*, *DELHI*<br>    her engines, boilers, tackle, appurtenances, cargo, and her other equipment, etc.,<br><br>    *in rem*,<br><br>    Defendant. | Civil Action<br>Docket No.: 1:24-cv-00072-JCN |

**CLAIMANT STATE OF MAINE'S MOTION FOR SUMMARY JUDGMENT WITH INCORPORATED MEMORANDUM OF LAW**

Pursuant to Federal Rule of Civil Procedure 56, Local Rules 7 and 56, and ECF 75, Claimant the State of Maine ("State") submits this motion for summary judgment with incorporated memorandum of law. The State respectfully requests that this Court enter judgment in favor of the State on its claim that it holds title to the *in rem* Defendant—the wrecked vessel *Delhi*—pursuant to section 2105 of the Abandoned Shipwreck Act, 43 U.S.C. §§ 2101-2106, because the *Delhi* is abandoned, embedded in Maine's submerged lands, and eligible for listing in the National Register of Historic Places ("National Register").

**Facts**

In 1872, Captain Richard F.C. Hartley of Saco, Maine constructed a wooden-hulled, two-masted schooner named *Delhi*. SMF ¶¶ 1-3. Initially, the *Delhi* was 204 tons, 113.1 feet long, 28 feet beam (width), and 8.1 feet deep, had a single deck, and worked in the coal trade. SMF ¶¶ 4-5. By 1879, the *Delhi* had been retrofitted. SMF ¶ 6. The *Delhi* was 266 tons, 113.1 feet long, 28

1

feet beam, and 12.5 feet deep, had two decks, and a future in granite. SMF ¶¶ 4, 7, 21.

After the Civil War, "Maine became a center of the granite industry in New England." SMF ¶ 8. Around the turn of the twentieth century, there were upwards of 44 granite quarries in Hancock County alone, including ▮▮▮▮▮▮▮▮. SMF ¶¶ 9-10. ▮▮▮▮▮▮▮▮ was located on the western side of ▮▮▮▮▮▮▮▮ where the waters are deep right up to the shore. SMF ¶¶ 11-12. While ▮▮▮▮▮▮▮▮ was open—from about 1875 until the Great Depression—countless schooners were loaded there with tens of thousands of granite blocks. SMF ¶¶ 13-14. Vessel loss sometimes occurred due to the weight of granite cargo. SMF ¶¶ 15-17. The most common vessel lost was a wooden-hulled, two- or three-masted schooner, like the *Delhi*. SMF ¶ 18.

On or about April 14, 1893, the *Delhi* was at ▮▮▮▮▮▮▮▮. SMF ¶ 19. A contemporary account indicates that Campbell & Macomber of Quarryville loaded the *Delhi* with approximately 32,000 granite paving stones. SMF ¶ 19. A representative stone from that cargo measures 6 inches by 3.5 inches by 10 inches and weighs roughly 25 pounds. SMF ¶ 20. Shortly after leaving port, the *Delhi* struck ice and promptly sank within view of the shore. SMF ¶ 21. The captain and crew escaped; otherwise, it was a total loss. SMF ¶ 22.

The loss of the *Delhi* was reported in Lloyd's Register of British and Foreign Shipping: Returns of Vessels Totally Lost, Condemned, & c. (July 29, 1893) and the Ellsworth American (April 20, 1893). SMF ¶¶ 22-23. The Ellsworth American reports that the "cargo was insured; but it is not known whether there was any insurance on the vessel." SMF ¶ 22. Were the cargo insured, that policy may have been written by Western Assurance Company of Canada, the corporate successor to which may be Intact Insurance Company. SMF ¶ 22, 24-25.

