## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| JJM, LLC, <br><br>      Plaintiff <br><br> v. <br><br> *THE ABANDONED AND SUBMERGED VESSEL, DELHI* <br>     her engines, boilers, tackle, appurtenances, cargo, and her other equipment, etc., <br><br>     *in rem*, <br><br>     Defendant. | Civil Action <br> Docket No.: 1:24-cv-00072-JCN |

### PLAINTIFF JJM LLC'S OPPOSITION TO CLAIMANT
### STATE OF MAINE'S MOTION FOR SUMMARY JUDGMENT

NOW COMES Plaintiff, JJM LLC ("JJM"), by and through its undersigned counsel, and submits this Opposition ("Opposition") to the Motion for Summary Judgment ("Motion") filed by party-in-interest State of Maine ("SOM").

### **FACTS**

JJM began looking for *in rem* Defendant *Delhi* (the "Vessel" or "Wreck") in Summer 2022. (Opp. SMF ¶ 109.) After conducting significant historical research, JJM found the Wreck through the use of sonar and verified its identity through a total of four exploratory dives. (Opp. SMF ¶ 110.) The first two dives were conducted by Justin Seavey, a technical diver hired by JJM. (Opp. SMF ¶ 111.) Seavey found the vessel on his second dive during which he retrieved a wooden plank and granite paver from the Wreck using his bare hands. (Opp. SMF ¶¶ 113-114.)

The second two dives were conducted by JJM's team of experts, Rick Simon ("Simon") and Eric Takakjian ("Takakjian"), after JJM had been granted custody of the Wreck by this Court. (Opp. SMF ¶ 115; ECF No. 11.) They observed that the Wreck is in poor condition, destroyed by over a century of exposure to fishing gear and the elements. (Opp. SMF. ¶¶ 117, 126, 129.) The remnants of the hull are scattered across the seafloor and do not resemble the original vessel. (Opp. SMF ¶ 117.) They confirmed that the substrate around the ship was a loose mud bottom prone to poor visibility. (Opp. SMF ¶ 120.)  As part of their investigative efforts, Simon reached into the mud beneath portions of the Wreck's timbers to determine whether parts of the ship lay beneath the substrate. (Opp. SMF ¶ 118.) He was able to submerge his arm all the way up to his shoulder and confirmed that none of the remains of the Vessel existed there; he only found garbage and glass bottles. (Opp. SMF ¶ 119.)

Simon did not attempt to move any pieces of the Wreck so as to avoid disturbing its resting site, but he did move some of the granite pavers. (Opp. SMF ¶ 121.) He noted that the pavers could all be removed by hand or with the assistance of hand tools. (Opp. SMF ¶ 122.) No tools of excavation were required. (*Id.*) The only person who has attempted, and successfully, moved part of the Wreck by hand was diver Justin Seavey, when he brought a paver and a wooden piece of the Wreck to the surface for purposes of establishing this Court's jurisdiction over the Wreck. (Opp. SMF ¶ 114.)

Using the data they collected on their dives, JJM's experts wrote a report that concluded that the Wreck is not embedded in the substrate pursuant to the Abandoned Shipwreck Act, is in poor physical condition, and lacks any historical significance. (Opp. SMF ¶ 123.) With respect to the historical significance of the Vessel, Takakjian opined that this type of vessel is still very common today for professional, recreational, and tourism purposes. (Opp. SMF ¶ 124.) There are

other wooden bulk cargo schooners that are both actively sailing and exist as shipwrecks that are largely intact, more representative of the vessels that existed historically, and offer more information regarding adaptations made for transportation of heavy cargo or how sailors lived during those time periods. (Opp. SMF ¶ 124-125,127-129.) We are further limited from learning anything about the crew of this Vessel because it sank shortly after settling sail. (Opp. SMF ¶ 128.) No one perished in the sinking. (*Id.*) Based on the current state of the Wreck, the limited information it can convey, and the common nature of these vessels, Takakjian has concluded that the Wreck is not historically significant. (Opp. SMF ¶ 130.)

SOM also hired experts to conduct an investigation, but their work pales in comparison to that of JJM's experts. (Opp. SMF ¶ 131.) SOM's investigation was limited to use of an ROV that constitutes "a low-end, almost disposable, piece of amateur equipment." (Opp. SMF ¶ 132.) The equipment they used was mediocre, inaccurate, and lacking in context that was only possible through use of sidescan sonar or an in-person dive. (*Id.*) As the only individuals associated with this litigation who have conducted dives on the Wreck site, JJM's experts are the only ones who can provide that context.

