UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JJM, LLC,
      Plaintiff

v.

*THE ABANDONED AND SUBMERGED VESSEL, DELHI*

      *in rem*, Defendant.

Civil Action
Docket No.: 1:24-cv-00072-JCN

**CLAIMANT STATE OF MAINE'S REPLY STATEMENT OF MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 56(d), the State of Maine's replies to JJM, LLC's Statement of Additional Material Facts follow. The facts admitted by the State are admitted solely for summary judgment. Local Rule 56(g)(2).

**State's Reply to JJM's Statement of Additional Material Facts**

109.    JJM began looking for *in rem* Defendant *Delhi* ("Wreck" or "Vessel") in Summer 2022. JJM Depo. 16:14-18.

    <u>State's reply to SMF 109</u>: Admitted.

110.    After conducting significant historical research, JJM found the Wreck in Summer 2023 through the use of sonar and verified its identity through multiple dives. JJM Depo. 16:19-17:13, 21:13-22:5.

    <u>State's reply to SMF 110</u>: Admitted.

111.    The first two dives were conducted in November 2023 by Justin Seavey ("Seavey"), a technical diver hired by JJM. Seavey Aff., ¶¶ 4-7.

    <u>State's reply to SMF 111</u>: Admitted.

1

112. The first dive was unsuccessful, but Seavey located the Wreck on his second dive. Seavey Aff., ¶¶ 5-11.

State's reply to SMF 112: Admitted.

113. During his dive, Seavey investigated what was below the substrate and noted that there was wood and stone debris in the area immediately surrounding the Vessel. Seavey Aff., ¶ 14.

State's reply to SMF 113: Admitted.

114. Before surfacing after the second dive, Seavey retrieved one of the granite pavers and a wooden plank from the substrate. He was able to pick up these items with his hands and without the assistance of any tools. Seavey Aff., ¶¶ 15-16.

State's reply to SMF 114: Qualified.  Seavey averred that the wooden plank he retrieved "was attached to the Vessel and was protruding from the muddy sea floor."  ECF 91-5, PageID 1414 (Seavey Aff. ¶ 16).

115. The second two dives were conducted by JJM's team of experts: Richard "Rick" Simon ("Simon") and Eric Takakjian ("Takakjian") on May 4, 2025. Simon Decl. ¶ 8; Takakjian Decl. ¶ 6.

State's reply to SMF 115: Admitted.

116. Both divers had the opportunity to view the Wreck and note its condition in

2

person. Simon Decl. ¶¶ 8, 11-12; Takakjian Decl. ¶ 7.

State's reply to SMF 116: Qualified.  Visibility for Simon and Takakjian at the wreck site was limited on their two dives to a variation of zero to two feet and zero to three feet.  ECF 79-2, PageID 399 (Simon Dep. Tr. 64:3-7); ECF 79-3, PageID 423, 436 (Simon Dep. Tr., Ex. 4).

117.   Simon and Takakjian agree that the Wreck consists of pieces scattered across the seafloor. It barely resembles the original Vessel. Simon Decl. ¶¶ 12-15; Takakjian Decl. ¶¶ 12, 22-23; Simon Depo. Ex. 4, at 19.

State's reply to SMF 117: Denied.

Regarding the first sentence of SMF 117, Simon testified that the Wreck includes more than just pieces scattered across the seafloor.  Simon testified that some portion of the *Delhi* is visible above the sea floor, including the sternpost, which protrudes above the seafloor, and clear perpendicular angles.  ECF 79-2, PageID 400-01, 403, 406 (Simon Tr. 67:18-23, 68:23-69:2, 71:18-20; 78:10-22, 79:15-17; 89:6-10, 90:10-16).  Simon testified that he has no basis to dispute McBrian's opinion that figure 5 of the McBrian Report, ECF 79-7, PageID 516, depicts the framing and outer hull planking of the *Delhi*.  ECF 79-2, PageID 403 (Simon Tr. 79:3-80:4).  Simon also agreed in deposition that some portion of the *Delhi* is not visible above the sea floor, and that some portion of the *Delhi* is stuck in the mud.  ECF 79-2, PageID 401, 407 (Simon Tr. 71:21-23, 93:10-14).  Takakjian also observed the *Delhi*'s sternpost.  ECF 79-4, PageID 455 (Takakjian Tr. 37:24-38:8).

