UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JJM, LLC, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:24-cv-00072-JCN |
| | ) | |
| S/V DELHI, | ) | |
| | ) | |
| Defendant | ) | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Plaintiff JJM, LLC, commenced this in rem proceeding against Defendant, the *Delhi* shipwreck, after locating the wreck in the State of Maine's coastal waters, asserting an ownership claim pursuant to the law of finds and, in the alternative, a claim for a salvage award. The State has intervened and seeks summary judgment on its claim that it holds title to the *Delhi* under the Abandoned Shipwreck Act (ASA), 43 U.S.C. § 2105. Following a review of the record and after consideration of the parties' arguments, the Court grants the motion.

## BACKGROUND

### A.   History of the *Delhi*

Defendant is the shipwrecked vessel *Delhi*. (SMF ¶ 1.) The *Delhi* was constructed in 1872-1873 by Captain Richard F.C. Hartley of Saco, Maine. (SMF ¶ 2.) The *Delhi* was a wooden-hulled, two-masted, single-decked, schooner-rigged vessel. (SMF ¶ 3.) As initially constructed, the *Delhi* was 204 tons, 113.1 feet long, 28 feet beam, and 8.1 feet deep. (SMF ¶ 4.) The *Delhi* shipped coal. (SMF ¶ 5.) In or around 1879, the *Delhi* was

retrofitted.  (SMF ¶ 6.)  The retrofit added a second deck to the *Delhi* and increased the vessel's depth to 12.5 feet and tonnage to 266 tons.  (SMF ¶ 7.)

After the American Civil War, Maine became a center of the granite industry in New England.  (SMF ¶ 8.)  The primary carriers of granite from New England ports were two- and three-masted schooners that began life as general traders and were later retrofitted for the stone trade.  (SMF ¶ 15.)  At the time, it was commonly remarked that "when a vessel got too old for even lumber coasting out of Bangor, or carrying wood for the Rockland lime kilns, she was considered none too ripe for the stone business and was often loaded to the scuppers with paving or huge blocks of granite."  (SMF ¶ 16.)  Due to the weight of the cargo, vessel loss was relatively common.  (SMF ¶ 17.)  A wooden-hulled two- or three- masted schooner ranging from 70 to 130 feet was the most common vessel lost.  (SMF ¶ 18.)

On or about April 14, 1893, Campbell & Macomber of Quarryville loaded the *Delhi* with more than 10,000 granite paving stones.  (*See* SMF ¶ 19.)  Shortly after leaving port, the *Delhi* struck ice and sank within view of the shore.  (SMF ¶ 21.)  The *Ellsworth American* covered the story of the *Delhi* sinking in an article dated April 20, 1893. (SMF ¶ 22.)  The *Delhi*'s casualty was also reported in Lloyd's Register of British and Foreign Shipping: Returns of Vessels Totally Lost, Condemned, & c. (July 29, 1893).  (SMF ¶ 23.)

There is no evidence that the *Delhi* was insured, but her cargo might have been.  If the *Delhi*'s cargo was insured, the policy might have been written by Western Assurance

2

Company of Canada. (SMF ¶ 24.) Intact Insurance Company (or a related entity) appears to be the corporate successor to Western Assurance Company of Canada. (*See* SMF ¶ 25.)[1]

According to oral tradition, the *Delhi*'s masts protruded above the water at low tide until World War II, when the Coast Guard cut the masts. (SMF ¶ 34.) The *Delhi* now lies under approximately 120 feet of water. (SMF ¶ 38.) The waters in the area are tidal and navigable. (SMF ¶ 39.) The submerged lands in the area are owned by the State of Maine in trust for the public. (SMF ¶ 40.)

By the time the *Delhi* sank in 1893, some underwater salvage operations were feasible. (*See* SMF ¶ 26.)[2] For example, in the winter of 1877-1878, the schooner *Joseph Farewell* sank in deep water in Long Island Sound with granite cargo valued at $23,682. (*See* SMF ¶ 27.) That same winter, wreckers salvaged *Joseph Farewell*'s cargo. (SMF ¶ 28.) The *Delhi*'s cargo and the vessel itself could possibly have been recovered in the 1890s, if they were worth salvaging. (*See* SMF ¶ 29; Pl. Response to SMF ¶ 29.)

---

[1] JJM asserts that Intact Assurance Company, the Canadian corporate entity for Intact Insurance, is the corporate successor to Western Assurance Company of Canada – but the affidavit it cites does establish as much, as the affidavit references Intact Insurance and relies on a "quick internet search" for the notion that Intact Insurance has acquired all the interests of Western Assurance Company. (*See* Pl. Response to SMF ¶ 25; Ford Dec. ¶¶ 8-10, ECF No. 91-2; State's Reply at 3.) The Court will discuss below the significance of the potential interest of Intact Insurance.

[2] The State asserts that the commercial diving industry and underwater salvage were "well formed and established by 1893." (SMF ¶ 26.) Although the record citation establishes only that wreckers performed two specific salvage operations in 1878, (Mohney Dec. Ex. 2 at SOM 2573-2574, ECF No. 80-2), other evidence in the record supports the State's assertion. (McBrian Report Annex 4 at 30, ECF No. 79-8.) JJM denies the State's assertion, citing decisions from other courts making findings regarding the feasibility of underwater salvage operations at different depths, and at different points in time, based on the records in those cases. (Pl. Response to SMF ¶ 26.) The records in other cases, however, do not constitute facts the Court can rely on in this case when assessing the parties' summary judgment arguments.