By 1893, the commercial diving industry and underwater salvage were established. SMF ¶ 26. Wreckers could salvage granite cargo from schooners that sank in deep water. SMF ¶¶ 27-

2

28. It is possible then that the *Delhi* and the cargo could have been recovered from ▇ in the 1890s and increasingly so in the decades since. SMF ¶¶ 27-29. A decision to salvage the *Delhi* or the *Delhi*'s cargo at the time of loss, and in the decades since, would have been a financial decision that, circumstances suggest, was not worth it. SMF ¶¶ 29-31. When the *Delhi* sank in 1893, the vessel was twenty years old and the cargo was replaceable: at the turn of the twentieth century, granite pavers for road construction were in ready supply and less valuable than granite cut for buildings and bridges. SMF ¶¶ 2, 8-9, 13-14, 30. By 1930, the *Delhi*'s cargo was obsolete: New England's granite industry was in severe decline because cheaper construction materials—structural steel, concrete, and asphalt—had replaced granite in building and road construction. SMF ¶ 31. Despite the *Delhi*'s loss being witnessed, contemporaneously recorded, and remaining part of local lore in the decades since, the record contains no indication that the owner of the *Delhi* or the *Delhi*'s cargo attempted to salvage the vessel or the granite pavers. SMF ¶¶ 21-23, 33-34.

Although increasingly out of sight due to the passage of time, the *Delhi* was not out of mind. ECF 1, Page ID 2; SMF ¶¶ 32-34. In 2023, JJM set out to find the *Delhi* and succeeded. SMF ¶¶ 35-37. The *Delhi* rests on Maine's submerged lands about 492 feet off the coast of Maine under approximately 120 feet of water in ▇. SMF ¶¶ 38-40; *see* 43 U.S.C. §§ 1301(a)(2), 2102(f)(1) (defining submerged lands for purposes of the ASA). The seafloor sediments in this location are silty and less resistant than hard-alluvial substrate (e.g., granite, gravel, bedrock). SMF ¶ 44. There is a layer of suspended mud sediment near the seafloor. SMF ¶ 45. Visibility at the site is limited. SMF ¶ 46.

Following the *Delhi*'s arrest, *see infra* 6, JJM and the State each assembled a survey team to examine the wreck. SMF ¶ 47; *see* U.S. Dep't of the Interior, Nat'l Park Serv., Abandoned Shipwreck Act Guidelines ("ASA Guidelines"), 55 Fed. Reg. 50116-01, 50130 (Dec. 4, 1990)

("All shipwrecks . . . should be ground-truthed through sea-bottom inspection—either by remotely operated vehicle or by divers" and "should be examined to determine the nature, extent and integrity of the wrecked vessel, surviving cargo, and associated scattered wreckage, and to locate any visible human remains.").

Led by technical and wreck diver Richard Simon, JJM's survey team took side scan sonar and sent a dive team down on two dives. SMF ¶¶ 48-50. They generated sonar images of the wreck that, like the sonar images in ECF 7-1, depict the *Delhi*'s stern. SMF ¶¶ 50-51. These sonar images do not differentiate between the portion of the vessel that is on the seafloor versus the portion of the vessel that is beneath the seafloor. SMF ¶ 52. JJM's team measured the overall wreck site. SMF ¶ 53. They observed the stern post extending from the seafloor but did not measure it. SMF ¶ 54. In addition to the stern post, they observed other visible timbers, including timbers that join at perpendicular angles, and thousands of granite pavers. SMF ¶ 55. The limited visibility at the wreck site prevented JJM's team from video-recording the entirety of both dives. SMF ¶ 56. They probed the mud at the wreck site with their hands and felt scattered timbers. SMF ¶ 57. After examining the wreck, Simon authored a report titled Mount Desert Island Shipwreck Investigation and Identification ("Simon Report"). SMF ¶ 58. Simon thinks all the *Delhi*'s cargo can be fully excavated only by hand, but agrees that tools of excavation are needed to gain access to what remains of the *Delhi*. SMF ¶¶ 77, 79.

Led by maritime archaeologist Connor McBrian, the State's survey team inspected the wreck site using a remotely operated vehicle ("ROV"). SMF ¶¶ 59-60. The State's field examination consisted of five individual ROV dives. SMF ¶ 61. The limited visibility at the wreck site did not prevent the State's team from video-recording its inspection of the wreck site. SMF ¶¶ 60, 62. Like JJM, the State's team observed the stern post extending from the mud, other visible