The State then applied for a determination of eligibility without notice to JJM. (Parker Decl. Ex. 1, at 1.) JJM objected to SOM's application and submitted its own expert report and analysis of the Wreck site, which directly contradicted the facts as presented by SOM. (*Id.*; SMF ¶ 85.) The Keeper of the Registry sided with the SOM, finding that the Wreck had "integrity" because it has the "capacity to convey or inform given its character as currently understood." (Mohney Decl. Ex. 7, at 5.) JJM's experts, on the other hand, believe that "[t]he artifacts that now remain on the site are of little historical significance," thereby indicating that there isn't much this Vessel can teach us. (Simon Depo. Ex. 4, at 20.) Ultimately, the Keeper credited the State's report

without doing any personal investigation and, instead, relied on material facts that are genuinely disputed in this litigation.

## STANDARD OF REVIEW

"Summary Judgment exists to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993) (quoting *Wynne v. Tufts Univ. Sch. Of Medicine*, 976 F.2d 791, 794 (1st Cir. 1992)). It is only appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F.R. Civ. P. 56(a). A dispute is genuine if the non-movant can point to record evidence showing contradictory facts. *Id.* 56(c)(1)(A). A fact is material if it has the potential to affect the outcome under governing law. *Nereida-Gonzalez*, 990 F.2d at 703.

In deciding a motion for summary judgment, the Court must view the record in the light most favorable to the non-moving party and may not weigh evidence, resolve credibility disputes, or choose between expert opinions. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir. 1995). Where, as here, the outcome turns on disputed historical facts and expert disagreement, summary judgment is improper.

## ARGUMENT

The Abandoned Shipwreck Act ("ASA") declares that title to shipwrecks located on submerged lands of a state shall vest in that state only if it is "abandoned" *and* "embedded," or "abandoned" *and* "determined eligible for inclusion in the National Register." 43 U.S.C. § 2105. Shipwrecks that do not meet these criteria fall outside the ASA's scope. *Deep Sea Research v. The Brother Jonathan*, 883 F. Supp. 1343, 1350 (N.D. Cal. 1995). SOM contends that the *Delhi* is

abandoned, embedded, and eligible for listing in the National Registry, but the record reveals genuine disputes of material fact on each issue. Moreover, SOM's reliance on an administrative eligibility determination improperly circumvents this Court's adjudicative role and deprives JJM of due process. Summary judgment must therefore be denied.

## I. A genuine dispute of material fact exists regarding whether the Wreck has been abandoned.

Whether a vessel has been abandoned is a threshold and dispositive question under the ASA. *Fairport Int'l Exploration, Inc. v. Shipwrecked Vessel*, 177 F.3d 491, 498 (6th Cir. 1999). The term "abandoned" is not defined by the ASA, *see The Brother Jonathan*, 883 F. Supp. at 1351, but the Supreme Court has confirmed that it "conforms with its meaning under admiralty law." *Cal. v. Deep Sea Research*, 523 U.S. 491, 508 (1998).

It is widely accepted that abandonment can be proven through express actions or inferred based on circumstantial evidence. *See*, *e.g.*, *Northeast Research, LLC v. One Shipwrecked Vessel*, 729 F.3d 197, 210 (2nd Cir. 2013) (discussing express abandonment versus inferred abandonment); *Fairport Int'l Exploration*, 177 F.3d at 499-500 (same); *Martha's Vineyard Scuba Headquarters, Inc. v Unidentified, Wrecked & Abandoned Steamship*, 833 F.2d 1059, 1065 (1st Cir. 1987) (same); *The Brother Jonathan*, 883 F. Supp. at 1351-1354 (same). However, "[i]t has long been the law that 'when articles are lost at sea the title of the owner in them remains.'" *The Brother Jonathan*, 883 F. Supp. at 1351 (quoting *Columbus-America Discovery Group, Inc. v. Atlantic Mut. Ins. Co.*, 947 F.2d 450, 461 (4th Cir. 1992)). Therefore, courts employ a presumption against a finding of abandonment. *See*, *e.g.*, *Northeast Research*, 729 F.3d at 209 ("Rather, courts employ an assumption of nonabandonment anchored on the realistic premise that property previously owned but lost at sea has been taken involuntarily out of the owner's possession and control by the forces of nature at work in oceans and waterways." (internal quotations omitted)); *Fairport Int'l*

*Exploration*, 177 F.3d at 498 ("Intent on protecting the property rights of owners, admiralty courts recognize a presumption against finding abandonment."). Thus, courts have adopted a "stringent burden of proof" for the abandonment inquiry, requiring that the party advocating for abandonment prove their case by clear and convincing evidence. *Northeast Research*, 729 F.3d at 209-210.