Regarding the second sentence of SMF 117, JJM's side-scan sonar images of the *Delhi* show continuity of a U-shaped object on the ocean floor with dimensions closely mirroring those observed by McBrian.  ECF 7-1; ECF 83-2 (Simon Dep. Tr., Ex. 4 (sealed) at 11-15, 17); ECF 79-7, PageID 527 (McBrian Decl. Ex. 1) (identifying the visible portion of the vessel at approximately 15 meters in length

and 8 meters in width).  In ECF 7-1, JJM's sonar images of the *Delhi* and the written narrative accompanying Figure 5 reveal enough of the *Delhi* that they remain under seal.  ECF 61; ECF 62-1, PageID 173; ECF 66, PageID 187-88.  Seavey averred that portions of the *Delhi* rise approximately "twenty to thirty feet above the ocean floor."  ECF 91-5, PageID 1413 (Seavey Aff. ¶ 11).  McBrian testified that "at least half of the shipwreck . . . is more or less intact and in situ."  ECF 79-5, PageID 479 (McBrian Dep. Tr. 58:4-15).

118.    During their dive, Simon physically investigated whether any of the Wreck was still intact under the substrate by reaching his arm into the mud all the way to his shoulder – almost three feet. He did this at multiple locations around the Wreck site. Simon Decl. ¶¶ 22-24; Simon Depo. 76:17-77:11.

State's reply to SMF 118: Admitted.

119.    Simon did not feel anything except for modern manmade debris such as glass bottles and other garbage. The Wreck is not preserved under the substrate. Simon Decl. ¶¶ 25-26; Simon Depo. 75:9-20.

State's reply to SMF 119: Denied.

Regarding the first sentence of SMF 119, Simon testified at deposition that he also felt scattered timbers.  ECF 79-2, PageID 402 (Simon Dep. Tr. 74:19-75:5).

Regarding the second sentence of SMF 119, Simon and McBrian agree that some portion of the *Delhi* and its timbers are in and under the mud.  ECF 79-2, PageID 400-402, 407 (Simon Dep. Tr. 68:24-69:22, 74:19-75:5, 93:10-14); ECF 79-5, PageID 471-72 (McBrian Dep. Tr. 27:16-30:21); ECF 79-6, PageID 502-03 (McBrian Decl. ¶¶ 16-17); ECF 79-7, PageID 527 (McBrian Decl. Ex. 1).

120.    Simon noted that the substrate was comprised of suspended sediment that can be described as loose, oozy, soupy material prone to creating visibility issues when stirred up. Simon Decl. ¶¶ 10; Simon Depo. 61:21-62:2; 62:18-20; 63:3-6.

State's reply to SMF 120: Qualified.  "Suspended sediment" is another way of saying "mud." ECF 79-2, PageID 405 (Simon Dep. Tr. 88:4-8).

121.    Simon did not attempt to move any pieces of the Wreck because he did not want to disturb its resting site. He did, however, attempt to pick up some of granite pavers strewn across the site. Simon Declr. ¶¶ 19, 22; Simon Depo. 76:17-77:11.

State's reply to SMF 121: Admitted.

122.    He could easily pick up the pavers and remove them from the substrate by hand. He also noted that the any pavers beneath the substrate could also easily be removed without the use of excavation tools, or at a maximum hand tools, due to the looseness of the sediment. Simon Decl. ¶¶ 20-21; Simon Depo. 136:7-13; Simon Depo. Ex. 4, at 24.

State's reply to SMF 122: Admitted.