**B.    Discovery of the *Delhi***

The members of JJM began looking for the *Delhi* during the summer of 2022.  (*See* SMF ¶ 35; PSAF ¶ 109.)  After conducting significant historical research, JJM discovered the *Delhi* in the summer of 2023 using side scan sonar, a remote sensing technique, and multiple dives to confirm the wreck's identity.  (SMF ¶¶ 36-37; PSAF ¶ 110.)  The first two dives were conducted in November 2023 by Justin Seavey, a technical diver hired by JJM.  (PSAF ¶ 111.)  The first dive was unsuccessful, but Seavey located the wreck on his second dive.  (PSAF ¶ 112.)  Seavey investigated what was below the substrate and noted that there was wood and stone debris in the area immediately surrounding the vessel. (PSAF ¶ 113.)  Before surfacing, Seavey retrieved one of the granite pavers and a wooden plank that was attached to the vessel and protruding from the muddy seafloor; he was able to remove these items without the use of any tools.  (*See* PSAF ¶ 114; Reply to PSAF ¶ 114.)  The paver removed from the *Delhi* measures approximately 6 inches by 3.5 inches by 10 inches and weighs about 25 pounds.  (SMF ¶ 20.)

JJM and the State each assembled a survey team to examine the wreck.  (SMF ¶ 47.) Captain Richard Simon of Shoreline Diving led JJM's survey team.  (SMF ¶ 48.)  To examine the *Delhi*, JJM's survey team used side scan sonar and human divers.  (*See* SMF ¶ 49; Pl. Response to SMF ¶ 49.)  JJM's dive team—Simon, Robert Foster, and Eric Takakjian—conducted two dives and took video footage during the dives.  (*See* SMF ¶ 50; PSAF ¶ 115.)  JJM's sonar images of the *Delhi* depict the vessel's stern.  (SMF ¶ 51.)  The images provide an impression of what is on the seafloor, but do not show what is beneath the seafloor.  (*See* SMF ¶ 52; Pl. Response to SMF ¶ 52.)

JJM's team measured the overall wreck site; the team observed the stern post extending from the seafloor but did not measure it.  (SMF ¶¶ 53-54.)  JJM's team also observed other visible timbers, including timbers that join at perpendicular angles—not all of which are necessarily from the wreck—and thousands of granite pavers.  (*See* SMF ¶ 55; Pl. Response to SMF ¶ 55.)  JJM video recorded less than half of its first dive because when the divers started working, visibility declined.  (SMF ¶ 56.)  Although visibility was limited to zero to two or three feet during the dives, JJM's divers were able to view the wreck and note its condition in person.  (*See* PSAF ¶ 116; Reply to PSAF ¶ 116.)  JJM's divers probed the mud at the site with their hands and arms and felt some scattered timbers.  (*See* SMF ¶ 57; Pl. Response to SMF ¶ 57.)  Simon investigated whether any of the wreck was still intact under the substrate by reaching his arm into the mud all the way to his shoulder, probing at multiple locations around the site.  (PSAF ¶ 118.)  Simon did not try to move any pieces of the wreck, but he did attempt to pick up some of the granite pavers strewn across the site.  (PSAF ¶ 121.)  Simon was able to easily remove the pavers from the substrate by hand and believed that any pavers beneath the substrate could also easily be removed by hand due to the looseness of the sediment.  (PSAF ¶ 122.)  After examining the wreck, Simon authored a report titled Mount Desert Island Shipwreck Investigation and Identification (Simon Report, ECF No. 83-2).  (SMF ¶ 58.)

Maritime archaeologist Connor McBrian led the State's survey team.  (SMF ¶ 59.)  To examine the *Delhi*, the State's survey team used a remotely operated vehicle (ROV), and video recorded its examination.  (SMF ¶ 60.)  The State's field examination consisted of five individual ROV dives over two days.  (SMF ¶ 61.)  To deal with visibility

limitations, the State's team either kept the ROV off the seafloor or set the ROV on the seafloor and waited for the sediment to clear.  (SMF ¶ 62.)  McBrian determined that the *Delhi*'s stern post extends approximately two meters off the seafloor, which is about half of the vessel's estimated original height of four meters.  (*See* SMF ¶ 64.)  Based on what was visible, the *Delhi*'s dimensions, and site formation processes, he concluded that the bottom portion of the stern post is buried in the seabed.  (*See* SMF ¶ 69.)[3]  McBrian advised that past midship, no part of the *Delhi* is visible above the mudline.  (*See* SMF ¶ 67.)  He observed, growing on the silty seafloor in a location where he would expect the bow to be, a type of kelp that attaches only to hard substrate, such as buried portions of the bow or the *Delhi*'s cargo.  (*See* SMF ¶ 68.)  Aside from the ROV work, the State did not conduct further surveys on the site; no one from the State's team personally dove to examine the wreck.  (PSAF ¶ 133.)  After assessing the wreck, McBrian authored a report titled Mount Desert Island Shipwreck Investigation: Maritime Archaeological Assessment (McBrian Report, ECF No. 83-6).  (SMF ¶ 70.)