4

timbers—e.g., framing and outer hull planking that join at perpendicular angles—and thousands of granite pavers. SMF ¶¶ 63, 75. The State's team did not probe the seafloor at the wreck site but did measure the visible section of stern post and determine that it protrudes 2 meters from the seafloor, which is about half its original height of 4 meters. SMF ¶ 64. McBrian saw continuity of the ship's hold from the stern post and around the sides. SMF ¶ 65. He observed that the interior of the wreck was mostly filled with sediment, obscuring the floor frames and keel and keelson of the vessel. SMF ¶ 66. He also observed growing on the silty seafloor in a location where he would except the bow to be a species of kelp that attaches only to hard substrate, such as buried portions of the bow or the *Delhi*'s cargo. SMF ¶ 68. Based on what was visible, the *Delhi*'s dimensions, and site formation processes, McBrian concluded that the bottom portion of the stern post, timbers that connect the stern post to the keel, the keel, and the keelson are buried in the seafloor. SMF ¶ 69. After examining the wreck, McBrian authored a report titled Mount Desert Island Shipwreck Investigation: Maritime Archaeological Assessment ("McBrian Report"). SMF ¶ 70. In a later annex to the McBrian report, McBrian also concluded that tools of excavation are needed to gain access to all that remains of the *Delhi* and fully excavate the vessel from the seafloor. SMF ¶ 79.

In summary: some portion of the *Delhi* and the cargo are visible above the seafloor, SMF ¶¶ 71, 75; some portion of the *Delhi* and the cargo are not visible above the seafloor and are buried in the mud; SMF ¶¶ 72-73, 76; and tools of excavation are needed to gain access to and fully excavate the *Delhi* from the seafloor, SMF ¶ 79.

Maine's State Historic Preservation Officer (SHPO) reviewed the McBrian Report. SMF ¶ 80. The SHPO evaluated the information in his possession as to the *Delhi* shipwreck and determined that it is eligible for listing in the National Register because it is locally significant under National Register listing criteria A and D. SMF ¶ 81. Pursuant to 43 U.S.C. § 2105(b), the

SHPO requested that the Keeper of the National Register determine whether the *Delhi* shipwreck is eligible for listing in the National Register. SMF ¶ 82. Several weeks later, JJM asked the Keeper to dismiss the SHPO's request for an eligibility determination. SMF ¶ 83. The Keeper subsequently asked the SHPO for additional information, including copies of the Simon and McBrian reports, and carefully considered all information supplied by the SHPO and JJM. SMF ¶¶ 85-89. Based on that review, Michael Roller, Ph.D, exercising the delegated authority of the Keeper, determined that the *Delhi* shipwreck is eligible for listing in the National Register under criterion D at the local level of significance. SMF ¶ 90. Regarding criterion A, Dr. Roller determined that more information is needed. SMF ¶ 91.

## Procedural History

Promptly after locating the *Delhi*, JJM filed a verified complaint against the *Delhi*, was appointed substitute custodian and special process server, and arrested the vessel. ECF 1, 11, 12-14, 22, 22-1. JJM published notice of the arrest in the *Bangor Daily News* and provided notice to the United States and the State. *See* ECF 15; Supplemental Admiralty Rule C. The State filed a verified statement of right or interest claiming title to the *Delhi* pursuant to the ASA and state law and answered JJM's complaint. ECF 24, 32. The United States notified the Court that based on available information it does not appear to have an ownership interest in the *Delhi* or its cargo beyond that asserted by State pursuant to the ASA. ECF 28.

Aside from the State and the United States, no other potential party filed a claim to the *Delhi* by the deadline set in the public notice. ECF 30-1. JJM moved to default all persons except the State and the United States. ECF 30. The Court denied JJM's default motion without prejudice and encouraged JJM to directly notify Intact Insurance Company, which is the presumed corporate successor to the insurer that may have insured the *Delhi*'s cargo. ECF 49; SMF ¶¶ 24-25, 94. JJM

has done so repeatedly. SMF ¶¶ 95-99, 101-02, 104-07. Intact Insurance Company investigated the matter, did not find any documents related to the *Delhi*, and has not filed a claim or otherwise moved to intervene in this matter. SMF ¶¶ 98, 100-01, 103.