SOM relies on the factors articulated in *Martha's Vinyard*,[1] arguing that abandonment is the "prudent choice" because no salvage was attempted and no owner has appeared. (Motion at 10-11.) These contentions are not sufficient to establish abandonment given the facts in the record.

First, an owner's lack of salvage attempts is not *prima facie* evidence that they have abandoned a vessel. *See, e.g., Fairport Int'l Exploration*, 177 F.3d at 499 (noting that "an owner's failure to return to a shipwreck site does not necessarily prove abandonment"); *Zych v. Unidentified, Wrecked & Abandoned Vessel, Believed to be SB* Lady Elgin, 755 F. Supp. 213, 216 (N.D. Ill. 1991) (finding that insurance company was not required to engage in recovery efforts over the course of 160 years in accordance with "the law's hesitancy to find abandonment and the concomitant requirement that abandonment be supported by strong and convincing evidence). This is especially true where, as SOM notes, the cost to raise the vessel outweighs its remaining usefulness or the value of the vessel and its cargo. (Motion at 12.)

Further, there is insufficient evidence in the record to prove that the "commercial diving industry and underwater salvage was well-formed and established by 1983." (SMF ¶ 26.) To support its contention, SOM points to one sentence in a 46-page document issued by the SHPO

---

[1] *Martha's Vineyard* was decided prior to the enactment of the ASA. Since then, other courts have addressed the issue and provided a full summary of factors to consider when analyzing abandonment for purposes of the ASA: "In determining whether clear and convincing circumstantial evidence supports inferring abandonment, courts consider a variety of factors, including lapse of time, the location and circumstances of the wreck, whether parties presently claim ownership, whether such parties have attempted to locate or salvage the vessel, and the availability of technology to do so." *Northeast Research, LLC v. One Shipwrecked Vessel*, 729 F.3d 197, 211 (2nd Cir. 2013).

that claims granite was salvaged from a wreck before it was re-loaded on a ship to its final destination. (*Id.*) This is not evidence that the salvage diving industry was "well-formed and established" in the 1890s, nor does it prove that the *Delhi*, specifically, could have been located and salvaged at the time it sank. Courts addressing historical salvage capabilities routinely treat such questions as fact-intensive and disputed. *See*, *e.g.*, *Northeast Research*, 729 F.3d at 213 ("Based on our review of the record, we therefore conclude that the technological possibility of salvage in the mid-1850s remains a disputed issue."); *The Brother Jonathan*, 883 F. Supp. at 1353 ("In this case, the state of the art technology necessary to accurately locate the *Brother Jonathan*, or to safely salvage the vessel at a depth of 250 feet, did not exist until just recently."); *Columbus-America Discovery Group*, 974 F.2d at 463 (noting an increase in interest in finding the wreck of the *Central America* after advancements in salvage technology in the 1960s). Taken in the light most favorable to JJM as the non-movant, the record is devoid of facts that conclusively establish, without dispute, that the technology was available to salvage the wreck and its cargo in the 1890s.

Second, and more importantly, there is a dispute of material fact over whether an insurance company exists with ownership rights over the Vessel and its cargo. Although no descendants of the original owner have appeared, JJM has produced evidence that Intact Insurance may hold successor rights.

The declaration of Benjamin Ford, Esq., details extensive efforts to identify the modern successor insurer. (Ford Decl. ¶¶ 3-10.) After being passed between company representatives, he was referred to Samuel Blatchley, Esq., who represents Intact Insurance's interests in this matter. (Parker Decl. Ex. 11, at 5; Ford Decl. ¶¶ 11-12; Szczepaniak Decl. ¶ 6.) Intact Insurance, through Attorney Blatchley, has expressed interest in asserting a claim and is actively reviewing archival records that are more than a century old. (Szczepaniak Decl. ¶ 7.)