123.    Using the data they collected on their dives, JJM's experts wrote a report that concluded the Wreck is in not embedded in the substrate as described by the Abandoned Shipwreck Act, is in poor physical condition and lacks any historical significance. Simon Depo. Ex. 4, at 21-24; Takakjian Depo. 11:12-23, 12:1-8.

State's reply to SMF 123: Admitted.

124.    Takakjian is familiar with this type of Wreck. They're still very common today for professional, recreational, and tourism purposes. Takakjian Decl. ¶¶ 9, 11; Simon Depo. Ex. 4, at 21.

State's reply to SMF 124: Admitted.

125.    There are also numerous other examples of wooden bulk cargo schooner shipwrecks that are largely intact and more representative of the type of vessel that may have historical value. Many of these wrecks are popular dive sites. Takakjian Decl. ¶¶ 18, 19; Simon Depo. 84:2-7; 85:6-23.

State's reply to SMF 125: Denied. "Of the thirteen schooners listed in the National Register or designated as National Historic Landmarks in the state of Maine, none are comparable to the *Delhi* in terms of their specific capacities to convey or inform based upon their current construction or historic functions." ECF 81-2, PageID 790-91 (Mohney Decl. Ex. 7).

126.    The *Delhi*, in comparison, is a collection of scattered and deteriorated timbers. Takakjian Decl. ¶¶ 20; Simon Decl. ¶ Simon Depo. 84:25-85:1; Simon Depo. Ex. 4 at 19.

State's reply to SMF 126: Denied. The *Delhi* includes, but is not limited to, scattered and deteriorated timbers. ECF 7-1 at 4; ECF 79-2, PageID 400-03, 407 (Simon Dep. Tr. 68:24-69:2, 71:21-23, 74:19-23, 79:9-80:4, 93:10-14); ECF 79-5, PageID 471-73, 479 (McBrian Dep. Tr. 28:19-30:21; 32:7-33:2; 58:4-15); ECF 79-6, PageID  502-05 (McBrian Decl. ¶¶ 16-17); ECF 79-7, PageID 515-17, 527 (McBrian Decl. Ex. 1); ECF 91-5, PageID 1413 (Seavey Aff. ¶ 11).

6

127.    The artifacts at the site are limited to pottery, such as jugs, mixing bowls, and plates, none of which have any historical significance and won't teach us much about living aboard sailing vessels in the late 1800s. They would have more historical value if brought to the surface to be shared with the public. Takakjian Decl. ¶¶ 14-15.

State's reply to SMF 127:  Regarding what artifacts are present at the site, qualified. The artifacts observed at the site to date by the State's team and JJM's team are limited to pottery, such as jugs, mixing bowls, and plates.  Otherwise, denied.  Among other information, the crew's artifacts can yield information about the shipboard life of the crew and the crew's social status in the Saco community.  ECF 80-3, PageID 679 (Mohney Decl. Ex. 3); ECF 81-2, PageID 790-91 (Mohney Decl. Ex. 7).  The significance of the artifacts "is the value they contribute to the research potential of [the *Delhi*] archeological site."  ECF 81-2, PageID 790-91 (Mohney Decl. Ex. 7).

128.    We are further limited from learning anything about the crew because this ship sank shortly after setting sail. The crew members barely had time to get settled before it sank and everyone survived the ordeal. Takakjian Decl. ¶¶ 16; Parker Decl. Ex. 3, at 3.

State's reply to SMF 128: Regarding the first sentence of SMF 128, denied.  Among other information, the crew's artifacts can yield information about the shipboard life of the crew and the crew's social status in the Saco community.  ECF 80-3, PageID 679 (Mohney Decl. Ex. 3); ECF 81-2, PageID 790-91 (Mohney Decl. Ex. 7).  Regarding the second sentence of SMF 128, admitted.

129.    Additionally, due to the condition of the Wreck, it cannot provide any information on vessel design or adaptations made for the transportation of heavy cargo. Anything that could have been learned has been long lost to damage caused by nature and commercial fishing.