Whether a vessel will become embedded in submerged lands depends on a number of variables, including vessel construction, wrecking event, and vessel resting location. (*See* SMF ¶ 41; Pl. Response to SMF ¶ 41.)  In general, a vessel that sinks in a protected

---

[3]  McBrian also concluded that other portions of the wreck are buried under the seabed.  (*See* SMF ¶ 69; McBrian Dec. ¶ 16, ECF No. 83-5.)  JJM has presented evidence suggesting that there is not an intact ship below the substrate.  (*See* Pl. Response to SMF ¶ 69; Simon Dec. ¶¶ 22-26, ECF No. 91-6; Takakjian Dec. ¶¶ 21-23, ECF No. 91-7.)

location has a better chance of being better preserved. (*See* SMF ¶ 43.)[4] The seafloor sediments in the vicinity of the *Delhi* are silty and less resistant than hard-alluvial substrate. (*See* SMF ¶ 44.)[5] There is a layer of suspended mud sediment near the seafloor. (*See* SMF ¶ 45; PSAF ¶ 120; Reply to PSAF ¶ 120.) Visibility at the site is limited. (SMF ¶ 46.)

Some portion of the *Delhi* is visible above the seafloor. (SMF ¶ 71.) Some portion of the *Delhi* is not visible above the seafloor. (*See* SMF ¶ 72.) Some portion of the *Delhi* is underneath the mud. (*See* SMF ¶ 73.)[6] More than 1,000 but fewer than 5,000 granite pavers are visible above the mudline at the wreck site. (SMF ¶ 75.) Up to more than half of the total number of pavers are buried in the mud. (SMF ¶ 76.)[7]

## C.    Determination of Eligibility for Listing in National Register of Historic Places

The National Parks Service has identified the following criteria for evaluating eligibility for inclusion on the National Register of Historic Places:

The quality of significance in American history, architecture, archeology, engineering, and culture is present in districts, sites, buildings, structures, and

---

[4] JJM denies SMF ¶ 43 citing examples of vessels that are in better condition than the *Delhi* that are being studied in New England waters. (*See* Pl. Response to SMF ¶ 43; Takakjian Dec. ¶ 19.) But the evidence to which JJM refers does not reflect whether the vessels are resting in protected locations. *See id.*

[5] In SMF ¶ 44, the State also asserts that the seafloor in this location is flat. JJM denies SMF ¶ 44 in its entirety but has generated a dispute only as to the topography (not the texture) of the seafloor at the wreck site – i.e., whether the seabed is flat or bowl-shaped. (*See* Pl. Response to SMF ¶ 44.)

[6] The State asserts that some portion of the wreck is "stuck" in the mud, (SMF ¶ 73), citing Simon's testimony agreeing with the proposition that "some portion of the wreck . . . has got to be stuck in the mud" because some portions of the vessel are protruding from the seafloor. (Simon Dep. at 93.) JJM denies this assertion, pointing to Simon's testimony that the muddy substrate is loose enough to permit the easy manipulation of objects. (Pl. Response to SMF ¶ 73; Simon Dep. at 76-77.) Simon also testified that he was unable to say whether portions of the wreck are firmly stuck in the mud because he did not try to remove the stern post or any other timbers. (Simon Dep. at 121-22.)

[7] It is unclear whether all of the pavers could be safely removed by hand without special equipment. (*See* SMF ¶¶ 77-78.) There is conflicting evidence in the record on this subject. (*Compare* Jarrett Dep. at 63-64, ECF No. 83-13, *with* Simon Dec. ¶¶ 20-21).

objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association and

> (a) that are associated with events that have made a significant contribution to the broad patterns of our history; or
>
> (b) that are associated with the lives of persons significant in our past; or
>
> (c) that embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or
>
> (d) that have yielded, or may be likely to yield, information important in prehistory or history.

36 C.F.R. § 60.4.

After reviewing all relevant information in his possession, including the McBrian Report and the Simon Report, Maine's State Historic Preservation Officer (SHPO) determined that the *Delhi* shipwreck would be eligible for listing on the National Register of Historic Places under criteria A and D at the local level of significance.  (*See* SMF ¶¶ 80-81; Mohney Dec. ¶ 7.)  Pursuant to 43 U.S.C. § 2105(b), the SHPO requested that the Keeper of the National Register of Historic Places (Keeper) determine whether the *Delhi* shipwreck is eligible for listing in the National Register.  (SMF ¶ 82.)

By letter to the National Register dated July 7, 2025, JJM requested that the Keeper dismiss the SHPO's request regarding the *Delhi*.  (SMF ¶ 83.)  JJM's letter recognized that under the ASA, 43 U.S.C. § 2105(b), "the Keeper may make a determination as to the eligibility of the wreck site for listing on the National Register[.]"  (SMF ¶ 84.)

Thereafter, in response to a request from the Keeper, the SHPO provided the Keeper with a redacted copy of the Simon Report.  (SMF ¶ 85.)  A few days later, the Keeper asked the SHPO to address contradictions between information contained in the SHPO's eligibility determination request and the Simon Report.  (SMF ¶ 86.)  On July 30, 2025, the SHPO responded to that inquiry.  (SMF ¶ 87.)  Two weeks later, the Keeper asked the SHPO to provide a copy of the McBrian Report, and the SHPO promptly obliged.  (SMF ¶¶ 88-89.)  On August 21, 2025, following review of the information in his possession, the Keeper notified the SHPO of his determination that the *Delhi* shipwreck is eligible for listing in the National Register under criterion D at the local level of significance.  (*See* SMF ¶ 90.)

**D.      Potential Interest of Intact Insurance**

In March 2025, the Court suggested that JJM contact Intact Insurance Company directly regarding its potential interest in the *Delhi*.  (SMF ¶ 94.)  JJM did so, notifying Intact Insurance Company in writing of this suit and the possibility that it "might still have a claim to the vessel" and that the Court might "issue a default that would make it more difficult for your company to enter an appearance."  (SMF ¶ 95.)  In May 2025, Intact Insurance Company was reviewing the matter internally.  (SMF ¶ 98.)