In a separate action styled *JJM v. United States Nat'l Park Serv.*, 1:25-cv-00486-LEW, JJM seeks judicial review of the Keeper's determination that the *Delhi* is eligible for listing in the National Register. In that action, JJM asks the Court to vacate as arbitrary and capricious the Keeper's eligibility determination and enjoin the Keeper from determining whether the *Delhi* is eligible for listing in the National Register.[1] *Id.*, ECF 1, Page ID 2, 5. That action, however, does not preclude summary judgment in favor of the State in this matter. *See infra* section II.C

The State now moves for summary judgment on its claim that it owns the *Delhi* pursuant to the ASA.

## ARGUMENT

### I. Standard of Review on Summary Judgment

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if "a reasonable jury could resolve the point in favor of the nonmoving party." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quotation marks omitted). "A fact is material if its existence or nonexistence has the potential to change the outcome of the suit." *Id.* (quotation marks omitted). Although the Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of the non-moving party, the Court "afford[s] no evidentiary

---

[1] At the time of filing this motion, it does not appear that JJM has completed service of *JJM v. United States Nat'l Park Serv.*, 1:25-cv-00486-LEW, on the United States National Park Service. The service of process deadline is December 22, 2025. *Id.* (ECF 1 docket text); Fed. R. Civ. P. 4(m).

weight to conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative." *Id.* (quotations marks omitted). Because there is no genuine dispute that the *Delhi* is abandoned, embedded in Maine's submerged lands, and eligible for listing in the National Register, this Court should enter summary judgment in favor of the State.

**II.     The State Holds Title to the *Delhi* Pursuant to the Abandoned Shipwreck Act**

The ASA was enacted to resolve the issue of whether the States should own and have "the authority to manage certain abandoned shipwrecks on State lands." H.R. Rep. 100-514, pt. II, at 2-3 (1988); *see* H.R. Rep. 100-514, pt. I, at 2 (1988) (highlighting existing confusion over ownership of abandoned shipwrecks). It accomplishes that goal and resolves the ownership issue in favor of the States. H.R. Rep. 100-514, pt. II, at 1 (1988) (stating purpose of the ASA); *see Northeast Research, LLC v. One Shipwrecked Vessel*, 729 F.2d 197, 208-09 (2d Cir. 2013) (describing the ASA's policy determinations). In doing so, it ensures state control over the excavation of state lands and the protection of natural and cultural resources. *See* H.R. Rep. 100-514, pt. II, at 5-6, 8; Anne G. Giesecke, *The Abandoned Shipwreck Act Through the Eyes of Its Drafter*, 30 J. Mar. L. & Com. 167, 170 & n.15 (1999).

The ASA applies to shipwrecks that are abandoned and are either "embedded in the submerged lands of a State" or "on submerged lands of a State and [are] included in or determined eligible for inclusion in the National Register."[2] 43 U.S.C. § 2105(a). The Act vests title to such shipwrecks in the United States and then transfers title "to the State in or on whose submerged lands the shipwreck is located." *Id.* § 2105(a), (c). The ASA directs the Secretary of the Interior

---

[2] Although not relevant here, the Abandoned Shipwreck Act also applies to abandoned shipwrecks that are "embedded in coralline formations protected by a State on submerged lands of a State." 43 U.S.C. § 2105(a)(2).

8

to consult with the appropriate State Historic Preservation Officer and "make a written determination that an abandoned shipwreck meets the criteria for eligibility for inclusion in the National Register of Historic Places under [section 2105](a)(3)." *Id.* § 2105(b). It instructs the National Park Service to publish in the Federal Register guidelines that encourage the development of public parks. *Id.* § 2104; *see* ASA Guidelines, 55 Fed. Reg. 50116-01. It also expressly displaces the law of salvage and the law of finds. *Id.* § 2106; H.R. Rep. 100-514, pt. II, at 8 (1988) (describing the law of salvage and the law of finds as "not well-suited to the preservation of historic and other shipwrecks to which this Act applies.").

To prevail on its motion then, the State must demonstrate that the *Delhi* is abandoned *and* is either embedded in Maine's submerged lands *or* has been determined eligible for listing in the National Register. 43 U.S.C. § 2105(a)(1), (3). The undisputed material facts demonstrate that the *Delhi* is all three: abandoned, embedded in Maine's submerged lands, and eligible for listing in the National Register.