SOM's contrary assertion rests on a subpoena served only on U.S. affiliates of Intact Insurance, despite indications that relevant records are held by the Canadian entity. As stated by Attorney Parker, SOM served a subpoena on Intact Insurance Group USA LLC and Intact Insurance Holdings Group LLC. (Parker Decl. ¶ 9.) On August 7, 2025, Intact Insurance responded that they did not have any insurance policies or other documents pertaining to the *Delhi*. (Parker Decl. Ex. 10.) However, on August 29, 2025, counsel for JJM received an email from Attorney Blatchley announcing he had been retained on this case. (Parker Decl. Ex. 11 at 5.) Attorney Blatchley later clarified that SOM only served the subpoena on the U.S. entity, not the Canadian entity, although it's the Canadian entity that is likely to have the relevant documentation. (Parker Decl. Ex. 11 at 1.)

SOM was aware of this discrepancy but made no attempt to investigate it prior to filing its Motion for Summary Judgment. On September 22, 2025, Attorney Parker received JJM's email correspondence with Intact Insurance, which included Attorney Blatchley's email explaining the subpoena error. (Parker Decl. ¶ 12; Parker Decl. Ex. 11 at 1.) It was also evident to SOM, based on the dates in the emails, that counsel for Intact Insurance had not been hired until *after* Attorney Parker received the letter from Intact Insurance. (Parker Decl. Ex. 10; Parker Dec. Ex. 11 at 5.) Yet, SOM made no effort to confirm Intact Insurance's interest, or alleged lack thereof, in this matter prior to filing its Motion for Summary Judgment. (Szczepaniak Decl. ¶¶ 3-5.)

Furthermore, there is historical evidence in the record that an insurance company paid out a policy on the cargo after the *Delhi* sank.[2] (SMF ¶ 22.) If that's true, then a finding of abandonment is precluded. The guidelines for the ASA, promulgated by the National Parks Service pursuant to 43 U.S.C. § 2104, exclude from abandonment those vessels for which a payment has been

---

[2] SOM alleges that there is no admissible evidence that the cargo was insured, but the newspaper article they cite to is admissible as a statement in an ancient document pursuant to Fed. R. Evid. 803(16).

distributed by an insurance underwriter. 55 Fed. Reg. 50116 Pt I (Dec. 4, 1990). "In such cases, title to the wrecked vessel is passed to the party who paid the owner." *Id.* Intact Insurance is likely the rightful claimant for the Vessel and its cargo and should be given the opportunity to complete its investigation and assert ownership and its claims. The fact that it has been difficult to locate the requisite documents is not clear and convincing evidence that Intact has abandoned the Wreck. *See*, *e.g.*, *Columbus-America Discovery Group*, 974 F.2d at 468 (vacating lower court's finding of abandonment because insurance documents lost over the course of 134 years were not evidence of the insurance company's intent to abandon claims to a wreck where it had paid out insurance proceeds). Until Intact Insurance states that it does not have a claim to the Wreck or its cargo, there is a dispute of material fact regarding whether anyone has an ownership claim to the Wreck.

Because abandonment is disputed and the evidence falls well short of the clear and convincing standard, summary judgment on this issue must be denied.

## II.    A genuine dispute of material fact exists regarding whether the wreck is "embedded" within the meaning of the Abandoned Shipwreck Act.

The ASA defines "embedded" as "*firmly affixed* in the submerged lands or in coralline formations such that the use of tools of excavation is *required* in order to *move the bottom sediments* to gain access to the shipwreck, its cargo, and any part thereof." 43 U.S.C. § 2102(a) (emphasis added). JJM's experts, the only individuals to physically examine the Wreck, attest that the hull remnants and cargo rest in loose mud and can be moved without excavation tools. Their firsthand observations directly contradict SOM's experts' conclusions, which are based on remote and circumstantial evidence. Furthermore, the only person between these parties who has attempted to move part of the ship is Justin Seavey, and he was able to successfully bring a section of a wooden plank to the surface using only his hands. (Opp. SMF ¶ 114.)

This conflict presents a classic battle of experts that cannot be resolved on summary judgment. Issues of credibility, weight, and competing interpretations of physical evidence are reserved for the fact-finder. *See, e.g.*, *Ferrara & Dimercurio v. St. Paul Mercury*, 240 F.3d 1, 7-9 (1st Cir. 2001) (discussing two expert opinions that directly contradicted each other). Here, the State's expert believes this Wreck is embedded based on a circumstantial conclusion that large parts of the Wreck lie beneath the substrate.[3] (SMF ¶ 69.) The first-hand accounts of JJM's experts, who were able to place their hands on the Wreck and personally investigate what lies beneath the substrate, demonstrate that the ship's hull does not extend into the substrate. (Opp. SMF ¶ 119.) Rather, what is visible on the surface of the seafloor is all that remains of the Wreck, and the remnants are limited to loose timbers scattered among modern debris. (Simon Depo. Ex. 4, at 21.)