Takakjian Decl. ¶¶ 17; Simon Depo. Ex. 4, at 22.

State's reply to SMF 129: Denied.  The *Delhi* has the potential "to yield significant information about multiple areas of research interest" including "ship design and alteration."  ECF 80-3, PageID 679 (Mohney Decl. Ex. 3); ECF 81-2, PageID 790-91 (Mohney Decl. Ex. 7).

130.    Based on his observations, Takakjian has concluded that this Wreck is not historically significant and not eligible for listing in the National Register of Historic Places. Takakjian Depo. 11-23; Simon Depo Ex. 4, at 20-22.

State's reply to SMF 130: Admitted.

131.    Claimant SOM also hired experts to conduct an investigation, but their work and equipment was inadequate in comparison to JJM's experts. Simon Depo. 115:14-116:1; Simon Depo. Ex. 4, at 25.

State's reply to SMF 131: The State admits that it hired experts to conduct an investigation but denies that its expert team's work and equipment were inadequate in comparison to JJM's expert team.

Regarding the adequacy of the State's team's work as compared with JJM's team's work: "[T]he McBrian Report was prepared in accordance with the best professional archeological practices for data collection and reporting" and "documents a systematic survey and evaluation by a professional archeological crew."  ECF 81-2, PageID 789 (Mohney Decl. Ex. 7).  In contrast, the Simon Report "did not document employment of any systematic methods of underwater archeological investigation" but "based its conclusion on divers not seeing or feeling buried elements through the layers of silt." ECF 81-2, PageID 789 (Mohney Decl. Ex. 7).

Regarding the adequacy of the State's team's equipment compared with JJM's team's

equipment: The State's team investigated the shipwreck using a remotely operated vehicle equipped with imaging sonar and, for portions of the survey, an additional camera; this equipment provided higher resolution sonar imagery than JJM's side scan sonar.  ECF 79-5, PageID 477-78 (McBrian Dep. Tr. 51:2-25, 55:1-11); ECF 81-3, PageID 797-98 (Jarrett Dep. Tr. 17:1-13, 20:10-25, 21:16-21, 22:9-22:14); ECF 79-7, PageID 512-14, 541 (McBrian Decl. Ex. 1); ECF 81, PageID 726-27 (Mohney Decl. Ex. 6).  The State's equipment allowed the State to know the location of the seafloor, which resulted in fewer visibility issues.  ECF 79-5, PageID  478 (McBrian Dep. Tr. 55:12-21); ECF 81-3, PageID 798-99 (Jarrett Dep. Tr., 24:6-25:10); ECF 79-2, PageID 399 (Simon Dep. Tr. 64:3-7); ECF 79-3, PageID 423, 436 (Simon Dep. Tr., Ex. 4).  Also, the State's team used JJM's side-scan sonar to locate the wreck site.  ECF 79-7, PageID 511 (McBrian Decl. Ex. 1).

132.    SOM's investigation was limited to use of an ROV that constitutes "a low-end, almost disposable, piece of amateur equipment." Only a sidescan survey would have accurately and efficiently measured the wreck's dimensions in 3D and in context on the seafloor. Simon Depo. Ex. 4, at 25.

State's reply to SMF 132: Denied.  The State's team used a remotely operated vehicle equipped with imaging sonar and an additional camera that allowed the State's team to conduct a systematic survey.  E.g., ECF 79-5, PageID 477, 478 (McBrian Dep. Tr. 51:2-4, 55:1-21); ECF 79-7, PageID 512-14, 541 (McBrian Decl. Ex. 1); ECF 81, PageID 726-27 (Mohney Decl. Ex. 6); ECF 81-3, PageID 797, 798 (Jarrett Dep. Tr. 17:1-13, 20:10-25, 21:16-21, 22:9-24:15).  Side-scan sonar may or may not be better than an ROV equipped with a camera and sonar for overall visualization of the wreck site; side scan sonar is not better for precise measurements.  ECF 79-5, PageID 478 (McBrian Dep. Tr. 54:7-56:7); ECF 81-3, PageID 797 (Jarrett Dep. Tr. 20:10-25).