On July 25, 2025, the State subpoenaed "Intact Insurance Group USA LLC; Intact Insurance Holdings Group USA LLC" for documents related to the *Delhi*.  (SMF ¶ 100.)  Around that same time, JJM asked Intact Insurance Company whether it had located any records relevant to the *Delhi*.  (SMF ¶ 101.)  JJM informed Intact Insurance Company that the State would "move for summary judgment to exclude Intact, or any other loss payor,

from the case." (SMF ¶ 102.)  On August 7, 2025, counsel for Intact Insurance Specialty Solutions, part of the U.S. corporate entity for Intact Insurance, informed the State that "Intact Insurance Company has no insurance policies or records of documents related to [the] *Delhi* as referenced in your subpoena." (*See* SMF ¶ 103; Pl. Response to SMF ¶ 103.)

On August 25, 2025, JJM informed Intact Insurance Company of the Keeper's eligibility determination.  (SMF ¶ 105.)  The following week, JJM informed Intact Insurance Company of the pending deadlines in the case.  (SMF ¶ 107.)  Around that same time, counsel for Intact Insurance Company emailed JJM's counsel advising that Intact Assurance had not properly been served with the State's subpoena.  (*See* PSAF ¶ 135; Reply to PSAF ¶ 135; Parker Dec. Ex. 11 at 1, ECF No. 82-11.)  JJM subsequently shared this email with the State.  (*See* PSAF ¶¶ 134-135; Reply to PSAF ¶¶ 135-135; Parker Dec. ¶ 12, ECF No. 82.)

Aside from Intact Insurance Company (and its Canadian counterpart), no other person or entity that might have a claim to the *Delhi* or its cargo has been identified.  (*See* SMF ¶ 92; Pl. Response to SMF ¶ 92.)  JJM has not located an insurance policy or evidence of a payout on the *Delhi* or its cargo; as of December 18, 2025, Intact Insurance was continuing to review its files for documents related to the *Delhi*.  (*See* SMF ¶ 93; Pl. Response to SMF ¶ 93.)

## DISCUSSION

Under the ASA, the "United States asserts title to any abandoned shipwreck" that is "embedded in submerged lands of a State" or "on submerged lands of a State and is included in or determined eligible for inclusion in the National Register."  43 U.S.C. §

2105(a).  "The title of the United States to any abandoned shipwreck asserted under [§ 2105(a)] is transferred to the State in or on whose submerged lands the shipwreck is located."  *Id.* § 2105(c).

For sunken ships within its ambit, the ASA displaces the maritime laws of salvage and finds, 43 U.S.C. § 2106(a), which form the basis for JJM's complaint.  In general, the law of salvage "applies when the original owner retains an ownership interest in the ship; a salvor receives a salvage award, but not title to the ship."  *Fairport Int'l Expl., Inc. v. Shipwrecked Vessel, Captain Lawrence*, 177 F.3d 491, 498 (6th Cir. 1999).  When the original owner has abandoned the ship, the law of finds applies, "vesting title in the finder of the ship."  *Id.*

In enacting the ASA and displacing the laws of salvage and finds with respect to certain shipwrecks, Congress clarified that those shipwrecks are "irreplaceable State resources for tourism, biological sanctuaries, and historical research[.]"  43 U.S.C. § 2103(a)(1).  Congress sought to preserve abandoned, embedded, and historic shipwrecks by entrusting states with management of the wrecks and encouraging states to develop policies to protect associated natural resources, guarantee recreational exploration of shipwreck sites, and allow for appropriate recovery of shipwrecks by balancing the historical and environmental values of shipwreck sites. *Ne. Rsch., LLC v. One Shipwrecked Vessel*, 729 F.3d 197, 208-09 (2d Cir. 2013) (citing 43 U.S.C. §§ 2101, 2103).  To establish title to a shipwreck under the ASA, a state must establish that the shipwreck is abandoned,

11

and either the wreck is embedded or the wreck "is included in or determined eligible for inclusion in the National Register." 43 U.S.C. § 2105(a)(3).

Here, the State claims title to the *Delhi* under the ASA, asserting that the undisputed material facts establish that the *Delhi* is abandoned and embedded in Maine's submerged lands and has been determined eligible for listing in the National Register.

## A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, a dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of Lond.*, 637 F.3d 53, 56 (1st Cir. 2011) (quotation marks and citation omitted).  And a fact is "material" if "its existence or nonexistence has the potential to change the outcome of the suit." *Id.* (quotation marks and citation omitted).

"After the moving party has presented evidence in support of its motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quotation marks and citation omitted).

A court reviews the factual record in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015).  If a court's review of the record reveals evidence sufficient to support findings in favor of the nonmoving party on one or more of the nonmovant's claims, a trial-

worthy controversy exists, and summary judgment must be denied as to any supported claim. *Id.* at 78.

**B.      Abandonment**[8]

In the ASA, Congress found that the states have the responsibility of managing resources in state waters and submerged lands, including "certain abandoned shipwrecks, which have been deserted and to which the owner has relinquished ownership rights with no retention." 43 U.S.C. § 2101. For purposes of the ASA, the Supreme Court has clarified, the concept of abandonment "conforms with its meaning under admiralty law." *California v. Deep Sea Rsch., Inc.*, 523 U.S. 491, 508 (1998).