A. The Delhi is Abandoned

Although the ASA does not define "abandoned," *see* 43 U.S.C. § 2102 (ASA definitions), the Supreme Court has clarified "that the meaning of 'abandoned' under the ASA conforms with its meaning under admiralty law." *California v. Deep Sea Research, Inc.*, 523 U.S. 491, 508 (1998). The First Circuit has not considered "abandoned" under the ASA but it has identified two scenarios in which the Court may find a vessel has been abandoned under admiralty law: (1) the vessel owner has affirmatively renounced title and (2) circumstances generate an inference of abandonment. *Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked and Abandoned Steam Vessel, etc.*, 833 F.2d 1059, 1065 (1st Cir. 1987). What circumstances generate an inference of abandonment? *Martha's Vineyard* identifies two: The passage of time—the vessel

9

is "so long lost that time can be presumed to have eroded any realistic claim of original title"—and the absence of an alleged owner—"no person or firm appeared [in the litigation] to assert any overall claim of ownership." *Id.* at 1065. Because the ASA imports the meaning of abandoned from admiralty law, *Martha's Vineyard* controls here. *Martha's Vineyard*'s treatment of abandoned is also consistent with legislative intent. *Compare id.* at 1065, *with* H.R. Rep. 100-514, pt. I, at 2 (1988) ("[T]he term 'abandoned' does not require the original owner to actively disclaim title or ownership. The abandonment or relinquishment of ownership rights may be implied or otherwise inferred, as by an owner never asserting any control over or otherwise indicating his claim of possession of the shipwreck."), *and* H.R. Rep. 100-514, pt. II, at 5 (1988).

Applying the *Martha's Vineyard* abandonment factors to the undisputed facts compels one result: the circumstances generate the inference that the *Delhi* is abandoned. The *Delhi* sank in ▮▮▮▮▮ in 1893. The fact and location of the shipwreck were well known at the time: the *Delhi* sank close to shore, there were witnesses, and the loss was covered by the local paper—the Ellsworth American—and recorded in Lloyd's Register of British and Foreign Shipping, Returns of Vessels Totally Lost, Condemned, &c. (July 29, 1893). SMF ¶¶ 21-23. Yet, aside from the United States Coast Guard possibly cutting off the *Delhi*'s mast after World War II, SMF ¶ 34, the *Delhi* has rested largely undisturbed for approximately the last 132 years. ECF 30-2. By this point, "time can be presumed to have eroded any realistic claim of original title" to the *Delhi*. *Martha's Vineyard Scuba Headquarters,* 833 F.2d at 1065.

Additionally, "no person or firm appeared [in the litigation] to assert any overall claim of ownership" to the *Delhi* despite adequate notice and opportunity. *Id.* at 1065. As required by Supplemental Admiralty Rule C(4) and this Court's Order, JJM notified the United States and the State of the *Delhi*'s arrest and caused notice of this action to be published in the *Bangor Daily*

10

*News* on April 16, 2024. ECF 15, 22, 22-1, 30-2. The public notice informed interested parties that they had fourteen days to file a verified claim to the *Delhi*. As the docket in this matter makes clear, no one claiming title to the *Delhi* or its cargo under the owner, respectively, Captain Hartley and (likely) Campbell & Macomber, filed a claim by the deadline or otherwise moved to intervene. *See United States v. Bauzo-Santiagó*, 867 F.3d 13, 23 (1st Cir. 2017) (recognizing that a court may take judicial notice of its docket). The record contains no admissible evidence that the *Delhi* itself was insured. *See* SMF ¶¶ 22, 92-93. Although the summary judgment record suggests that the *Delhi*'s cargo was insured, SMF ¶ 22, the record contains no admissible evidence that proves the *Delhi*'s cargo was insured; there is no cargo insurance policy, no documentation of a claim paid, no underwriting file, and no related correspondence. SMF ¶¶ 93, 100-01, 103. Intact Insurance Company—the presumed corporate successor to the insurer that may have issued a cargo policy for the *Delhi*—received direct notice of this matter, investigated the matter, informed the State that it "has no insurance policies or records of documents related to *Delhi* as referenced in your subpoena," and has not filed a claim or otherwise moved to intervene. SMF ¶¶ 23-25, 95-108; *see Bauzo-Santiagó*, 867 F.3d at 23. The *Delhi*'s arrest and the notice that JJM caused to be published in the *Bangor Daily News* are all that is legally required to notify persons with an interest in the *Delhi*. *Atlantic Wreck Salvage v. The Wrecked and Abandoned Vessel known as the S.S. Carolina*, 2021 WL 1382155 (D. N.J. 2021) (summarizing maritime law notice principles); *see Tamblyn v. River Bend Marine, Inc.*, 837 F.2d 447, 448 & n.1 (11th Cir. 1988). Here, additional notice was provided: the only entity aside from those listed in this Court's Order, ECF 15, that may have a potential claim to the *Delhi*'s cargo was directly notified of this action. SMF ¶ 23-25, 92-105. No further notice is warranted. It is time to declare the *Delhi* abandoned. *See Martha's Vineyard*, 833 F.2d at 1065.