The record establishes that Seavey was able to remove part of the ship and cargo using only his hands. (Opp. SMF 114.) Neither SOM nor JJM's experts have attempted to move any portion of the ship, so Seavey's experience – paired with JJM's experts' characterizations of the substrate and observations of the remaining pieces of the Wreck – is the only evidence available to help determine whether the Wreck is "embedded" under the ASA. Whether the wreck is embedded is a fact-intensive inquiry that must be resolved at trial. The experts for both parties have come to drastically different conclusions and the evidence cannot be properly weighed based on the paper filings alone. The Court, as fact-finder, is unable to hear the testimony of the experts, observe them on cross-examination, or weigh their credibility.

Taking these inferences in favor of non-movant JJM, the record establishes that the Wreck is not "firmly affixed" to the substrate. Summary judgment on this issue is inappropriate.

---

[3] The Keeper of the Historic Register also "agree[d] with JJM that until systematic subsurface investigation can definitely determine the character of remains, our understanding of the character and integrity of the ship's bow remains inconclusive," and that the conclusions of the State's expert were based on "circumstantial and empirical evidence." (Mohney Decl. 7, at SOM 2547.)

**III.    There is a genuine dispute of material fact as to whether the Wreck is eligible for listing on the National Register of Historic Places.**

In this case, SOM is attempting to circumvent the judicial process by prematurely seeking an eligibility determination by the Keeper ("Keeper") of the National Register for Historic Places ("National Register"). Its attempts fail because the Keeper's determination is based on material facts disputed by the parties and because a Keeper's determination at this stage of the proceedings deprives JJM of its procedural due process rights.

<u>A.    The Keeper's determination is premised on disputed facts.</u>

Eligibility determinations necessarily depend on factual findings regarding a wreck's condition, integrity, and significance. Where those facts are disputed, they must be resolved by the judiciary, not through an administrative process lacking evidentiary safeguards. JJM is entitled to have these facts adjudicated pursuant to this Court's subject matter jurisdiction without the State's attempts to gain an unfair advantage by taking an end-run around the Court's authority after JJM reported and arrested the Wreck. *See*, *e.g.*, *Deep Sea Research*, 523 U.S. at 502 ("Early cases involving the disposition of 'prize' vessels captured during wartime appear to have assumed that federal courts could adjudicate the *in rem* disposition of the bounty even when state officials raised an objection.").

JJM's experts strongly disagree with the facts on which Dr. Michael P. Roller ("Dr. Roller"), acting as the Keeper, determined that the Wreck is eligible for listing on the National Register. He claims that "all information supplied by MPHC and JJM was carefully considered in the process of completing this determination of the eligibility for the *Delhi* shipwreck." (Mohney Declaration, Ex. 7 at 2.) Although he may have "considered" information provided by both SOM and JJM, he *credited* the information given to him by the State over that provided by JJM. For example, in his Determination of Eligibility Comment Sheet, Dr. Roller states that the "sudden

sinking of the vessel has resulted in a relatively intact vessel," which is potentially false and contrary to everything JJM's experts have concluded. (Mohney Decl. Ex. 7, at 2.) Rather, JJM's experts have consistently stated that, based on what they witnessed during their dives, what is left of the structure of the Wreck is scattered in pieces across the ocean floor. Aside from ignoring JJM's findings, there's no basis for such an absurd conclusion; the "sudden sinking" of the *Delhi* in 1893 has no bearing on the state of the Wreck after more than a century of environmental degradation. (Simon Decl. ¶ 17.)

JJM's experts also disagree with Dr. Roller's conclusions that this wreck has historical significance. Dr. Roller claims that "[r]egardless of its condition, the significance of a property under any criteria is based upon its evaluated capacity to convey or inform given its character as currently understood." (*Id.* at 5.) JJM's experts, one of whom was hired specifically to provide historical context, has determined that the Wreck has no remaining capacity to convey meaningful information about shipbuilding, maritime commerce, or daily life of the period. (Takakjian Decl. ¶¶ 5, 13, 17.)

The Keeper has never personally visited the Wreck site, so his evaluation is limited to the competing accounts provided by the parties. He is, in essence, another expert or fact-finder substituting his own opinions for the experts hired by the parties without any oversight by the Court. His determination substitutes an administrative opinion for judicial fact-finding and cannot stand when JJM properly initiated this suit pursuant to the Court's *in rem* jurisdiction and facts remain unresolved. The State may not win administratively what it has not yet proven judicially.