9

133.    Aside from the ROV work, SOM did not conduct any further surveys on the Wreck. No one from the State's survey team personally dove on the Wreck. Simon Depo. Ex. 4, at 25.

State's reply to SMF 133: Admitted.

134.    As of September 22, 2025, SOM had all emails that had been exchanged at that time between counsel for Intact Insurance and counsel for JJM. Parker Decl. ¶ 12.

State's reply to SMF 134: Denied.  The record material cited by JJM does not support that the State had received all such emails; it supports only that the State received from JJM's counsel on September 22 two threads of JJM's Counsel's Email Correspondence with Intact Insurance Company, dated July 25 through September 2, 2025, and September 11 through September 18, 2025.  ECF 82, PageID 825 (Parker Decl. ¶ 12).

135.    Those emails show that SOM was aware that its subpoena on Intact Insurance had been improperly served, and that the Canadian entity was interested in asserting a claim in this matter. Parker Decl. Ex. 11, at 1.

State's reply to SMF 135: Denied.  The record material cited by JJM does not support SMF 135. The cited email shows only that attorney Samuel Blatchley of Eckland & Blando opined that the subpoena had been served on the incorrect entity; it says nothing about the Canadian entity being "interested in asserting a claim in this matter."  ECF 82-11, PageID 858 (Parker Decl. Ex. 11).

136.    The emails further reveal that Intact Insurance was actively checking its records

for a policy or other documents related to the *Delhi*. Parker Decl. Ex. 11, at 1, 5.

State's reply to SMF 136: Denied.  The record material cited by JJM does not support SMF 136. ECF 82-11, PageID 858, 862 (Parker Decl. Ex. 11); *see also* ECF 82-10, PageID 857 (Parker Decl. Ex. 10).

137.    Despite knowing there was still a potential claimant preparing to come forward, SOM filed its Motion for Summary Judgment alleging abandonment of the Wreck. State's Motion for Summary Judgment, at 8-12.

State's reply to SMF 137: Denied.  The record material cited by JJM does not support SMF 137. The State was not aware when it filed its Motion for Summary Judgment alleging abandonment of the wreck that a potential claimant was preparing to come forward.  ECF 82-11, PageID 858, 860, 862 (Parker Decl. Ex. 11); ECF 82-12, PageID 869 (Parker Decl. Ex. 12); *see also* ECF 82-10, PageID 857 (Parker Decl. Ex. 10).

138.    SOM made no efforts to further investigate Intact Insurance's claims until December 8, 2025 – over two weeks after filing its Motion for Summary Judgment. Szczepaniak Decl. ¶¶ 4-7.

State's reply to SAMF 138: Qualified.  After receiving from JJM's counsel on December 2, 2025, email correspondence between JJM's counsel and Intact Insurance's counsel on which the State's counsel was not copied despite the Court's discovery order, the State met by Microsoft Teams with, among others, Intact Insurance's counsel and JJM's counsel.  ECF 91-3, PageID 1403-07 (Ford Decl. Ex. 1); ECF 91-4, Page ID 1410-11 (Szczepaniak Decl. ¶¶ 4-6); *see* ECF 76, PageID 303; ECF 78 (Tr. 23-25 (Oct. 14, 2025)).  The State is not investigating Intact Insurance's claims.

11

Dated: Augusta, Maine
January 9, 2026

Respectfully submitted,

AARON M. FREY
Attorney General of the State of Maine


/s/ Lauren E Parker
Lauren E. Parker, AAG
lauren.parker@maine.gov
Timothy E. Steigelman, AAG
timothy.steigelman@maine.gov
Carey J. Gustanski, AAG
carey.gustanski@maine.gov

Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
207-626-8878

Attorneys for Claimant the State of Maine,
including the Maine State Museum

12