In admiralty cases, courts "have traditionally presumed that when property is lost at sea, title remains with the true owner[.]" *R.M.S. Titanic, Inc. v. The Wrecked & Abandoned Vessel*, 435 F.3d 521, 532 (4th Cir. 2006). This presumption is grounded in the "premise that property previously owned but lost at sea has been taken involuntarily out of the owner's possession and control by the forces of nature at work in oceans and waterways." *Ne. Rsch.,* 729 F.3d at 209 (quotation marks and citation omitted). The Courts of Appeal "differ somewhat" as to the proof necessary to overcome the presumption. Thomas J. Schoenbaum, 2 Admiralty & Mar. Law § 16:7 n.64 (7th ed. 2025).

---

[8] JJM argued in writing that a dispute of material fact exists as to whether the *Delhi* has been abandoned but at oral argument JJM did not contest the issue. In this case, the State claims ownership of the *Delhi*. (Verified Statement of Right or Interest of the State of Maine at 2, ECF No. 24.) The State thus claims that its title to the *Delhi* is not only superior to the right claimed by JJM but is superior to all other interests, including another potential interest raised by JJM (i.e., the potential interest of Intact Insurance Company). Because the State seeks a determination that it holds title to the *Delhi*, the Court will assess whether the record establishes that the *Delhi* has been abandoned even though JJM did not contest the issue at oral argument.

The United States Court of Appeals for the First Circuit has evidently not had occasion to consider the element of abandonment under the ASA, or the burden of proof applicable to that element. The First Circuit has, however, assessed the meaning of the term "abandoned" in an admiralty case, where, prior to enactment of the ASA, it considered whether to apply the law of finds or the law of salvage to property retrieved from the ocean floor. *Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked & Abandoned Steam Vessel*, 833 F.2d 1059, 1065 (1st Cir. 1987). The First Circuit concluded that the law of finds was appropriately utilized when articles recovered from the seafloor had been "presumptively abandoned, *i.e.*, either affirmatively renounced, or so long lost that time can be presumed to have eroded any realistic claim of original title[.]" *Id.* Applying the latter principle of inferential abandonment, the First Circuit affirmed the district court's decision to apply the law of finds where 73 years had elapsed from the sinking of the vessel until its discovery and no person had appeared to assert any claim of ownership after the petitioner initiated an action against the vessel *in rem*. *See id.*

In other jurisdictions—including the Second, Fourth, and Sixth Circuits—courts impose a high burden of proof of abandonment in admiralty cases and require clear and convincing evidence of abandonment for purposes of the ASA. *Ne. Rsch.*, 729 F.3d at 209-10; *Fairport Int'l*, 177 F.3d at 500-01; *see also Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 464-65 (4th Cir. 1992); *but cf. Fairport Int'l*, 177 F.3d at 502-03 (Moore, concurring in part) (disagreeing that clear and convincing standard should apply because it "would run counter to the expressed intention of Congress to place title to . . . abandoned shipwrecks in the hands of the states"). "In determining whether clear and

14

convincing evidence supports" an inference of abandonment, "courts consider a variety of factors, including lapse of time, the location and circumstances of the wreck, whether parties presently claim ownership, whether such parties have attempted to locate or salvage the vessel, and the availability of technology to do so." *Ne. Rsch.*, 729 F.3d at 211. "For example, an owner's failure to salvage a vessel despite the availability of technology to do so may support an inference that the owner has abandoned his property, while the technical infeasibility of salvage may deprive the owner's inaction of evidentiary significance." *Id.*

Regardless of the applicable standard, the State has established abandonment. The *Delhi* sank in 1893, loaded with granite paving stones, within view of the shore. There were witnesses to the sinking and the loss was covered by the local newspaper. According to oral tradition, the *Delhi*'s masts protruded above the water at low tide until World War II, when the Coast Guard cut the masts. Despite awareness of the wreck, there is no evidence that any salvage efforts were attempted for nearly 130 years. When the *Delhi* sank, it was 20 years old and might have been approaching the end of its useful life. The age of the vessel and the decline of the granite industry in the years that followed call into question the economic worth of the wreck and its cargo and the then-owners' interest in recovery. Indeed, the parties agree that salvage was not economically practicable in 1893. (*See* Motion at 12, ECF No. 87; Pl. Opp. at 6, ECF No. 90; Pl. Response to SMF ¶ 29.) Moreover, no person or entity has appeared in the case to assert an ownership interest in the wreck or its cargo.

On the question of technology, the State has carried its burden of making an initial showing that it is possible that the *Delhi* and its cargo could have been recovered from the

15

ocean floor in the 1890s.  (*See* SMF ¶ 29;; *see also* Reply at 4; McBrian Report Annex 4 at 30.)  The record includes no genuine disputed fact regarding the technological feasibility of salvage operations in the 1890s. That is, there are no materials in the record that suggest a factual dispute regarding feasibility.  Further, given that the *Delhi* remained largely undisturbed for nearly 130 years, even as the technology inarguably improved, the record supports an inference of abandonment.  *See Ne. Rsch.*, 729 F.3d at 213 (discerning genuine dispute of fact regarding the technological possibility of salvage in the 1850s based on conflicting record evidence at summary judgment, but nevertheless inferring abandonment where salvage was not attempted "despite advances in deep-water salvage in the intervening years").