Although not a *Martha's Vineyard* factor, other courts, in determining whether abandonment may be inferred based on circumstances, have considered the feasibility of salvaging the vessel or cargo. *Northeast Research*, 729 F.3d at 211, 213-14. Considering salvage feasibility here underscores that the *Delhi* is abandoned. The commercial diving industry and underwater salvage were established by 1893, when the twenty-year-old *Delhi* sank in broad daylight close to shore. SMF ¶¶ 21, 26-28. There is no indication that the *Delhi*'s owner made any attempt to salvage the *Delhi*. Indeed, it is possible that the *Delhi* was near the end of its useful life at the time of sinking. Why incur the cost to raise a then-twenty-year-old wooden sailing vessel? *See* SMF ¶¶ 15-18, 29. Fiscally, abandonment seems the more prudent choice. As compared with the *Delhi* itself, it would have been much easier to salvage the cargo in 1893 and in subsequent decades, especially if, as JJM suggests, the cargo can be raised by hand without any special equipment. SMF ¶ 77. Yet the record contains no evidence that the owner of the *Delhi*'s cargo made any attempt to salvage the cargo around the time of the *Delhi*'s loss or in the following decades. Why incur the cost to recover a product that was readily replaceable at the time of loss and, a few decades later, no longer in demand? *See* SMF ¶¶ 8-9, 13-14, 30-31. Taken together, the lack of any salvage attempts of either vessel or cargo for 130 years establishes that the *Delhi* is abandoned.

### B. The Delhi is Embedded in Maine's Submerged Lands

With no financial incentive for the *Delhi*'s owners to recover the vessel, the *Delhi* has rested largely undisturbed under 120 feet of water, close to shore in ▮▮▮▮▮▮▮ for the past 132 years. In that time, the *Delhi* has embedded in Maine's submerged lands.

The ASA defines embedded as "firmly affixed in the submerged lands or in the coralline formations such that the use of tools of excavation is required in order to move the bottom sediments to gain access to the shipwreck, its cargo, and any part thereof." 43 U.S.C. § 2102(a).

Tools of excavation include, without limitation, "hydraulic, pneumatic, or mechanical dredges; explosives; propeller wash deflectors; air lifts; blowtorches; induction equipment; chemicals; and mechanical tools used to remove or displace bottom sediments or coralline formations to gain access to shipwrecks." ASA Guidelines, 55 Fed. Reg. at 50121. "Diving equipment normally worn by recreational divers while exploring or viewing shipwreck sites are not considered to be tools of excavation." Id. at 50117.

Whether a vessel will become embedded in submerged lands depends on site formation processes: vessel construction, wrecking event, vessel resting location. SMF ¶ 41. Over time, heavier vessels will sink into less resistant sediments up to their waterline. SMF ¶ 42. Vessels that sink in protected locations will be better preserved. SMF ¶ 43.