B.    By attempting to circumvent the judicial system, SOM is depriving JJM of its constitutionally protected due process rights.

To allow SOM to file an eligibility determination while this litigation is pending is a violation of JJM's procedural due process rights. "Procedural due process imposes constraints on

governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). It requires implementation of fair procedures based on the circumstances presented by the particular situation which usually, at the very least, includes the right to a hearing. *See*, *e.g.*, *Id.* at 332, 334; *DePoutot v. Raffaelly*, 424 F.3d 112, 117-118 (1st Cir. 2005) ("In its procedural aspect, due process ensures that government, when dealing with private persons, will use fair procedures."). Thus, an analysis of the following factors is required to determine whether a due process violation occurred: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

As this Court has recognized by designating JJM as substitute custodian and presumptive salvor, JJM has asserted a cognizable property interest in the *Delhi*. If the ASA does not apply, then it is entitled to a salvage award or title to the wreck in exchange for the efforts expended in locating and (eventually) retrieving its cargo. The government's interest, on the other hand, is the ASA's directive to promote access to shipwrecks for recreational and educational purposes. Listing in the National Register aligns with the ASA's directive to promote access to shipwrecks for recreational and educational purposes. 43 U.S.C. § 2103(a). Aside from that, the government's interest is limited as it has indicated that it plans to leave the Wreck in its current location, with no intention of retrieving any artifacts for viewing by the general public and, instead, leaving the Wreck's remains and its artifacts subject to looters.

In this specific case, the risk of an erroneous deprivation and value of procedural safeguards is the factor that weighs the heaviest. To allow the State to seek an eligibility determination amid litigation has poor public policy implications. Upholding the Keeper's determination would not only reward the State for negotiating in bad faith, but will also create a chilling effect in wreck diving that is at odds with historic preservation goals. Salvors are secretive and enterprising by nature, and if there is precedent for them to forfeit potential ownership claims, despite following legal *in rem* procedures, because the State can sidestep the *in rem* process and obtain an eligibility determination at any time, then those salvors have no incentive to report their findings. Historical artifacts will suffer from this result; wrecks will go unreported and salvors will pillage their findings knowing that they have no adjudicative avenues for recourse. This effect goes *against* the objectives of the ASA and should be avoided.

Permitting such administrative end-runs during litigation creates perverse incentives, discouraging salvors from reporting discoveries and undermining the ASA's preservation goals.[4] JJM followed proper legal channels by invoking this Court's jurisdiction. Due process requires that factual disputes be resolved here, not through premature administrative determinations. Accordingly, the Keeper's eligibility determination should be vacated.

## CONCLUSION

The ASA applies in limited circumstances and the State is unable to establish, without dispute, that those circumstances exist here. It is premature to declare that the *Delhi* has been abandoned given Intact Insurance's potential interest which the State failed to thoroughly investigate prior to filing its Motion for Summary Judgment despite having knowledge that its

---

[4] This public policy rationale is consistent with the generous award system of American salvage law generally. *See, e.g.*, *Blackwall*, 77 U.S. 1, 12 (1869) and The Treasure Act, 1996 (Eng.) which both compel salvors to report their finds to the Crown or Court in exchange for a share in its value.

investigation is ongoing. Further, the experts for JJM and the State disagree about the state of the Wreck, whether it is embedded, and its historical significance. The Keeper relied on the State's perspective to make its determination of eligibility, taking on an adjudicative role without an opportunity to properly weigh the evidence before this Court. To allow his determination to stand would be a violation of JJM's procedural due process rights. For all of the foregoing reasons, the State's Motion for Summary Judgment should be denied.

WHEREFORE, JJM respectfully requests that this Court DENY the State of Maine's Motion for Summary Judgment.


Dated at Portland, Maine, this 19th day of December, 2025.


_____*/s/ Twain Braden*_____
Benjamin E. Ford, Esq.
Twain Braden, Esq.
Grayson P. Szczepaniak, Esq.
Attorneys for Plaintiff JJM, LLC

**ARCHIPELAGO**
1 Dana Street, 4th Floor
Portland, ME 04101
(207) 558-0102
bford@archipelagona.com
tbraden@archipelagona.com
gszczepaniak@archipelagona.com


## CERTIFICATION OF FILING

I, Twain Braden, hereby certify that on the date indicated above, the foregoing document was filed using the CM/ECF system, which will serve all counsel of record with notice of this filing via email.

_____*/s/ Twain Braden*_____
Twain Braden, Esq.