Finally, Intact Insurance Company's potential interest in the *Delhi*'s cargo does not generate a genuine dispute of material fact necessitating a trial.  The record suggests that the *Delhi*'s cargo was insured.  If the cargo was insured, the policy might have been written by Western Assurance Company of Canada.  Intact Insurance Company (or a related Canadian entity) appears to be the corporate successor to Western Assurance Company of Canada.  Aside from Intact Insurance Company (and its Canadian counterpart), no other person or entity that might have a claim to the *Delhi* or its cargo has been identified.  Intact Insurance Company received constructive notice of this action in April 2024 when JJM caused notice of the *Delhi*'s arrest to be published in the *Bangor Daily News*.  Intact Insurance Company later received explicit notice of this lawsuit from JJM in March 2025.  In response to a subpoena, Intact Insurance Company advised the State in August 2025 that it had no insurance policies or other documents related to the *Delhi*.  Thereafter, Intact

16

Assurance advised that it had not been properly served with the State's subpoena. The State moved for summary judgment in November 2025. As of December 2025, Intact Insurance Company was continuing to review its records for documents related to the *Delhi*.

At this point, Intact Insurance Company has been on explicit notice of the suit for more than a year, but it has not sought to intervene or suggested that it has a basis to do so. Although the record suggests that the *Delhi*'s cargo was insured, there is no evidence that the insurer paid a claim on the cargo or any other evidence suggesting Intact Insurance Company has a legitimate claim to assert. Under the circumstances, Intact Insurance Company's potential interest in the suit amounts to nothing more than unsubstantiated speculation; it does not give rise to a reasonable inference of non-abandonment.

Accounting for all of the relevant factors, the record establishes an inference of abandonment, even under the clear and convincing standard – i.e., to a high degree of probability. *See Ne. Rsch.*, 729 F.3d at 212-14 (reaching same conclusion on a similar set of facts under the clear and convincing standard). The *Delhi* has sat on the ocean floor off the coast of Maine for more than a century, during which time there were no recovery attempts. There is no genuine dispute regarding the technological feasibility of salvage: it might have been possible in 1893. However, the parties agree that salvage would not have been economically viable at that time, supporting an inference of abandonment. Moreover, the only entity that might have a claim against the *Delhi* and its cargo has had more than a year to search for records related to the *Delhi* and to evaluate whether to intervene. No

records have been produced, and intervention has not occurred. Under the circumstances, the State has established abandonment.

## C. Embeddedness

For purposes of the ASA, the term "embedded" means "firmly affixed in the submerged lands . . . such that the use of tools of excavation is required in order to move the bottom sediments to gain access to the shipwreck, its cargo, and any part thereof[.]" 43 U.S.C. § 2102(a). "The statute thus indicates that an embedded wreck is one that is at least partially buried." *Zych v. Unidentified, Wrecked & Abandoned Vessel, Believed to be the Seabird*, 941 F.2d 525, 529 (7th Cir. 1991); *accord* Roberto Iraola, The Abandoned Shipwreck Act of 1987, 25 Whittier L. Rev. 787, 817 & n.131-132 (2004) (collecting cases and referencing commentary suggesting that the standard for establishing embeddedness is not onerous, and is met where item in question is partially buried).[9]

"Tools of excavation are tools used to remove or displace bottom sediments . . . to gain access to embedded shipwrecks." Abandoned Shipwreck Act Guidelines, 55 Fed. Reg. 50116-01, 50117 (Dec. 4, 1990). Examples include: "dredges; explosives; propeller wash deflectors; air lifts; blowtorches; induction equipment; chemicals; and mechanical

---

[9] The definition of embedded under the ASA is consistent with the embeddedness exception to the common law of finds. *See Zych*, 941 F.2d at 530 n.7 (quoting H.R. Rep. No. 100-514, pt. 2, at 7, for the proposition that embeddedness under the ASA is to be "consistent with the recognized exception from the law of finds for shipwrecks embedded in submerged lands of a state"). Under the embeddedness exception, when abandoned property is embedded in the land, that property belongs not to the finder but the owner of the land. 1 Am. Jur. 2d *Abandoned, Lost & Unclaimed Property* § 23 (2026) (collecting cases). "[P]roperty need not be totally buried to satisfy the embeddedness" exception. *Chance v. Certain Artifacts Found & Salvaged from The Nashville*, 606 F. Supp. 801, 806 (S.D. Ga. 1984). Where "a portion of the find is firmly affixed to the land, then even though other portions of it lie in loose surface soil, title to the entire find nevertheless rests with the land owner." *Id.* at 806-07.

tools used to remove or displace bottom sediments . . . to gain access to shipwrecks." *Id.* at 50121. These examples "clearly indicate that diving equipment normally worn by recreational divers while exploring or viewing shipwreck sites are not considered to be tools of excavation." *Id.* at 50117.

The record reveals a genuine dispute regarding how much of the *Delhi* remains. Based on ROV footage of the *Delhi*, McBrian saw what he believed to be the *Delhi*'s stern post and timbers attached to the stern post near the mudline. (*See* SMF ¶ 63.) He believes that over 40% of the original vessel's structure remains, "including a keel that is at least 45 feet in length and probably close to 12 inches in width and depth" buried under several feet of sediment and under thousands of granite blocks. (McBrian Report Annex 4 at 29.) Based on physical examination during his dives, Simon disagrees: he submits that the *Delhi* is "just an incomplete skeleton of a few deteriorated timbers" sitting within a layer of suspended sediment. (Simon Report at 19.) The parties have identified conflicting evidence regarding whether there is any continuity to the remainder of the *Delhi*, whether the wreck has an interior, and whether timbers connecting the stern post to the keel and the keelson are buried in the seabed. (*See* SMF ¶¶ 65-66, 69; McBrian Dep. at 29, ECF No. 83-4; McBrian Dec. ¶ 16; Pl. Response to SMF ¶¶ 65-66, 69; Simon Dec. ¶¶ 13, 22-26; Takakjian Dec. ¶¶ 21-23.) They have also presented conflicting evidence as to whether tools of excavation would be necessary to remove all the pavers from the wreck. (*See* SMF ¶¶ 77-78; *compare* Jarrett Dep. at 63-64 *with* Simon Dec. ¶¶ 20-21.)