When the *Delhi* set sail on its final voyage, the *Delhi* was a 266-ton, wooden-hulled sailing vessel. The *Delhi* sank close to shore in ▬▬▬▬ following a collision with ice and rests in a protected location (i.e., close to shore in relatively deep water). SMF ¶¶ 21, 38. The submerged lands there are silty, flat, and featureless; they are less resistant than a rocky seabed. SMF ¶ 44. Toward the seafloor, there is a layer of soft mud sediment. SMF ¶ 45. The *Delhi* is not completely disarticulated. JJM's side scan sonar images depict the *Delhi*'s stern—enough so that the images in ECF 7-1 remain under seal. ECF 66, Page ID 187-88. The parties disagree as to how much of the *Delhi* remains, and whether tools of excavation are needed to safely remove the entirety of the cargo, but these disputes are immaterial considering the facts that are not in dispute.

There is no genuine dispute that some portion of the *Delhi* is visible above the seafloor. SMF ¶ 71. Both teams saw the *Delhi*'s stern post extending from the seafloor and timbers that join at perpendicular angles. SMF ¶¶ 54-55, 63, 65. McBrian determined that the stern post, which was likely 4 meters total, extended 2 meters above the seafloor on an angle. SMF ¶ 64. McBrian

13

also observed from the ROV footage continuity of the ship's hold from the stern post and around the sides and that the interior of the wreck is mostly filled with sediment. SMF ¶¶ 65-66.

There is no genuine dispute that some portion of the *Delhi* is not visible above the seafloor and is stuck in the mud. SMF ¶¶ 72-73. Based in part on the *Delhi*'s dimensions at the time of sinking, the dimension of the wreck site, and the portion of the *Delhi* that is visible above the seafloor, McBrian determined that: a portion of the *Delhi*'s stern post is buried in the mud and the *Delhi*'s keel and keelson, which are substantial large timbers that form the spine and primary longitudinal support for the vessel, are buried under the seabed along with supporting timbers that connect the stern post to the keel. SMF ¶ 69. McBrian also observed a species of kelp that attaches only to hard substrate growing where the *Delhi*'s bow should be, which suggests that part of the *Delhi*'s bow is also buried in the seabed. SMF ¶ 68. Although JJM disputes how much of the *Delhi* is buried in the seabed, there is no genuine dispute that to fully excavate what remains of the *Delhi* extensive use of tools of excavation such as water dredges, water jets, underwater chainsaws, and some lifting apparatus such as a crane, are needed to gain access to the parts of the *Delhi* that are stuck in the mud. SMF ¶ 79.

The parties also dispute whether it is possible to safely remove all the *Delhi*'s cargo—approximately 32,000 granite pavers—from the wreck site using only hand tools. SMF ¶¶ 19, 77-78. A representative paver from the *Delhi*'s cargo measures 6 inches by 3.5 inches by 10 inches and weighs 25 pounds. SMF ¶ 20. Of the approximately 32,000 pavers on board the *Delhi* when it sank, between 1,000 and 5,000 pavers are visible above the mudline. SMF ¶¶ 19, 74-75. Most of the ship's hold is full of sediment, and up to more than half the pavers are buried in the mud. SMF ¶¶ 65-66, 76. Contrary to JJM's contention, up to 32,000 granite pavers cannot be safely excavated from the wreck site without using excavation tools to gain access to the thousands of

granite pavers that are below the mudline and buried in sediment. SMF ¶¶ 77-78. The ASA's definition of "embedded" renders this dispute immaterial, however. As discussed above, the *Delhi* itself—timbers, planking, posts, and framing—cannot be completely removed from Maine's submerged lands without using "tools of excavation . . . to move the bottom sediments to gain access to [the *Delhi*] shipwreck . . . and any part thereof." 43 U.S.C. § 2102(a). Consequently, the *Delhi* is embedded in Maine's submerged lands. Like the submerged lands in which she is embedded, the *Delhi* belongs to the State. *Id.* § 2105(a)(1), (c).

    C. *The Delhi has been Determined Eligible for Listing in the National Register of Historic Places*

Even if the Court finds that a genuine dispute exists as to whether the *Delhi* is embedded, the State is still entitled to judgment on its claim that it owns the *Delhi* because there is no dispute that the *Delhi* is located on Maine's submerged lands and that the Keeper, after consulting with Maine's SHPO, determined that the *Delhi* is eligible for inclusion in the National Register.