JJM contends that the record reflects a "classic battle of experts that cannot be resolved on summary judgment." (Pl. Opp. at 10.) The State maintains that the expert

disputes are immaterial; it believes that the undisputed facts establish that the *Delhi* is embedded within the meaning of the ASA.

The mere fact that the parties' experts offer conflicting opinions does not necessarily preclude summary judgment. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 346 F. Supp. 3d 174, 193-94 (D. Mass. 2018) (recognizing that "competing expert reports alone do not necessarily preclude summary judgment" particularly where the undisputed facts contradict one side's expert opinion); *see also In re Fresneius GranuFlo/NaturaLyte Dialysate Prods. Liab. Litig.*, 691 F. Supp. 3d 280, 299 (D. Mass. 2023) (granting summary judgment to defendant despite opinions of plaintiff's experts where expert opinions were either conclusory assertions or were undermined by the testimony and admissions of plaintiff's experts). As to embeddedness in this case, the question is whether the record, which includes the expert opinions, would allow a factfinder to find that the *Delhi* is embedded as contemplated by the ASA.

There is no dispute that some portion of the *Delhi* is visible above the seafloor. (SMF ¶ 71.) There is no dispute that some portion of the *Delhi* is not visible above the seafloor. (*See* SMF ¶ 72; *see also supra* n.7.) There is also no dispute that some portion

20

of the *Delhi* is underneath the mud.  (*See* SMF ¶ 73; *see also supra* n.8.)[10]

Under the ASA, the fact that a portion of the *Delhi* might be below the surface of seafloor and even "stuck in the mud" is not dispositive.  The issue is whether tools of excavation are necessary to gain access to the subsurface portion or portions of the *Delhi*. 43 U.S.C. § 2102(a).

The State argues that the summary judgment record establishes that more than hand tools would be required to excavate at least some portion of the *Delhi* and, therefore, tools of excavation are required to remove the *Delhi*.[11]  The State contends that because JJM"s expert (Simon) agrees that more than hand tools are needed for excavation, by definition, the *Delhi* is embedded.

In support of its argument, the State cites the following portion of Simon's deposition testimony:

> *State's Attorney*:  Would you agree with me, Mr. McBrian's conclusion is that more than hand tools would be required to fully excavate the *Delhi*; do you agree with me that's his conclusion?

---

[10] As referenced in footnote 6, in the following colloquy during his deposition, JJM's expert (Simon) acknowledged the logic that supports the conclusion that a portion of the stern post is below the seafloor:

> *State's Attorney*: If portions of the vessel are protruding from the sea floor and up into the water, logic tells us that some portion of the wreck, of the ship's wood, has got to be stuck in the mud; right?

> *Simon*: Portions, yes.

(Simon Dep. at 93.)

[11] Although the distinction between hand tools and tools of excavation is not codified in the ASA, in the assessment of the State's motion, the Court will assume the distinction is meaningful and reasonable. During discovery, the parties' experts discussed whether more than hand tools would be necessary to excavate the *Delhi*.

*Simon*:  He says, next to impossible.

*State's Attorney*:  Okay.  So that's his conclusion, it would be next to impossible to fully excavate *Delhi* without using more than just hand tools?

*Simon*: Correct.

*State's Attorney*: Do you agree or disagree with that conclusion?

*Simon*:  If you were going to pick up a wood timber, then, yes.  If you're going to pick up the cobblestones, I could pick them up by hand.

*State's Attorney*:  Just to make sure I'm clear, your distinction is, if the only thing to be excavated are just the pavers, you could do that by hand?

*Simon*:  Correct.

*State's Attorney*:  And if you wanted to excavate –

*Simon*:  The whole wreck site is what he is saying, you need tools.

*State's Attorney*:  More than hand tools?

*Simon*:  Correct.

(Simon Dep. at 135-36.)

The Court is not persuaded that the preceding exchange represents Simon's opinion that "the use of tools of excavation is required in order to move the bottom sediments to gain access to the shipwreck, its cargo, and any part thereof[.]"  43 U.S.C. § 2102(a). Simon distinguishes between "pick[ing] up" wood timbers and "pick[ing] up" pavers. Notably, he was not asked about, and did not comment on, whether more than hand tools would be necessary "to remove or displace bottom sediments to gain access to the shipwreck" or any part thereof. 43 U.S.C. § 2102(a).  One reasonable interpretation of Simon's testimony is that he believes that more than hand tools would be required to bring

the whole shipwreck to the surface of the sea. This interpretation would be consistent with Simon's report and general opinion that, based on his physical inspection of the wreck, which inspection included probing below the surface of the seafloor, there was "not much left" of the wreck. (Simon Dep. at 96.)