Some abandoned shipwrecks may never embed in a State's submerged lands. A sunken vessel that comes to rest on a rocky seabed, for example, would not be able to sink into the seabed. The ASA nevertheless claims title to such vessel for the State if the vessel "is included in or determined eligible for inclusion in the National Register." *Id.* § 2105(a)(3); *see* H.R. Rep. 100-514, pt. II, at 7 (1988). Who determines whether a vessel is eligible for inclusion in the National Register? The Secretary of the Interior. The ASA states: "The Secretary of the Interior, after consultation with the appropriate State Historic Preservation Officer, shall make a written determination that an abandoned shipwreck meets the criteria for eligibility for inclusion in the National Register of Historic Places under clause (a)(3)." 43 U.S.C. § 2105(b); *see* 54 U.S.C. §

302103 (instructing the Secretary to establish National Register criteria for evaluation); 36 C.F.R. § 60.4 (establishing National Register criteria for evaluation). That is what happened here.

Maine's SHPO is responsible for "administer[ing] the State Historic Preservation Program" and is qualified for the position through "special training or experience in the field of historic preservation." 54 U.S.C. § 302303; 27 M.R.S. § 505 (2025). The SHPO reviewed the information in his possession regarding the *Delhi* and, to initiate the Keeper's review pursuant to 43 U.S.C. § 2105(b), provided to the Keeper the SHPO's written opinion with supporting rationale that the *Delhi* shipwreck meets National Register criteria A and D at the local level of significance. SMF ¶¶ 80-82. Dr. Roller, exercising the delegated authority of the Keeper, reviewed the SHPO's submission and requested additional information from the SHPO, including the Simon Report and the McBrian Report. SMF ¶¶ 85-90; *see* 54 U.S.C. § 300316 (providing that the Secretary acts through the Director of the National Park Service for purposes of historic preservation); 36 C.F.R. § 60.3(f) (delegating to the Keeper "the authority by NPS to list properties and determine their eligibility for the National Register" and authorizing the Keeper to "further delegate this authority as he or she deems appropriate"). After consulting with the SHPO, and based on careful review of all information submitted to the Keeper, including the Simon Report, Dr. Roller determined that the *Delhi* is eligible for inclusion in the National Register under criterion D at the local level of significance. SMF ¶ 90. The Keeper complied with 43 U.S.C. § 2105(b) and determined that the *Delhi* is eligible for listing in the National Register. Consequently, the State, through the United States, takes title to the *Delhi* pursuant to 43 U.S.C. § 2105(a)(3).

JJM does not agree with the Keeper's determination that the *Delhi* is eligible for inclusion in the National Register under criterion D at the local level of significance. *JJM v. United States Nat'l Park Serv.*, 1:25-cv-00486-LEW, ECF 1. But the ASA does not invite judicial review of the

16

Keeper's determination. It simply asks this Court to decide whether the Keeper made that determination and whether it did so after consulting with the appropriate State Historic Preservation Officer. 43 U.S.C. § 2105(a)(3), (b). Consequently, even if this Court were to conclude that a genuine dispute exists over whether the *Delhi* is embedded in Maine's submerged lands, the Court should still enter summary judgment in favor of the State because there is no dispute that the *Delhi* is located on Maine's submerged lands and that the Keeper has determined that the *Delhi* is eligible for inclusion in the National Register.

## CONCLUSION

There is no genuine dispute of material fact that the *Delhi* is abandoned, embedded in Maine's submerged lands, and has been determined eligible for listing in the National Register. Pursuant to the ASA, the United States takes title to the *Delhi* and transfers it to the State. The Court should enter judgment for the State on its claim that it owns the *Delhi* pursuant to the ASA and dismiss the action for want of jurisdiction.

Dated: Augusta, Maine
November 21, 2025

Respectfully submitted,

AARON M. FREY
Attorney General of the State of Maine

*/s/ Lauren E. Parker*
Lauren E. Parker, AAG
lauren.parker@maine.gov
Timothy E. Steigelman, AAG
timothy.steigelman@maine.gov
Carey J. Gustanski, AAG
carey.gustanski@maine.gov

Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
207-626-8878

Attorneys for Claimant the State of Maine, including the Maine State Museum