In sum, although the summary judgment record establishes that at least some portion of the *Delhi* is below the seafloor, whether the *Delhi* is embedded is the subject of genuine factual dispute. Given the expert opinion conflict and because the evidence does not otherwise establish that the *Delhi* is embedded, a dispute exists as to whether "the use of tools of excavation is required in order to move the bottom sediments to gain access to" the portions of the *Delhi* that are below the seabed.[12] *Compare New York v. French Creek Marina, LLC*, No. 03-CV-1410, 03-CV-1449, 2005 WL 8171294, at *12 (N.D.N.Y. July 21, 2005) (concluding that summary judgment record supported conclusion that anchor was embedded within the meaning of the ASA and the law of finds where evidence established that anchor was partially buried and diver used hands to access anchor but needed to utilize air filled barrels to break anchor free from sediment); *with Aqua Log, Inc. v. Lost & Abandoned Pre-Cut Logs & Rafts of Logs*, 103 F. Supp. 3d 1369, 1379 (M.D. Ga. 2015) (concluding, on summary judgment, that logs were not embedded where they rested on river bottom and did "not remain in one place due to the current and flow of the river" and where plan to use a winch, cable, and crane to remove logs did not involve tools

---

[12] Although the evidence establishes that some portions of the *Delhi* are below the seabed (e.g., a portion of the stern post), the record does not establish that tools of excavation are necessary to access the subsurface portions as there is no evidence that anyone has attempted to access a portion of the *Delhi* and been unable to do so by hand or with hand tools.

23

of excavation because the tools would not be used "to move bottom sediments to gain access" to the logs).

## D.    Determination of Eligibility for Inclusion in the National Register

Although a factual dispute remains as to embeddedness, the State is nevertheless entitled to summary judgment because the record establishes that the *Delhi* is abandoned on submerged lands of the State and has been "determined eligible for inclusion in the National Register."  43 U.S.C. § 2105(a)(3).

The ASA commits the determination of eligibility for inclusion in the National Register to the Secretary of the Interior, following consultation with the appropriate SHPO. *Id.* § 2105(b).  The statute does not require that the shipwreck be listed in the National Register; instead, it contemplates a determination, by the Secretary of the Interior, that the shipwreck meets the eligibility criteria for inclusion in the National Register.  *See id.*; *see also* H.R. Rep. 100-514, pt. 2, at 7 (1988) ("As to those shipwrecks in the third category [covered by the ASA], the Committee intends that the abandoned shipwrecks should meet the criteria for eligibility for inclusion in the National Register . . . but does not intend that the shipwreck must be listed formally on the Register."); Abandoned Shipwreck Act Guidelines, 55 Fed. Reg. at 50121 ("When a question exists as to the historical significance of a shipwreck that is not listed in or determined eligible for the National Register of Historic Places, any person may make a request to the Secretary of the Interior for a written determination of the shipwreck's eligibility for inclusion in the National Register.").

There is no dispute that the Keeper, after consultation with Maine's SHPO, determined that the *Delhi* is eligible for inclusion in the National Register under criterion

24

D at the local level of significance.  *See* 36 C.F.R. § 60.1(b)(3) (providing that a property may be added to the National Register upon nomination submitted by a SHPO approved by the National Park Service); *id.* § 60.3(f) (defining the Keeper of the National Register as "the individual who has been delegated the authority by" the National Park Service "to list properties and determine their eligibility for the National Register" and providing that the Keeper "may further delegate this authority as he or she deems appropriate"); *id.* § 60.4 (establishing National Register criteria for evaluation).

While JJM questions the Keeper's determination and the process by which the Keeper made the determination, JJM has cited no persuasive authority to suggest that once the determination has been made by the Keeper, the Court can vacate the determination in a collateral action to determine title to a wreck under the ASA.  The plain language of the ASA—that the wreck "is included in" or "determined eligible for inclusion in" the National Register—suggests that the determination is an administrative decision and not a judicial determination.  43 U.S.C. § 2105(a)(3).  Indeed, the statute specifically provides that "[t]he Secretary of the Interior, after consultation with the appropriate State Historic Preservation Officer, shall make a written determination that an abandoned shipwreck meets the criteria for eligibility for inclusion in the National Register of Historic Places under clause (a)(3)."[13]  *Id.* § 2105(b). To the extent that JJM has a right to challenge the Keeper's determination on procedural or other grounds, the challenge would presumably have to

---

[13] As noted above, the Keeper has been delegated the authority to make the determination.

involve the decision-maker as a party.[14]  To that end, JJM has challenged the Keeper's

determination by way of a separate lawsuit.  *See JJM v. United States Nat'l Park Serv.*,

1:25-cv-00486-LEW (the related action).

Regardless of the merits of JJM's challenge to the determination in the related

action, the summary judgment record in this case establishes that the Keeper made the

eligibility determination.  For purposes of the ASA, therefore, the *Delhi* has been

"determined eligible for inclusion in the National Register." 43 U.S.C. § 2105(a)(3).  That

is, the relevant element of the ASA is satisfied where, as here, the eligibility determination

has been made by the Keeper (exercising delegated powers) in consultation with the SHPO.

### CONCLUSION

Following a review of the record, for the reasons explained herein, the Court finds

no material disputed facts that would warrant a trial as to whether the State of Maine holds

title to the *Delhi* under the Abandoned Shipwreck Act, 43 U.S.C. § 2105.  The summary

judgment record establishes that the *Delhi* is abandoned and has been determined eligible

for inclusion in the National Register.  Accordingly, the Court grants the State's motion for

summary judgment.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 23rd day of June, 2026.

---

[14] The Court's observation should not be construed to suggest that JJM has a cause of action against the Keeper or the relevant agency.  Whether JJM can challenge the determination and, if so, whether JJM can prevail on its challenge, will presumably be among the issues raised by the parties and addressed by the court in the related action.